**Exhibit 1:** Plaintiffs' Complaint for Injunctive and Declaratory Relief (with attached exhibits)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE; PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; WHOLE WOMAN'S HEALTH; WHOLE WOMAN'S HEALTH ALLIANCE; SOUTHWESTERN WOMEN'S SURGERY CENTER; BROOKSIDE WOMEN'S MEDICAL CENTER PA d/b/a BROOKSIDE WOMEN'S HEALTH CENTER AND AUSTIN WOMEN'S HEALTH CENTER; and ROBIN WALLACE, M.D., | No. 1:20-cv-323 |

       Plaintiffs,

       v.

GREG ABBOTT, in his official capacity as Governor of Texas; KEN PAXTON, in his official capacity as Attorney General of Texas; PHIL WILSON, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission; STEPHEN BRINT CARLTON, in his official capacity as Executive Director of the Texas Medical Board; KATHERINE A. THOMAS, in her official capacity as the Executive Director of the Texas Board of Nursing; MARGARET MOORE, District Attorney for Travis County; JOE GONZALES, Criminal District Attorney for Bexar County; JOHN CREUZOT, District Attorney for Dallas County; JAIME ESPARZA, District Attorney for El Paso County; KIM OGG, Criminal District Attorney for Harris County; RICARDO RODRIGUEZ, JR., Criminal District Attorney for Hidalgo County; BARRY JOHNSON, Criminal District Attorney for McLennan County; SHAREN WILSON, Criminal District Attorney for Tarrant County; and BRIAN MIDDLETON, Criminal District Attorney for Fort Bend County,

       Defendants.

# COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.      This is a constitutional challenge under 42 U.S.C. § 1983 to an interpretation by the Texas Attorney General of Governor Greg Abbott's March 22, 2020, Executive Order GA 09, "Relating to hospital capacity during the COVID-19 disaster" ("the Executive Order"), as applied to abortion, and to the extent that interpretation is consistent with the Executive Order, a challenge to the order itself. The Texas Attorney General's interpretation is attached as Exhibit A. The Executive Order is attached as Exhibit B. This lawsuit also challenges the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order. The Emergency Rule is attached as Exhibit C.

2.      Citing the ongoing COVID-19 pandemic and the need to preserve hospital capacity and personal protective equipment ("PPE"), the Executive Order prohibits all surgeries and procedures that—as determined by a patient's physician—are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate receipt of such care would be at risk for serious adverse medical consequences or death. It applies to all licensed health care practitioners and all licensed health care facilities in Texas. The Executive Order directs regulated parties to stop performing all covered services, with the exception of procedures that, if performed using the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the PPE needed to cope with the COVID-19 disaster.

3.      The Executive Order took effect the afternoon of March 22, 2020, and will remain in effect until at least April 21, 2020.

App.003

4.      As the American College of Obstetricians and Gynecologists ("ACOG") has recognized, abortion care is essential care because it cannot be delayed without risking the health and safety of the patient. Accordingly, Plaintiffs believe that providing this care is entirely consistent with the Governor's Executive Order.

5.      However, on March 23, 2020, Texas Attorney General Ken Paxton issued a press release singling out abortion providers and suggesting that he believed provision of non-emergency abortions would violate the Executive Order. The release stated that "[t]hose who violate the governor's order will be met with the full force of the law" and threatened criminal penalties, including jail time.

6.      By stating that the Executive Order applies to "*any type* of abortion," the Attorney General's news release suggests it even prohibits medication abortion, which involves only taking medications by mouth and is not "surgery" or a "procedure" that falls within the terms of the Executive Order. *See id.* (emphasis added). This appears to be the only oral medication targeted in this manner.

7.      For nearly fifty years, the U.S. Supreme Court has recognized the fundamental federal constitutional right to make the profoundly personal decision whether to terminate a pregnancy. *See Roe v. Wade*, 410 U.S. 113 (1973). The Supreme Court has repeatedly recognized that this right is foundational to equality and to respect for the dignity, autonomy, and bodily integrity of all people. The "central principle" of *Roe* is that "[b]efore viability, the State's interests are not strong enough to support a prohibition on abortion," *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 846, 871 (1992), regardless whether that prohibition contains an exception to preserve the life or health of the pregnant woman.

3

8.      The Texas Attorney General's enforcement threats are a blatant effort to exploit a public health crisis to advance an extreme, anti-abortion agenda, without any benefit to the state in terms of preventing or resolving shortages of PPE or hospital capacity. As a result of these threats, this week Plaintiffs have already been forced to turn away patients in need of time-sensitive care.

9.      Without injunctive relief, Plaintiffs will be forced to continue turning away patients seeking abortion care. At a minimum, those patients will not be able to obtain an abortion for weeks or even months, given that the COVID-19 pandemic is likely to last far beyond the order's stated expiration date. Some will not be able to access abortion at all and will be forced to carry pregnancies to term. Not only will these patients be deprived of their constitutional right to essential healthcare and self-determination, but forcing them to continue their pregnancies will in fact impose far greater strains on an already-taxed healthcare system, as prenatal care and delivery involve much greater exhaustion of hospital health care services and PPE than abortions. All will be delayed in getting the abortion care they are seeking, with attendant risks to their health, wellbeing, and economic security. This violates Plaintiffs' patients' fundamental constitutional right to decide whether to have an abortion prior to viability.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

11.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

12.      Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PLAINTIFFS

13.     Plaintiff Planned Parenthood Center for Choice ("PP Houston"), a Texas not-for-profit corporation headquartered in Houston, operates a licensed ambulatory surgical center in Houston and a licensed abortion facility in Stafford. PP Houston and its predecessor organizations have provided abortions in Houston and southeast Texas since 1973. PP Houston provides a range of reproductive health services, including medication and procedural abortions. PP Houston sues on behalf of itself, its staff, physicians, nurses, and patients.

14.     Plaintiff Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services") is a Texas not-for-profit corporation, headquartered in Dallas. PPGT Surgical Health Services and its predecessor organizations have provided high-quality reproductive health care in Texas for decades. PPGT Surgical Health Services operates licensed ambulatory surgical centers in Austin, Dallas, and Fort Worth, and licensed abortion facilities in Waco and Austin. PPGT Surgical Health Services provides a range of reproductive health services, including medication and procedural abortions. PPGT Surgical Health Services sues on behalf of itself, its staff, physicians, nurses, and patients.

15.     Plaintiff Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), a not-for-profit corporation headquartered in San Antonio, operates a licensed ambulatory surgical center and a licensed abortion facility in San Antonio. PPST Surgical Center provides a range of reproductive health services, including medication and procedural abortions. PPST Surgical Center sues on behalf of itself, its staff, physicians, nurses, and patients.

16.     Plaintiff Whole Woman's Health operates licensed abortion facilities in Fort Worth and McAllen. Whole Woman's Health provides a range of reproductive health services, including medication and procedural abortions. Whole Woman's Health sues on behalf of itself, its staff, physicians, nurses, and patients.

5

17.     Plaintiff Whole Woman's Health Alliance is a Texas not-for-profit corporation. Its mission is to provide abortion care in underserved communities and shift the stigma around abortion in our culture. It operates a licensed abortion facility in Austin that provides both medication and procedural abortions. Whole Woman's Health Alliance sues on behalf of itself, its staff, physicians, nurses, and patients.

18.     Plaintiff Southwestern Women's Surgery Center ("Southwestern") operates a licensed ambulatory surgical center in Dallas. Southwestern provides a range of reproductive health services, including medication and procedural abortions. Southwestern sues on behalf of itself, its staff, physicians, nurses, and patients.

19.     Plaintiff Robin Wallace, M.D. is co-medical director at Southwestern. Dr. Wallace is a board-certified family medicine physician who provides abortion care. Dr. Wallace sues on her own behalf and on behalf of her patients.

20.     Plaintiff Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center ("Austin Women's") operates a licensed abortion facility in Austin. Austin Women's provides a range of reproductive health services, including medication and procedural abortions. Austin Women's sues on behalf of itself, its staff, physicians, nurses, advanced practice registered nurses, and patients.

### DEFENDANTS

21.     Defendant Greg Abbott is the Governor of Texas and the author of the Executive Order, which he issued pursuant to his emergency authority.[1] He is sued in his official capacity and may be served with process at 1100 San Jacinto Blvd., Austin, Texas 78701.

---

[1] Tex. Gov't Code § 418.012.

App.007

22.     Defendant Ken Paxton is the Attorney General of Texas. He is empowered to assist county and district attorneys in the prosecution of criminal offenses,[2] including criminal violations of the Executive Order. He authored the challenged legal interpretation of the Executive Order. He is sued in his official capacity and may be served with process at 300 West 15th Street, Austin, Texas 78701.

23.     Defendant Phil Wilson is the Acting Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). HHSC is authorized to enforce violations of the Executive Order administratively.[3] As Executive Commissioner, Mr. Wilson has general supervision and control over all matters relating to the health of the people of Texas.[4] He is sued in his official capacity and may be served with process at 4900 N. Lamar Blvd., Austin, TX 78751.

24.     Defendant Stephen Brint Carlton is the Executive Director of the Texas Medical Board ("TMB"). TMB is authorized to enforce violations of the Executive Order using administrative action against physicians and physician assistants licensed in Texas.[5] TMB has implemented the Executive Order through its Emergency Rule. As Executive Director, Mr. Carlton serves as the chief executive and administrative officer of the Board.[6] He is sued in his official capacity and may be served with process at 333 Guadalupe, Tower 3, Suite 610, Austin, TX 78701.

25.     Defendant Katherine A. Thomas is the Executive Director of the Texas Board of Nursing ("TBN"). TBN is authorized to enforce violations of the Executive Order using

---

[2] *Id*. § 402.028.
[3] Tex. Health & Safety Code §§ 243.0115, 245.012(c); 25 Tex. Admin. Code §§ 135.24(a)(1)(F), 139.32(b)(6); Tex. Gov't Code § 531.02011(2) (transferring all "regulatory functions . . . of the Department of State Health Services" to HHSC).
[4] Tex. Health & Safety Code Ann. § 12.001(a).
[5] Tex. Occ. Code § 164.051; 22 Tex. Admin. Code § 185.17(11).
[6] Tex. Occ. Code § 152.051.

administrative action against nurses licensed in Texas.[7] As Executive Director, Ms. Thomas performs duties as required by Chapter 301 or designated by the board.[8] She is sued in her official capacity and may be served with process at 333 Guadalupe, Suite 3-460, Austin, TX 78701-3944.

26.    Defendant Margaret Moore is the District Attorney for Travis County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Travis County. She is sued in her official capacity and may be served with process at 509 West 11th Street, Room 300, Austin, Texas 78701.

27.    Defendant Joe Gonzales is the Criminal District Attorney for Bexar County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Bexar County. He is sued in his official capacity and may be served with process at 101 West Nueva Street, 4th Floor, San Antonio, Texas 78205.

28.    Defendant John Creuzot is the District Attorney for Dallas County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Dallas County. He is sued in his official capacity and may be served with process at 133 North Riverfront Boulevard, LB 19, Dallas, Texas 75207.

29.    Defendant Jaime Esparza is the District Attorney for El Paso County. He is responsible for prosecuting criminal violations of the Executive Order occurring in El Paso County. He is sued in his official capacity and may be served with process at El Paso County Courthouse, 500 East San Antonio Avenue, Room 201, El Paso, Texas 79901.

30.    Defendant Kim Ogg is the Criminal District Attorney for Harris County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Harris County.

---

[7] *Id.* § 301.452.
[8] *Id.* § 301.101.

She is sued in her official capacity and may be served with process at 1201 Franklin Street, Suite 600, Houston, Texas 77002.

31.     Defendant Ricardo Rodriguez, Jr., is the Criminal District Attorney for Hidalgo County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Hidalgo County. He is sued in his official capacity and may be served with process at 100 East Cano, Edinburg, Texas 78539.

32.     Defendant Barry Johnson is the Criminal District Attorney for McLennan County. He is responsible for prosecuting criminal violations of the Executive Order occurring in McLennan County. He is sued in his official capacity and may be served with process at 219 North 6th Street, Suite 200, Waco, Texas 76701.

33.     Defendant Sharen Wilson is the Criminal District Attorney for Tarrant County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Tarrant County. She is sued in her official capacity and may be served with process at the Tim Curry Criminal Justice Center, 401 West Belknap Street, Fort Worth, Texas 76196-0201.

34.     Defendant Brian Middleton is the Criminal District Attorney for Fort Bend County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Fort Bend County. He is sued in his official capacity and may be served with process at 1422 Eugene Heimann Circle, Suite 21004, Richmond, TX 77469.

## FACTUAL ALLEGATIONS

### A. Abortion Generally and As Provided in Texas

35.     Pregnancy is commonly measured from the first day of the pregnant person's last menstrual period ("LMP"). A full-term pregnancy has a duration of approximately forty weeks LMP. In Texas, abortion is almost entirely banned about halfway through pregnancy, at twenty-two weeks LMP.

App.010

36.     Up to ten weeks LMP, patients wishing to terminate their pregnancy can choose between medication abortion (where the patient takes pills to end and expel the pregnancy) and abortion by procedure or "procedural abortion," as it is commonly called (where a clinician uses gentle suction, sometimes along with instruments, to empty the patient's uterus). After ten weeks LMP, only procedural abortion is available in Texas.

37.     Medication abortion involves the patient ingesting a combination of two pills: mifepristone and misoprostol. The patient takes the first medication, mifepristone, in the health center and then, typically twenty-four to forty-eight hours later, takes the second medication, misoprostol, at a location of their choosing, most often at home, after which they expel the pregnancy in a manner similar to a miscarriage. While medication abortion is safe and effective up to eleven weeks LMP, Texas law prohibits medication abortion after ten weeks LMP.[9]

38.     Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery," as it involves no incisions and no need for general anesthesia. In a procedural abortion, the clinician uses gentle suction from a thin, flexible tube to empty the contents of the patient's uterus. Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods. Beginning around fifteen weeks LMP, clinicians generally must use instruments to complete the procedure, a technique called dilation and evacuation ("D&E"). Later in the second trimester, the clinician may begin cervical dilation the day before the procedure itself.

39.     Both medication abortion and procedural abortion are effective in terminating a pregnancy. For some patients, however, one method is medically indicated over the other. For example, a patient may be allergic to one of the medications used in medication abortion, or may

---

[9] *See* Tex. Health & Safety Code § 171.063(a)(2).

have medical conditions that make procedural abortion relatively more safe.[10] According to the latest data from the Texas Department of Health and Human Services, in 2017, more than 68 percent of all abortions in the state were procedural abortions.[11]

40.     Legal abortion is one of the safest medical procedures in the United States.[12] The vast majority of abortions in the United States are provided in an outpatient setting. In comparison, more than ninety-eight percent of births in the United States take place in a hospital.[13] Complications from both medication and procedural abortion are rare, and when they occur, they can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a follow-up visit. Major complications—defined as complications requiring hospital admission, surgery, or blood transfusion—occur in less than one-quarter of one percent (0.23%) of abortion cases: specifically, such complications arise in just 0.31% of medication abortion cases, 0.16% of first-trimester procedural abortion cases, and 0.41% of procedural cases in the second trimester or later.[14] Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States.[15]

---

[10] Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 8 (2018) ("Few women are medically ineligible for abortion. There are, however, specific contraindications to using mifepristone for a medication abortion or induction.").

[11] Tex. Health & Human Servs., 2017 Induced Terminations of Pregnancy by Post-Fertilization Age and Procedure (2018), https://hhs.texas.gov/about-hhs/records-statistics/data-statistics/itop-statistics. The remaining 0.1% of abortions before eleven weeks LMP had a reported method of "other/not stated."

[12] Nat'l Acads., *supra* note 10 at 77–78, 162–63.

[13] Marian F. MacDorman et al., Nat'l Ctr. for Health Statistics, NCHS Data Brief No. 144: Trends in Out-of-Hospital Births in the United States, 1990-2012 (2014), https://www.cdc.gov/nchs/products/databriefs/db144.htm.

[14] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015).

[15] Ushma D. Upadhyay et al., *Abortion-related Emergency Room Visits in the United States: An Analysis of a National Emergency Room Sample*, 16(1) BMC Med. 1, 1 (2018).

App.012

41.     Indeed, both medication abortion and procedural abortion are substantially safer than continuing a pregnancy through to childbirth. The risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion,[16] and complications such as hemorrhage are far more likely to occur with childbirth than following an abortion.

42.     Even with an uncomplicated pregnancy in an otherwise healthy individual, carrying a pregnancy to term and giving birth poses serious medical risks and can have long-term medical and physical consequences. For a person with a medical condition caused or exacerbated by pregnancy or for a person who receives a diagnosis of a severe or lethal fetal anomaly, these risks are increased.

43.     People decide to end a pregnancy for a variety of reasons, including familial, medical, financial, and personal reasons. Some people end a pregnancy because they conclude it is not the right time in their lives to have a child; some do so because they already have one or more children and decide they cannot add to their families; some do so to preserve their life, health, or safety; some do so because they receive a diagnosis of a fetal anomaly; some do so because they have become pregnant as a result of rape or incest; and some do so because they choose not to have biological children. Approximately one in four women in this country will have an abortion by age forty-five.

44.     Plaintiffs provide medication abortion, procedural abortion, or both medication and procedural abortion. Plaintiffs provide medication abortion up to ten weeks LMP. Plaintiffs provide procedural abortion to varying gestational points in pregnancy within the bounds of Texas

---

[16] Nat'l Acads., *supra* note 10 at 11, 74–75.

law, which prohibits abortion care except in narrow circumstances at or after twenty-two weeks

LMP.[17]

## B.  The COVID-19 Pandemic

45.     Since first identified in December 2019,[18] COVID-19 has grown to a worldwide

pandemic. The disease has spread to 195 countries, infecting hundreds of thousands of people and

killing more than 16,000.[19] In the United States, the virus has reached every state, including nearly

1,000 confirmed cases and twelve deaths in Texas as of the time of filing.[20] Federal and state

officials and medical professionals expect a surge of infections—which may last for a year or

eighteen months[21]—to test the limits of the healthcare system.[22] Healthcare workers are facing a

shortage of certain types of PPE, particularly N95 masks.[23]

46.     On March 13, 2020, the White House issued a proclamation declaring that the

COVID-19 outbreak in the United States constitutes a national emergency. That same day,

---

[17] Texas Health & Safety Code section 171.044 prohibits abortion when "the probable post-fertilization age of the unborn child is 20 or more weeks." "Post-fertilization age" means "the age of the unborn child as calculated from the fusion of a human spermatozoon with a human ovum," *id*. § 171.042, which occurs approximately two weeks after the first day of a patient's last menstrual period. Thus, twenty weeks post-fertilization is twenty-two weeks LMP.

[18] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. Times (updated Mar. 24, 2020), https://www.nytimes.com/article/coronavirus-timeline.html.

[19] World Health Org., Coronavirus Disease (COVID-19) Pandemic, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last viewed Mar. 24, 2020).

[20] Tex. Dep't of State Health Servs., *Texas Case Counts: COVID-19* (last updated Mar. 24, 2020), https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83.

[21] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[22] Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html.

[23] Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

Governor Abbott issued a disaster declaration certifying that COVID-19 poses an imminent threat of disaster for all counties in Texas.

47.    On March 18, 2020, a group of preeminent national medical organizations issued a joint statement on "Abortion Access During the COVID-19 Outbreak."[24] That guidance instructs that "[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

48.    On March 19, 2020, the Texas Department of State Health Services ("DSHS") determined that COVID-19 constitutes a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code.

49.    On March 21, 2020, the Texas Medical Board ("TMB") issued guidance to its licensees—all physicians licensed in the state of Texas—regarding the scheduling of elective surgeries and procedures in light of Governor Abbott's COVID-19 disaster declaration. Consistent with guidance from the Centers for Disease Control and Prevention ("CDC"), TMB recommended that licensees "postpone all non-urgent elective surgeries and procedures in inpatient and outpatient settings."[25] TMB explained that postponing non-urgent elective cases would preserve PPE, ventilator availability, ICU beds, and "significant healthcare practitioner time."

---

[24] The medical organizations issuing this joint guidance were ACOG, the American Board of Obstetrics & Gynecology, the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine.

[25] Tex. Med. Bd., Texas Medical Board (TMB) Guidance on the Scheduling of Non-Urgent Elective Surgeries and Procedures During Texas Disaster Declaration for COVID-19 Pandemic

50.     As further guidance, TMB clarified that "elective, non-urgent cases" are cases where "there is no anticipated short-term nor long-term negative impact because of delaying a procedure or surgery," such as "screening for a chronic condition or most cosmetic procedures." By contrast, TMB defined "urgent or elective urgent" procedures as those where "there is a risk of patient deterioration or disease progression likely to occur if the procedure is not undertaken or is significantly delayed." Significantly, TMB stressed that for these cases, "[t]he resulting decline in [the patient's] health could make them more vulnerable to COVID-19 and other issues." TMB categorized as "emergent" those cases where the patient would suffer a life-threatening condition if the procedure were not undertaken or cases that cannot be safely delayed for any significant period of time.

51.     Plaintiffs are committed to responding to the current public health crisis, including by preserving much-needed medical resources that are in short supply during the pandemic. Since the onset of the COVID-19 outbreak Plaintiffs have taken precautions to maximize the safety of their patients and staff and to conserve PPE. For example, they have begun screening patients for COVID-19 symptoms before each visit. They have reduced patient volume and/or increased appointment spacing between patients to comply with social-distancing precautions. They have begun requiring patients to wait in their cars rather than in the waiting room after checking in for an appointment. They have postponed or cancelled non-essential procedures that require health care staff to use PPE, such as masks. For procedural abortions and other essential medical procedures, they have reduced use of PPE as much as possible.

52.     Plaintiffs do not provide inpatient care and are not equipped to do so.

---

(Mar. 21, 2020), *available at* http://www.tmb.state.tx.us/idl/05863196-2EC6-BE0E-3036-910D363B6C25.

53.     Abortion does not require extensive use of PPE. Providing patients with pills for medication abortion does not require the use of *any* PPE.

54.     While clinicians use some PPE for procedural abortion—such as gloves, a surgical mask, and protective eyewear—only a small number of health care staff are physically present for these procedures or their preparation/recovery and therefore in need of PPE. Plaintiffs generally do not use N95 respirators, the PPE in shortest supply during the COVID-19 pandemic, and only do so to protect patients and staff from potential COVID-19 transmission. In Plaintiffs' communities there does not appear to be a shortage of the non-sterile gloves Plaintiffs use for procedural abortions and exams.[26]

55.     The COVID-19 pandemic and its fallout do not reduce patients' needs for abortion; if anything, they make timely access to abortion even more urgent, while raising additional obstacles for patients seeking that care.

56.     While much is unknown about COVID-19, including whether it can complicate pregnancy, some pregnant people who are delayed in accessing abortion may be exposed to additional health risks from the disease. ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as

---

[26] U.S. Food & Drug Admin., Medical Glove Conservation Strategies: Letter to Health Care Providers (last updated Mar. 20, 2020), *available at* https://www.fda.gov/medical-devices/letters-health-care-providers/medical-glove-conservation-strategies-letter-health-care-providers (referring to a potential shortage but that the FDA is monitoring for any widespread shortages); U.S. Food & Drug Admin., FAQs on Shortages of Medical Gloves (last updated Mar. 20, 2020), *available at* https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/faqs-shortages-medical-gloves (not noting a shortage of medical gloves at this time, but acknowledging demand could exceed supply, which the FDA is monitoring).

App.017

influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[27]

57.    Meanwhile, Texas legal restrictions on abortion, which are some of the harshest in the country, impose burdens that weigh even more heavily during the current pandemic and that also undermine Defendants' stated goal of preserving PPE. For example, Texas law requires most patients to make at least two in-person appointments for an abortion, even though most patients could obtain care just as safely in one visit.[28] Texas law also mandates medically unnecessary ultrasounds,[29] as well as in-person follow-up visits that could safely be provided through telemedicine.[30] Texas law unnecessarily restricts medication abortion to ten weeks when it can safely be provided through eleven weeks, thereby eliminating an evidence-based method to reduce the need for abortion by procedure.[31] And minor patients, unless emancipated, must obtain either written consent from a parent or a judicial order before they can receive care.[32] During the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity, minimal

---

[27] ACOG, Practice Advisory - Novel Coronavirus 2019 (COVID-19) (March 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

[28] Tex. Health & Safety Code § 171.012 (mandating that patients receive an ultrasound at least twenty-four hours before an abortion procedure).

[29] *Id.*

[30] Tex. Health & Safety Code § 171.063(e); 25 Tex. Admin Code § 139.53(b)(4). Indeed, to respond to the pandemic, the state has suspended restrictions on telemedicine generally, 28 Tex. Admin. Code § 35.1 (emergency regulation adopted Mar. 17, 2020); Tex. Med. Bd., Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Telemedicine During Texas Disaster Declaration for COVID-19 Pandemic (Mar. 19, 2020), http://www.tmb.state.tx.us/idl/A2936385-466D-15D1-0F9E-F486D0491A27, and could suspend the existing restrictions barring Plaintiffs from using telemedicine to provide medication abortion and post-abortion follow-up care. Tex. Occ. Code § 111.005(c); Tex. Health & Safety Code § 171.063(e); 25 Tex. Admin Code § 139.53(b)(4).

[31] Tex. Health & Safety Code § 171.063(a)(2)

[32] Tex. Family Code § 33.003.

public transit availability, and limited childcare assistance due to mandatory social-distancing and shelter-in-place orders.

58.     In addition to all other harms, the pandemic has caused layoffs and other work disruptions, and has shuttered schools and childcare facilities. Unemployment claims are soaring.[33] People who receive health insurance through their employers are being laid off and left without insurance coverage for themselves and their families. Other workers are remaining on the job despite symptoms and increasingly dire public health warnings, fearing the loss of work even more than the disease.

59.     As trusted healthcare providers, Plaintiffs understand their responsibility to be there when their patients need them most.

## C.  The Governor's and Attorney General's Threats to Abortion Access

60.     On March 22, 2020, Governor Abbott issued Executive Order GA 09, barring "all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." The Order states that it is responding to the fact that "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient," and it exempts "any procedure that, if performed in accordance with the commonly accepted standard

---

[33] Chris Costa, *Texas Workforce Commission encourages employers to use 'Shared Work' program instead of layoffs due to COVID-19*, KHOU.com (last updated March 22, 2020), https://www.khou.com/article/news/health/coronavirus/texas-workforce-commission-encourages-employers-to-use-shared-work-program-instead-of-layoffs-due-to-covid-19/285-cdd5527b-7764-4806-af5d-9509f660ef9d ("The Texas Workforce Commission was overwhelmed by thousands of Texans are applying for unemployment benefits because of layoffs and reduced hours due to COVID-19.").

of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *See* Ex. B.

61.    Although the order does not define "personal protective equipment," Plaintiffs understand that term to refer to, for example, surgical masks, sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. Plaintiffs also understand that term to refer to N95 respirators.

62.    Failure to comply with the Executive Order is a criminal offense punishable by a fine of up to $1,000, confinement in jail for up to 180 days, or both fine and confinement. *See* Ex. B. These criminal penalties may in turn trigger administrative enforcement by the Texas Health and Human Services Commission, the Texas Medical Board, and the Texas Board of Nursing, which are authorized to pursue disciplinary action against licensees who violate criminal laws.[34]

63.    To implement the Executive Order, Plaintiffs promptly developed internal policies identifying the relevant factors physicians must consider when making a determination whether a procedure would be permissible under the Order. Those considerations included not only the text of the Order itself, but also the guidance of trusted national medical organizations, which highlight that abortion is a time-sensitive procedure for which delay would cause harm to the patient.

64.    On March 23, 2020, the Texas Attorney General issued a press release titled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight Covid-19 Pandemic." This press release singled out abortion providers multiple times. It suggested that the Attorney General interprets the Executive Order, contrary to its plain language, as prohibiting the

---

[34] 25 Tex. Admin. Code § 139.32(b)(6); 25 Tex. Admin. Code § 135.24(a)(1)(F); Tex. Occ. Code § 164.051(a)(2)(B), (a)(6); 22 Tex. Admin. Code § 185.17(11); Tex. Occ. Code Ann. § 301.452(b)(3), (B)(10).

App.020

provision of non-emergency abortions and warned that "[t]hose who violate the governor's order will be met with the full force of the law." *See* Ex. A.

65.     Because medication abortion involves only taking medications by mouth it is not a "surgery" or "procedure" that falls within the terms of the Executive Order. However, by stating that the Executive Order applies to "*any type* of abortion," the Attorney General's news release suggests that the Attorney General interprets the Executive Order contrary to its plain language as prohibiting medication abortion. *See id.* (emphasis added).

66.     On March 24, 2020, the TMB adopted an emergency rule to enforce the Executive Order. Under preexisting law, the TMB can temporarily suspend or restrict a physician's license if the physician's "continuation in practice would constitute a continuing threat to the public welfare."[35] The Emergency Rule expands this basis for discipline to include "performance of a non-urgent elective surgery or procedure," and incorporates the terms of the Executive Order, requiring all licensed health care professionals to postpone all surgeries and procedures that are not immediately necessary.[36]

67.     If the Executive Order is enforced, as interpreted by the Attorney General (contrary to its plain language), to apply to both procedural abortion and medication abortion, it effectively bans abortion in Texas for the duration of the COVID-19 public health emergency. Given the enforcement threat sparked by the Attorney General's press release and the criminal and other penalties specified in the Executive Order, Plaintiffs, their physicians, nurses, and staff have been and will continue to be forced to cancel scheduled appointments. They must stop providing all

---

[35] 22 Tex. Admin. Code § 187.57(b).
[36] 22 Tex. Admin. Code § 187.57 (emergency regulation adopted Mar. 23, 2020), *available at* https://tinyurl.com/v4pz99u.

App.021

non-emergency abortion care that uses PPE or subject themselves to risk of criminal prosecution or other penalties.

68.     If the Executive Order is understood (consistent with its plain language) as not applying to medication abortion, which is provided through medications by mouth and not a "procedure," it will still effectively outlaw abortion after ten weeks of pregnancy. This interpretation of the Executive Order, allowing medication abortion but not procedural abortion, still operates as a ban for those patients who would otherwise obtain a procedural abortion—that is, all those who are ten or more weeks pregnant and those with earlier pregnancies for whom medication abortion is not appropriate.

69.     Under either interpretation, the Executive Order will deprive Plaintiffs' patients of the freedom to make a very personal decision in consultation with their medical providers, which is all the more weighty given the increased health risks to pregnant persons during the COVID-19 pandemic. It will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families. Patients' abortions will be delayed, and in some cases, denied altogether. As a result, Texas patients will be forced to carry pregnancies to term, resulting in a deprivation of their fundamental right to determine when and whether to have a child or to add to their existing families.

70.     If a person is forced to continue a pregnancy against their will, particularly during a global pandemic, it can pose a risk to their physical, mental, and emotional health, as well as to the stability and wellbeing of their family, including their existing children. Pregnancy, childbirth, and an additional child may exacerbate an already difficult situation for those who have suffered trauma, such as sexual assault or domestic violence. And research has found that women denied an abortion were four times more likely than women who received an abortion to experience

economic hardship and insecurity lasting for years, with serious consequences for those women and their families. As a result of the COVID-19 pandemic, unemployment rates are soaring, meaning that families are losing not only their income but in many cases their employer-provided health insurance; the medical and economic hardships of pregnancy and childrearing, for many families, is thus more acute now than ever.

71.     Delaying abortion poses risks to patients, too. Although abortion is significantly safer than continuing pregnancy through childbirth, the risks associated with abortion increase as pregnancy advances. And carrying an unwanted pregnancy burdens patients physically, emotionally, psychologically, and financially. Finally, in Texas, as in many other states, legal restrictions make abortion harder to access with each passing week—and almost entirely unlawful at or after twenty-two weeks LMP. As ACOG and other well-respected medical professional organizations have observed, abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[37]  For these reasons, abortion is an especially urgent medical treatment during the COVID-19 pandemic.

72.     Patients generally seek abortion as soon as they are able, but many face financial and logistical obstacles that can delay their access to abortion. For example, low-wage workers often have no paid time off or sick leave, so even if a pregnant worker is able to get time off work for an abortion appointment, they will likely have to forgo part of a paycheck. Patients facing long travel distances typically must arrange and pay for transportation and arrange to take time off work. Many patients must also arrange and pay for childcare while they travel to their abortion

---

[37] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

appointment. These barriers routinely delay abortion access for people with low incomes, including delay past the point in pregnancy when medication abortion is no longer available, and for some, to the point that a more complex, two-day procedure is required. Although abortion is safe throughout pregnancy, the risk, complexity, duration, and thus cost increase as pregnancy progresses. As a result, patients who are delayed in obtaining care as they save money for the procedure may find that even more money is needed for the delayed procedure, necessitating even more delay.

73.     The Executive Order will remain in force until April 21, 2020, at the earliest. It is subject to extension for the duration of the coronavirus pandemic, which experts believe will last at least one year to eighteen months, if not more.[38] The current shortage of PPE is expected to continue for months.[39] As a result, the Attorney General's interpretation of the Executive Order threatens to ban abortion for all Texans who are currently pregnant or who will become pregnant in the coming months.

## CLAIMS FOR RELIEF

### COUNT I
(Substantive Due Process)

74.     Plaintiffs reallege and incorporate by reference the allegations contained above.

75.     By banning all non-emergency abortion prior to viability, or alternatively by banning non-emergency abortion after ten weeks of pregnancy and allowing no exception for patients prior to ten weeks of pregnancy for whom medication abortion is contraindicated, the

---

[38] *See* Grady, *supra* note 21.
[39] Ctrs. for Disease Control & Prevention, *Healthcare Supply of Personal Protective Equipment*, (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html

App.024

Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as applied to abortion, violate the right to substantive due process.

76.     Unless enjoined, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule will subject Plaintiffs' patients to irreparable harm for which no adequate remedy at law exists by preventing patients from or significantly delaying them in obtaining an abortion in Texas, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

COUNT 2<br>(Equal Protection)

77.     Plaintiffs reallege and incorporate by reference the allegations contained above.

78.     By selectively burdening patients' fundamental right to abortion without justification and singling abortion providers and their patients out for differential treatment from providers of other medical services and their patients, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as enforced, violate Texans' right to equal protection guaranteed by the Fourteenth Amendment to the U.S. Constitution.

79.     Unless enjoined, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule will subject Plaintiffs and their patients to irreparable harm for which no adequate remedy at law exists by preventing patients from or significantly delaying them in obtaining an abortion in Texas, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A.     To immediately issue a temporary restraining order, followed by a preliminary injunction, and ultimately a permanent injunction, restraining Defendants, their officers, agents,

24

servants, employees, and attorneys, and any persons in active concert or participation with them, from enforcing or complying with the Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as applied to abortion;

B.     To enter a judgment declaring that the Executive Order and corresponding Attorney General interpretation and Emergency Rule, as applied to abortion, violate the Fourteenth Amendment to the U.S. Constitution;

C.     To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

D.     To grant such other and further relief as the Court deems just and proper.

Dated:  March 25, 2020

Respectfully submitted,

/s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com

*Attorney for Plaintiffs*

Julie Murray (*pro hac vice* pending)
Alice Clapman (*pro hac vice* pending)
Richard Muniz (*pro hac vice* pending)
Hannah Swanson (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
alice.clapman@ppfa.org
richard.muniz@ppfa.org

25

hannah.swanson@ppfa.org

Jennifer Sandman (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood Center for
Choice, Planned Parenthood of Greater Texas Surgical
Health Services, and Planned Parenthood South Texas
Surgical Center*

Molly Duane (*pro hac vice* pending)
Rabia Muqaddam (*pro hac vice* pending)
Francesca Cocuzza (*pro hac vice* pending)
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Plaintiffs Southwestern Women's
Surgery Center and Brookside Women's Medical
Center PA d/b/a Brookside Women's Health Center
and Austin Women's Health Center*

Stephanie Toti
Rupali Sharma (*pro hac vice* pending)
Sneha Shah (*pro hac vice* pending)
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

*Attorneys for Plaintiffs Whole Woman's Health and
Whole Woman's Health Alliance*

26

# EXHIBIT A





(https://www.texasattorneygeneral.gov/)

**March 23, 2020**

# Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic

Texas Attorney General Ken Paxton today warned all licensed health care professionals and all licensed health care facilities, including abortion providers, that, pursuant to Executive Order GA 09 issued by Gov. Greg Abbott, they must postpone all surgeries and procedures that are not immediately medically necessary.

App.029

On Saturday, Gov. Abbott issued an executive order that "all licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." This prohibition applies throughout the State and to all surgeries and procedures that are not immediately medically necessary, including routine dermatological, ophthalmological, and dental procedures, as well as most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother.

The COVID-19 pandemic has increased demands for hospital beds and has created a shortage of personal protective equipment needed to protect health care professionals and stop transmission of the virus. Postponing surgeries and procedures that are not immediately medically necessary will ensure that hospital beds are available for those suffering from COVID-19 and that PPEs are available for health care professionals. Failure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time.

"We must work together as Texans to stop the spread of COVID-19 and ensure that our health care professionals and facilities have all the resources they need to fight the virus at this time," said Attorney General Paxton. "No one is exempt from the governor's executive order on medically unnecessary surgeries and procedures, including abortion providers. Those who violate the governor's order will be met with the full force of the law."

For information on the spread or treatment of Coronavirus (COVID-19), please visit the Texas Department of State Health Services (https://dshs.texas.gov/coronavirus/) website.

# EXHIBIT B

Case 1:20-cv-00323   Document 1-2   Filed 03/25/20   Page 2 of 6



GOVERNOR GREG ABBOTT

March 22, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:30 Pm O'CLOCK

MAR 2 2 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

> Executive Order No. GA-09 relating to hospital capacity during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

App.033

# 𝔈𝔵𝔢𝔠𝔲𝔱𝔦𝔳𝔢 𝔒𝔯𝔡𝔢𝔯

### BY THE
### GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 22, 2020**

**EXECUTIVE ORDER**
**GA 09**

*Relating to hospital capacity during the COVID-19 disaster.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Texas Department of State Health Services has determined that, as of March 19, 2020, COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, on March 19, 2020, I issued an executive order in accordance with the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC), and mandated certain obligations for Texans that are aimed at slowing the spread of COVID-19; and

WHEREAS, a shortage of hospital capacity or personal protective equipment would hinder efforts to cope with the COVID-19 disaster; and

WHEREAS, hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient, contrary to recommendations from the President's Coronavirus Task Force, the CDC, the U.S. Surgeon General, and the Centers for Medicare and Medicaid Services; and

WHEREAS, various hospital licensing requirements would stand in the way of implementing increased occupancy in the event of surge needs for hospital capacity due to COVID-19; and

WHEREAS, the "governor is responsible for meeting . . . the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders . . . hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and



FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:39 PM O'CLOCK

MAR 2 2 2020

Case 1:20-cv-00323   Document 1-2   Filed 03/25/20   Page 4 of 6

**Governor Greg Abbott**                                        *Executive Order GA-09*
March 22, 2020                                                          Page 2

WHEREAS, under Section 418.173, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable by a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both fine and confinement.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order that, beginning now and continuing until 11:59 p.m. on April 21, 2020, all licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician;

PROVIDED, however, that this prohibition shall not apply to any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster.

At the request of the Texas Health and Human Services Commission, I hereby suspend the following provisions to the extent necessary to implement increased occupancy in the event of surge needs for hospital capacity due to COVID-19:

 25 TAC Sec. 133.162(d)(4)(A)(iii)(I);
 25 TAC Sec. 133.163(f)(1)(A)(i)(II)–(III);
 25 TAC Sec. 133.163(f)(1)(B)(i)(III)–(IV);
 25 TAC Sec. 133.163(m)(1)(B)(ii);
 25 TAC Sec. 133.163(t)(1)(B)(iii)–(iv);
 25 TAC Sec. 133.163(t)(1)(C);
 25 TAC Sec. 133.163(t)(5)(B)–(C); and
 any other pertinent regulations or statutes, upon written approval of the Office of the Governor.

This executive order shall remain in effect and in full force until 11:59 p.m. on April 21, 2020, unless it is modified, amended, rescinded, or superseded by me or by a succeeding governor.

Given under my hand this the 22nd day of March, 2020.

_____
GREG ABBOTT
Governor

ATTESTED BY:

_____
RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:39 PM O'CLOCK

MAR 2 2 2020

App.035

# EXHIBIT C

# Texas Register

| TITLE 22 | EXAMINING BOARDS |
| PART 9 | TEXAS MEDICAL BOARD |
| CHAPTER 187 | PROCEDURAL RULES |
| SUBCHAPTER F | TEMPORARY SUSPENSION AND RESTRICTION PROCEEDINGS |
| RULE §187.57 | Charge of the Disciplinary Panel |
| ISSUE | 04/03/2020 |
| ACTION | Emergency |

Preamble                                                                 Texas Admin Code
                                                                                   Rule

(a)The disciplinary panel shall determine from the evidence or information presented to it whether a person's continuation in practice constitutes a continuing threat to the public welfare.

(b)If the disciplinary panel determines that a person's continuation in practice would constitute a continuing threat to the public welfare, the disciplinary panel shall temporarily suspend or restrict the license of that person.

(c)In accordance with the Act, §151.002(a)(2), "continuing threat to the public welfare," means a real danger to the health of a physician's patients or the public caused through the physician's lack of competence, impaired status, performance of a non-urgent elective surgery or procedure, or failure to care adequately for the physician's patients. A real danger exists if patients have an exposure to or risk of injury that is not merely abstract, hypothetical or remote and is based on actual actions or inactions of the physician. Information that the physician has committed similar actions or inactions in the past shall be considered by the disciplinary panel.

(1)For purposes of this rule all licensed health care professionals shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician.

(2)Provided, however, that this prohibition shall not apply to any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster.

(d)The disciplinary panel may also temporarily restrict or suspend a license of a person upon proof that a person has been arrested for an offense under:

  (1)Section 22.011(a)(2), Penal Code (sexual assault of a child);

  (2)Section 22.021(a)(1)(B), Penal Code (aggravated sexual assault of a child);

  (3)Section 21.02, Penal Code (continuous sexual abuse of a young child or children); or

  (4)Section 21.11, Penal Code (indecency with a child).

The agency certifies that legal counsel has reviewed the emergency adoption and found it to be within the state agency's legal authority to adopt.

Filed with the Office of the Secretary of State on March 23, 2020

**TRD-202001217**

Scott Freshour

General Counsel

Texas Medical Board

Effective date: March 23, 2020

Expiration date: July 20, 2020

For further information, please call: (512) 305-7016

---

Next Page        Previous Page

Re-Query Register        Back to List of Records

**HOME** | **TEXAS REGISTER** | **TEXAS ADMINISTRATIVE CODE** | **OPEN MEETINGS**

**Exhibit 2:** Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction and Memorandum of Law in Support (with attached exhibits)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

PLANNED PARENTHOOD CENTER FOR
CHOICE, *et al.*,

     Plaintiffs,

     v.

GREG ABBOTT, in his official capacity as
Governor of Texas, *et al.*,

     Defendants.

No. 1:20-cv-00323-LY

## <u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>
## <u>AND/OR PRELIMINARY INJUNCTION AND</u>
## <u>MEMORANDUM OF LAW IN SUPPORT</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Planned Parenthood Center for

Choice ("PP Houston"), Planned Parenthood of Greater Texas Surgical Health Services ("PPGT

Surgical Health Services"), Planned Parenthood South Texas Surgical Center ("PPST Surgical

Center"), Whole Woman's Health, Whole Woman's Health Alliance, Southwestern Women's

Surgery Center ("Southwestern"), Brookside Women's Medical Center PA d/b/a Brookside

Women's Health Center and Austin Women's Health Center ("Austin Women's"), and Dr. Robin

Wallace, M.D. move for a temporary restraining order, followed by a preliminary injunction, to

enjoin Defendants' efforts to immediately ban most abortion procedures during the COVID-19

pandemic through their application of Governor Greg Abbott's March 22, 2020, Executive Order

GA 09, "Relating to hospital capacity during the COVID-19 disaster" and the Texas Medical

Board's ("TMB") emergency amendment to 22 Tex. Admin. Code § 187.57 ("Emergency Rule"), which imposes the same requirements as Executive Order GA 09.[1]

As the American College of Obstetricians and Gynecologists ("ACOG") has recognized, abortion care is essential care because it cannot be delayed without risking the health and safety of the patient.[2] Accordingly, Plaintiffs' provision of this care is entirely consistent with the Governor's Executive Order, which bars all "surgeries and procedures" in Texas that are "not immediately medically necessary" during the coronavirus disease 2019 (COVID-19) outbreak ("Executive Order") (attached as Ex. B to Compl. for Injunctive & Declaratory Relief, ECF No. 1 ("Compl.")).

However, on March 23, 2020, Texas Attorney General Ken Paxton issued a news release singling out abortion providers, suggesting that continuing to provide most abortions (other than those performed in an immediate medical emergency) would violate the Executive Order, and noting that "[t]hose who violate the governor's order will be met with the full force of the law." Ken Paxton, Attorney Gen. of Tex., Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to

---

[1] On March 24, 2020, the TMB adopted an emergency rule to enforce the Executive Order. Under preexisting law, the TMB can temporarily suspend or restrict a physician's license if the physician's "continuation in practice would constitute a continuing threat to the public welfare." 22 TAC § 187.57(b). The Emergency Rule expands this basis for discipline to include "performance of a non-urgent elective surgery or procedure." 22 Tex. Admin. Code §187.57 (emergency regulation adopted Mar. 23, 2020), *available at* https://tinyurl.com/v4pz99u (attached as Ex. C to Compl.). Because the Emergency Rule contains the same requirement to postpone surgeries and procedures that are not immediately necessary, *see id.*, Plaintiffs discuss the Emergency Rule together with the Executive Order above and throughout.

[2] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

2

Preserve Resources to Fight COVID-19 Pandemic (Mar. 23, 2020) (attached as Ex. A to Compl.).[3]

By stating that the Executive Order applies to "*any type* of abortion," the Attorney General's news release suggests the Attorney General interprets the Executive Order as limiting even the provision of medication abortion, which involves only taking medications by mouth and is not "surgery" or a "procedure" that falls within the terms of the Executive Order. *See id* (emphasis added).

During the COVID-19 outbreak, Plaintiffs—like all healthcare providers—have an important role to play in serving their communities, including by preserving much-needed medical resources that are in short supply during the pandemic and taking steps to reduce the transmission and spread of COVID-19, while continuing to provide essential healthcare services. They are doing their part by stopping all non-essential procedures that require health care staff to use personal protective equipment ("PPE"), such as sterile and non-sterile gloves and masks, and by reducing as much as possible the use of PPE during procedural abortions and other essential medical procedures that they intend to continue to provide in keeping with the terms and purpose of the Executive Order.

Given the Attorney General's aggressive threats of criminal liability, however, Plaintiffs have been forced to cancel numerous medication abortion and procedural abortion appointments this week and will be forced to cancel hundreds of future appointments, throwing abortion access in the state into disarray. The State's actions violate nearly five decades of Supreme Court precedent that categorically prohibits states from banning abortion before viability, and they are, therefore, unconstitutional.[4] Absent an order from this Court, Plaintiffs' patients will be denied

[3] *Available at* https://www.texasattorneygeneral.gov/news/releases/health-care-professionals-and-facilities-including-abortion-providers-must-immediately-stop-all.
[4] At minimum, even if the Executive Order does not apply to medication abortion, on the Attorney General's interpretation it bans abortions after the ten-week cutoff for medication abortion.

App.042

their right to access safe and legal previability abortion in Texas and be forced to carry pregnancies to term against their will amidst a health system overburdened by responding to COVID-19. Accordingly, Plaintiffs seek to restrain and preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them from enforcing or complying with the Attorney General's interpretation of the Executive Order to prohibit abortion procedures.

<strong>STATEMENT OF FACTS</strong>

**A.      The Governor's Executive Order**

In March 2020, the United States declared a state of emergency and the State of Texas declared a state of disaster related to the COVID-19 pandemic. *See* Executive Order at 2; Proclamation by the Governor of the State of Texas (Mar. 13, 2020)[5]; Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020). The virus has reached every state in the country, with nearly 1,000 confirmed cases in Texas and twelve deaths at the time of this filing.[6] Federal and state officials and medical professionals expect a surge of infections that will test the limits of a health care system already facing a shortage of PPE,[7] particularly N95 masks.[8]

---

[5]  *Available at*  https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf.

[6]  Ctrs. for Disease Control & Prevention, *Cases in U.S.* (last updated Mar. 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; Tex. Dep't of State Health Servs., *Texas Case Counts: COVID-19* (last updated Mar. 25, 2020), https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83.

[7]  Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States* (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html.

[8]  Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times, Mar. 19, 2020, https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

In light of this new reality, on March 22, 2020, Governor Greg Abbott issued an executive order barring "all surgeries and procedures that are not immediately medically necessary," effective immediately. Executive Order at 3.[9] By way of justification, the Executive Order states that "a shortage of hospital capacity or personal protective equipment would hinder efforts to cope with the COVID-19 disaster" and "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary" *Id.* at 2. Although the Executive Order does not define "personal protective equipment," Plaintiffs understand that term to refer, for example, to N95 masks, surgical masks, non-sterile and sterile gloves, disposable protective eyewear, disposable gowns, hair covers, and shoe covers, which are commonly used in surgical procedures, including—for some types of PPE—procedural abortions. Decl. of Polin C. Barraza in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Barraza Decl.") ¶ 7, attached hereto as Ex. 1; Decl. of Alicia Dewitt-Dick in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Dewitt-Dick Decl.") ¶¶ 6, 19, attached hereto as Ex. 2; Decl. of Andrea Ferrigno in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Ferrigno Decl.") ¶¶ 10, 21, attached hereto as Ex. 3; Decl. of Amy Hagstrom-Miller in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Hagstrom-Miller Decl.") ¶¶ 13, 22, attached hereto as Ex. 4; Decl. of Jessica Klier in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Klier Decl.") ¶¶ 6, 11, attached hereto as Ex. 5; Decl. of Ken Lambrecht in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Lambrecht Decl.") ¶¶ 7, 12, attached hereto as Ex. 6; Decl. of Ann Schutt-Aine, M.D. in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Schutt-Aine Decl.") ¶¶ 8, 25, attached hereto as Ex.

---

[9] The Executive Order cites as its authority section 418.012, which allows the Governor to issue Executive Orders with the "force and effect of law," and section 418.061(a), which permits the Governor to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." Executive Order at 2 (citing Tex. Gov't Code §§ 418.012, 418.016(a)).

App.044

7; Decl. of Pl. Robin Wallace, M.D. in Supp. of Pls.' Mot. for TRO & Prelim. Inj. ("Wallace

Decl.") ¶¶ 7, 12, attached hereto as Ex. 8.

> In full, the Executive Order describes the care covered by the Executive Order as
> all surgeries and procedures that are not immediately medically necessary to correct
> a serious medical condition of, or to preserve the life of, a patient who without
> immediate performance of the surgery or procedure would be at risk for serious
> adverse medical consequences or death, as determined by the patient's physician.

Executive Order at 3. The Executive Order does not define "serious medical condition" or "serious

adverse medical consequences." It further states that procedures that "would not deplete the . . .

personal protective equipment needed to cope with the COVID-19 disaster" are exempt from the

order. *Id*.

The Executive Order remains in effect until 11:59 PM on April 21, 2020, at the earliest, or

until Governor Abbott rescinds or modifies it. *Id.* Federal officials and medical professionals

expect the pandemic to last for a year or eighteen months.[10] The current shortage of PPE is

expected to continue for the next three or four months.[11] Failure to comply with the Executive

Order is a criminal offense punishable by a fine of up to $1,000, confinement in jail for up to 180

days, or both fine and confinement. Executive Order at 3 (citing Tex. Gov't Code § 418.173).

These criminal penalties may in turn trigger administrative enforcement by the Texas Health and

Human Services Commission, the Texas Medical Board, and the Texas Board of Nursing, which

are authorized to pursue disciplinary action against licensees who violate criminal laws.[12]

---

[10] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times, Mar. 8, 2020, https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[11] Ctrs. for Disease Control & Prevention, *Healthcare Supply of Personal Protective Equipment*, (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html; *see also*, 22 Tex. Admin. Code § 187.57 (TMB emergency regulation does not expire until July 20, 2020).

[12] 25 Tex. Admin. Code §§ 139.32(b)(6), 135.24(a)(1)(F); 22 Tex. Admin. Code § 185.17(11); Tex. Occ. Code Ann. §§ 164.051(a)(2)(B), (a)(6); 301.452(b)(3), (B)(10).

6

## B.     Abortion in Texas

Individuals seek abortion for a multitude of personal and often complex reasons. By way of example, some patients have abortions because they conclude that it is not the right time to become a parent or have additional children, they desire to pursue their education or career, or they lack the necessary financial resources or a sufficient level of partner or familial support or stability. Ferrigno Decl. ¶ 32; Hagstrom-Miller Decl. ¶ 30; Schutt-Aine Decl. ¶ 20. Other patients seek abortions because continuing with the pregnancy could pose a greater risk to their health. Schutt-Aine Decl. ¶ 20.

There are two main methods of abortion: medication abortion and procedural abortion. Schutt-Aine Decl. ¶ 12. Both methods are equally effective in terminating a pregnancy. Schutt-Aine Decl. ¶ 12. Medication abortion involves the patient ingesting a combination of two pills: mifepristone and misoprostol. Schutt-Aine Decl. ¶ 13. The patient takes the mifepristone in the health center and then, typically twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage. Schutt-Aine Decl. ¶ 13. Although medication abortion is safe and effective through eleven weeks as measured from the first day of a pregnant person's last menstrual period ("LMP"), Texas law restricts this method to the first ten weeks LMP.[13] Plaintiffs provide medication abortion to that ten-week limit.

Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery"; it involves no incision, no need for general anesthesia, and no requirement of a sterile field. Schutt-Aine Decl. ¶ 16. In the procedural abortion known as

---

[13] Texas Health and Safety Code section 171.063 restricts the first drug to the limit on the federally approved label, which is ten weeks. *See* U.S. Food & Drug Admin., *Mifeprex (mifepristone) Information* (last updated Feb. 5, 2018), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information.

aspiration, the clinician uses gentle suction from a narrow, flexible tube to empty the contents of the patient's uterus. Schutt-Aine Decl. ¶ 16. Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods. Beginning around fifteen weeks LMP, clinicians generally must use instruments to complete the procedure, a technique called dilation and evacuation ("D&E"). Later in the second trimester, the clinician may begin cervical dilation the day before the procedure itself. Schutt-Aine Decl. ¶ 16. For some patients, medication abortion is contraindicated or there are other factors that would necessitate a procedural abortion, such as when the patient has an allergy to the medications or other medical conditions that make procedural abortion relatively safer. Schutt-Aine Decl. ¶ 17. Plaintiffs provide procedural abortion in both the first and second trimester. Texas law prohibits abortion care except in narrow circumstances at or after twenty-two weeks LMP. *See* Tex. Health & Safety Code § 171.044.[14]

Neither method of abortion requires extensive PPE. In fact, for medication abortion, providing patients with the medication does not require the use of any PPE. Barraza Decl. ¶ 7; Dewitt-Dick Decl. ¶ 19; Ferrigno Decl. ¶ 10; Hagstrom-Miller Decl. ¶ 13; Lambrecht Decl. ¶ 12; Klier Decl. ¶ 11; Schutt-Aine Decl. ¶ 25; Wallace Decl. ¶ 12. For procedural abortion, providers use PPE such as gloves, a surgical mask, disposable protective eyewear, disposable or washable gowns, hair covers, and shoe covers. Barraza Decl. ¶ 7; Dewitt-Dick Decl. ¶ 19; Ferrigno Decl. ¶¶ 10, 12; Hagstrom-Miller Decl. ¶¶ 13, 15; Klier Decl. ¶ 11; Lambrecht Decl. ¶ 12; Schutt-Aine

---

[14] This provision prohibits abortion when "the probable post-fertilization age of the unborn child is 20 or more weeks." Tex. Health & Safety Code § 171.044. "Post-fertilization age" means "the age of the unborn child as calculated from the fusion of a human spermatozoon with a human ovum," *id.* § 171.042, which occurs approximately two weeks after the first day of a patient's last menstrual period. Thus, twenty weeks post-fertilization is twenty-two weeks LMP.

App.047

Decl. ¶ 25; Wallace Decl. ¶ 12.[15] Most Plaintiffs do not have N95 masks, and those that do have

only a small supply that they rarely, if ever, use. (Out of all of Plaintiffs' facilities and physicians,

only one physician has used an N95 mask since the beginning of the COVID-19 pandemic and

that physician has been reusing the same single mask as an extra precaution during all patient

interactions.) Barraza Decl. ¶ 8; Ferrigno Decl. ¶ 13; Hagstrom-Miller Decl. ¶ 16; Klier Decl. ¶ 6;

Lambrecht Decl. ¶ 12; Schutt-Aine Decl. ¶ 27. Plaintiffs could further conserve PPE during the

pandemic were Defendants willing to waive medically unnecessary abortion restrictions such as

mandated extra in-person visits prior to the abortion, the unnecessary gestational age limit for

medication abortion, ultrasound requirements, and in-person follow-up requirements.[16]

Patients generally seek abortion as soon as they are able, but many face logistical obstacles

that can delay access to abortion care. Decl. of Kamyon Conner in Supp. of Pls.' Mot. for TRO &

Prelim. Inj. ("Conner Decl.") ¶ 5, attached hereto as Ex. 9; Dewitt-Dick Decl. ¶ 22; Schutt-Aine

Decl. ¶ 23. Patients will need to schedule an appointment, gather the resources to pay for the

abortion and related costs, Conner Decl. ¶ 5; Dewitt-Dick Decl. ¶ 22; Schutt-Aine Decl. ¶ 23, and

---

[15] Gloves are typically needed for any transvaginal ultrasound or laboratory exam, but are not required for transabdominal ultrasounds. Per CDC guidance, Plaintiffs also provide patients for whom there is a concern for COVID-19 or other upper respiratory disease with a mask. Ctrs. for Disease Control & Prevention, *Frequently Asked Questions about Personal Protective Equipment* (Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq. html.

[16] Temporarily lifting these restrictions to minimize unnecessary in-person visits would be consistent with Defendants' general response to the pandemic. 28 Tex. Admin. Code § 35.1 (emergency regulation adopted Mar. 17, 2020) (suspending regulations related to telemedicine); Tex. Med. Bd., *Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Telemedicine During Texas Disaster Declaration for COVID-19 Pandemic* (Mar. 19, 2020), http://www.tmb.state.tx.us/idl/A2936385-466D-15D1-0F9E-F486D0491A27 (same); Executive Order at 3 (suspending certain hospital regulations); Office of the Tex. Governor, *Governor Abbott Takes Action to Expand Texas Hospital Capacity* (Mar. 25, 2020), https://gov.texas.gov/ news/post/governor-abbott-takes-action-to-expand-texas-hospital-capacity (waiving certain requirements for hospitals, free-standing emergency medical facilities, and end-stage renal facilities).

arrange transportation to a clinic, time off of work, and possibly childcare during appointments, often without any paid sick leave or other paid time off work. Conner Decl. ¶¶ 5, 11; Dewitt-Dick Decl. ¶ 22; Ferrigno Decl. ¶ 33; Schutt-Aine Decl. ¶ 23. Delays result in higher financial and emotional costs to the patient. Conner Decl. ¶¶ 5, 11; Dewitt-Dick Decl. ¶ 22; Ferrigno Decl. ¶ 34; Hagstrom-Miller Decl. ¶ 33; Schutt-Aine Decl. ¶ 23; Wallace Decl. ¶ 16.

Meanwhile, Texas legal restrictions on abortion, which are some of the harshest in the country, impose burdens that weigh even more heavily during the current pandemic and that also undermine Defendants' stated goal of preserving PPE. For example, Texas law requires most patients to make at least two in-person appointments for an abortion, even though most patients could obtain care just as safely in one visit.[17] Texas law also mandates medically unnecessary ultrasounds,[18] as well as in-person follow-up visits that could safely be provided through telemedicine.[19] Texas law unnecessarily restricts medication abortion to ten weeks when it can safely be provided through eleven weeks, thereby eliminating an evidence-based method to reduce the need for abortion by procedure.[20] And minor patients, unless emancipated, must obtain either written consent from a parent or a judicial bypass order before they can receive care.[21] During the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity,

---

[17] Tex. Health & Safety Code § 171.012 (mandating that patients receive an ultrasound at least twenty-four hours before an abortion procedure).

[18] *Id.*

[19] Tex. Health & Safety Code § 171.063(e), 25 Tex. Admin Code § 139.53(b)(4). Indeed, to respond to the pandemic, the state has suspended restrictions on telemedicine generally, 28 Tex. Admin. Code § 35.1 (emergency regulation adopted Mar. 17, 2020); Tex. Med. Bd., *supra* note 16, and could suspend the existing restrictions barring Plaintiffs from using telemedicine to provide medication abortion and post-abortion follow-up care. Tex. Occ. Code § 111.005(c); Tex. Health & Safety Code § 171.063(e), 25 Tex. Admin Code § 139.53(b)(4).

[20] Tex. Health & Safety Code § 171.063(a)(2).

[21] Tex. Family Code § 33.003.

minimal public transit availability, and limited childcare assistance due to mandatory social-distancing and shelter-in-place orders.

The window during which a patient can obtain an abortion in Texas is limited. Pregnancy is generally forty weeks in duration, and Texas prohibits abortion except in narrow circumstances after twenty-two weeks LMP. Ferrigno Decl. ¶ 35; Hagstrom-Miller Decl. ¶ 34; Schutt-Aine Decl. ¶ 21; Wallace Decl. ¶ 10. Although abortion is a very safe medical procedure, the health risks associated with it increase with gestational age. Dewitt-Dick Decl. ¶ 22; Ferrigno Decl. ¶ 36; Hagstrom-Miller Decl. ¶ 35; Schutt-Aine Decl. ¶ 22. As ACOG and other well-respected medical professional organizations have observed, specifically in relation to the COVID-19 pandemic, abortion "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[22]

Indeed, while much is unknown about COVID-19, including whether it can complicate pregnancy, some pregnant people may be exposed to additional health risks from the disease. ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[23]

The COVID-19 pandemic has exacerbated existing burdens on patients seeking abortion care. It has limited public transit availability, caused layoffs and other work disruptions, shuttered

---

[22] ACOG et al., *supra* note 2.

[23] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

App.050

schools and childcare facilities, and otherwise limited patients' options for transportation and

childcare support during a time of recommended social-distancing and shelter-in-place orders.[24]

Indeed, jobless claims are soaring due to the virus.[25] Conner Decl. ¶¶ 8, 11; Dewitt-Dick Decl.

¶ 23; Ferrigno Decl. ¶ 33; Hagstrom-Miller Decl. ¶ 32; Schutt-Aine Decl. ¶ 24.

## C.    Plaintiffs' Implementation of the Executive Order

Plaintiffs are committed to doing their part and following the Governor's Executive Order

in an effort to "flatten the curve," protect patients and staff, and minimize the use of PPE. Even

before the order, Plaintiffs had taken numerous steps in this direction by, for example, limiting the

number of individuals present for any procedure who would require PPE. Barraza Decl. ¶ 11;

Dewitt-Dick Decl. ¶¶ 9, 11; Klier Decl. ¶ 13; Lambrecht Decl. ¶ 15; Schutt-Aine Decl. ¶ 30;

Wallace Decl. ¶ 13.

Plaintiffs immediately prepared to comply with the Executive Order, for example adopting

policies identifying the numerous relevant factors to determine whether a procedure would be

---

[24] Tex. Exec. Order No. GA-08 (Mar. 19, 2020) (closing Texas schools and discouraging Texans from participating in non-essential activities); Jacqulyn Powell, *Will Child Care Centers Shut Down During COVID-19 Outbreak?*, KXAN (Mar. 23, 2020), https://www.kxan.com/news/education/will-child-care-centers-shut-down-during-covid-19-outbreak/ (saying that 2,400 child care operations in the state have reported closures); Metro. Transit Authority of Harris Cty., *METRO Response to Coronavirus (COVID-19)*, https://www.ridemetro.org/Pages/Coronavirus.aspx (last visited Mar. 24, 2020) (noting a "sharp ridership decline," reducing frequency of bus services, and reducing customer seating in Harris County); *see also* White House, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance _8.5x11_315PM.pdf; Rebecca Shabad, *Fauci Predicts Americans Will Likely Need to Stay Home for at Least Several More Weeks*, NBC News (Mar. 20, 2020) https://www.nbcnews.com/politics/ donald-trump/fauci-predicts-americans-will-likely-need-stay-home-least-several-n1164701.

[25] *See* Matt Largey, *COVID-19 Is Costing People Their Jobs. Here's How to Apply for Unemployment in Texas*, KUT 90.5, Mar. 19, 2020, https://www.kut.org/post/covid-19-costing-people-their-jobs-heres-how-apply-unemployment-texas (Texas unemployment claims between March 15 and March 18 were eleven times higher than for the same period in 2019); Tex. Workforce Comm'n, *TWC Extends Call Center Hours* (Mar. 23, 2020), https://twc.texas.gov/news/twc-extends-call-center-hours (Texas Workforce Commission reporting that they have received "an unprecedented call volume as a result of COVID-19").

permissible under the Order. Barraza Decl. ¶ 3; Ferrigno Decl. ¶ 22; Hagstrom-Miller Decl. ¶ 23; Klier Decl. ¶ 17; Lambrecht Decl. ¶ 8; Schutt-Aine Decl. ¶ 9. They did so while continuing to make every effort to conserve PPE and to reduce the possibility of spread and transmission of COVID-19. Barraza Decl. ¶¶ 11–13; Dewitt-Dick Decl. ¶¶ 10–13; Ferrigno Decl. ¶¶ 15–19; Hagstrom-Miller Decl. ¶¶ 18–20; Klier Decl. ¶¶ 13–16; Lambrecht Decl. ¶¶ 15–16; Schutt-Aine Decl. ¶¶ 30–31; Wallace Decl. ¶ 13.

Consistent with the Executive Order, Plaintiffs determined that abortion is a time-sensitive service and an essential component of comprehensive care, for which a delay of thirty days or even less increases the risks to patients, or makes abortion completely inaccessible, and that such delay in accessing or inability to access an abortion exposes patients to risk of a serious adverse medical consequence. In reaching this determination, Plaintiffs considered such facts and authorities as the following:

- "The purpose and text of EO GA 09, namely: concern for 'a shortage of hospital capacity or personal protective equipment' that could 'hinder efforts to cope with the COVID-19 disaster.'"

- "The stated 30-day duration of the delay, taking into account the Ambulatory Surgery Center Association's 'COVID-19: Guidance for ASCs for Necessary Surgery,' issued March 18, 2020, which states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, 'including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent.'"[26]

- "The fact that pregnancy has a duration of approximately forty weeks, as measured from the first day of a woman's last menstrual period (LMP) and that most abortions are banned in Texas beginning at 20 weeks gestation [the equivalent of 22 weeks LMP]. Tex. Health & Safety Code § 171.044."

---

[26] *See also* Am. Surgical Ctr. Ass'n, *COVID-19: Guidance for ASCs on Necessary Surgeries* (last updated Mar. 19, 2020), https://www.ascassociation.org/asca/resourcecenter/latestnewsresourcecenter/covid-19/covid-19-guidance (quoting Am. Coll. of Surgeons, *COVID-19: Recommendations for Management of Elective Surgical Procedures* (Mar. 13, 2020), https://www.facs.org/about-acs/covid-19/information-for-surgeons/elective-surgery).

- "The fact that, while abortion is an extremely safe medical procedure, delay increases the risk to the health of the patient. *See, e.g.,* Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 77–78, 162–63 (2018). Delay is of particular concern during the COVID-19 crisis, given guidance from the Centers for Disease Control ('CDC') and American College of Obstetricians and Gynecologists ('ACOG') that pregnant women may be at heightened risk of severe illness, morbidity, or mortality from viral respiratory infections such as COVID-19."[27]

- "The Joint Statement by the American College of Obstetricians and Gynecologists ('ACOG'), the American Association of Gynecologic Laparoscopists, *et al.*, on Elective Surgeries,[28] issued March 16, 2020, which states that 'Obstetric and gynecologic procedures for which a delay will negatively affect patient health and safety should not be delayed. This includes gynecologic procedures and procedures related to pregnancy for which delay would harm patient health. Obstetrician–gynecologists and other health care practitioners should be aware of the unintended impact that policies responding to COVID-19 may have, including limiting access to time-sensitive obstetric and gynecological procedures.'"

- "The Joint Statement by the ACOG, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak,[29] issued March 18, 2020, which states that to 'the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure' because it 'is an essential component of comprehensive health care' and 'a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible.'"

*See, e.g.*, Ex. A to Barraza Decl. (PPST Surgical Center policy); Ferrigno Decl. ¶¶ 10–19; Hagstrom-Miller Decl. ¶¶ 13–20; Ex. A to Lambrecht Decl. (PPGT Surgical Health Services policy); Ex. B to Schutt-Aine Decl. (PP Houston policy); Klier Decl. ¶¶ 11–12; Dewitt-Dick Decl. ¶ 26; Wallace Decl. ¶¶ 11–14.

---

[27] ACOG, *Practice Advisory: Novel Coronavirus 2019 (COVID-19), supra* note 23; Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women*, *supra* note 23.

[28] Am. Ass'n of Gynecologic Laparoscopists et al., *Joint Statement on Elective Surgery During COVID-19 Pandemic* (Mar. 16, 2020), https://www.aagl.org/news/joint-society-message-on-covid-19/.

[29] ACOG et al., *supra* note 2.

**D.      The Attorney General's Threat to End Abortion Access and the Resulting Impact**

Late in the afternoon on March 23, 2020, Plaintiffs received word of the Texas Attorney General's press release suggesting that he believes continuing to provide *any* abortion care (other than for an immediate medical emergency) would violate the Executive Order, and warning that "[t]hose who violate the governor's order will be met with the full force of the law." Plaintiffs sought clarification from the Attorney General's office as to whether he was interpreting the Executive Order to apply to medication abortion as well as procedural abortion. The office provided no such clarification.

If the Executive Order is enforced as interpreted by the Attorney General, it effectively bans almost all abortions in Texas for the duration of the COVID-19 public health emergency. Given the Attorney General's enforcement threat and the serious criminal and other penalties specified in the Executive Order and Emergency Rule, Plaintiffs, their physicians, and staff have been forced to cancel scheduled appointments and to stop providing *all* abortion care (other than for an immediate medical emergency) that entails the use of PPE. Barraza Decl. ¶ 15; Dewitt-Dick Decl. ¶ 8; Ferrigno Decl. ¶ 28; Hagstrom-Miller Decl. ¶ 28; Klier Decl. ¶ 17; Lambrecht Decl. ¶ 18; Schutt-Aine Decl. ¶ 33; Wallace Decl. ¶ 15. Even if the Executive Order is understood (consistent with its plain language) not to apply to medication abortion, which is provided through medications by mouth and is not a "procedure," it still operates as a previability ban for those patients who would otherwise obtain a procedural abortion—that is, all those who are ten or more weeks pregnant and those with earlier pregnancies for whom medication abortion is not appropriate.

Under either interpretation, the Executive Order will deprive Plaintiffs' patients of the freedom to make a very personal decision in consultation with their families and doctors, which is all the weightier given the increased health risks to pregnant persons during the COVID-19

15

pandemic. Lambrecht Decl. ¶ 18; Schutt-Aine Decl. ¶¶ 10, 36. It will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families. Conner Decl. ¶ 9; Dewitt-Dick Decl. ¶ 28; Ferrigno Decl. ¶ 34; Hagstrom-Miller Decl. ¶ 33; Lambrecht Decl. ¶ 18; Schutt-Aine Decl. ¶ 36; Wallace Decl. ¶ 16. Without access to Plaintiffs' services, patient care will be delayed, and in some cases, denied altogether. Barraza Decl. ¶ 15; Conner Decl. ¶¶ 9–11; Dewitt-Dick Decl. ¶ 8; Ferrigno Decl. ¶¶ 26–29, 34–35; Hagstrom-Miller Decl. ¶¶ 27–29, 33–34; Klier Decl. ¶¶ 17–18; Lambrecht Decl. ¶¶ 18–20; Schutt-Aine Decl. ¶¶ 33–39; Wallace Decl. ¶ 15. As a result, these patients will be forced to carry pregnancies to term, resulting in a deprivation of their fundamental right to determine when and whether to have a child or to add to their existing families, as well as in greater health and other risks to them and their children. Conner Decl. ¶ 11; Ferrigno Decl. ¶ 34; Hagstrom-Miller Decl. ¶ 33; Schutte-Aine Decl. ¶ 38; Wallace Decl. ¶ 16. Finally, by targeting abortion, the Executive Order is likely to *increase* the need for other pregnancy-related healthcare and attendant medical facilities, personnel, and PPE. Schutt-Aine Decl. ¶¶ 35–36.

## ARGUMENT

Plaintiffs seek a temporary restraining order, and thereafter, a preliminary injunction, to prevent the Attorney General's enforcement threats and the Executive Order from inflicting harm on Plaintiffs' patients who are unable to access abortion in Texas under the Executive Order as interpreted by the Attorney General. In ruling on such a motion, the Court considers four factors, all of which weigh heavily in Plaintiffs' favor: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the injury to Plaintiffs outweighs any harm the injunction might cause Defendants; and (4) granting the injunction will not disserve the public interest. *See*, *e.g.*, *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) ("*Jackson I*"); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

As discussed below, Plaintiffs are entitled to injunctive relief because they are likely to succeed on the merits of their claims. The Attorney General's interpretation of the Executive Order as banning almost all abortions directly contravenes decades of binding Supreme Court precedent holding that a state may not ban abortion before viability. Moreover, injunctive relief will prevent severe and irreparable harm to Plaintiffs' patients; is consistent with the balance of hardships; and serves the public interest. Accordingly, this Court should grant injunctive relief.

## I. PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR SUBSTANTIVE DUE PROCESS CLAIM.

Plaintiffs are certain to succeed on the merits of their claim that the Attorney General's interpretation of the Executive Order violates Plaintiffs' patients' liberty rights under the Fourteenth Amendment by banning abortion before viability. Nearly five decades ago, the Supreme Court struck down as unconstitutional a state criminal abortion statute proscribing all abortions except those performed to save the life of the pregnant person. *Roe v. Wade*, 410 U.S. 113, 166 (1973). Specifically, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects a woman's right to choose abortion, *id.* at 153–54, and prior to viability, a state has *no interest* sufficient to justify a ban on abortion, *id.* at 163–65. Rather, a state may proscribe abortion only *after* viability, and even then it must allow abortion where necessary to preserve the life or health of the patient. *Id.* at 163–64.

The Supreme Court has repeatedly adhered to this core holding. For example, more than twenty-five years ago, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court reaffirmed *Roe*'s "central principle" that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion." 505 U.S. 833, 846, 871 (1992); *id.* at 871 (asserting that any state interest is "insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions"). Although a plurality in *Casey* announced an "undue burden"

App.056

standard, under which "a provision of law [restricting previability abortion] is invalid[] if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion," 505 U.S. at 878 (plurality opinion), it emphasized:

> Our adoption of the undue burden analysis does not disturb the central holding of *Roe v. Wade*, and we reaffirm that holding. Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

*Id.* at 879; *see also id.* at 846 ("*Roe*'s essential holding . . . is a recognition of the right of the woman to choose to have an abortion before viability."). *Roe*'s central principle has been repeatedly reaffirmed by the Court, including as recently as 2016. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

Unsurprisingly, attempts to ban abortion prior to viability have been uniformly rejected by courts across the country and by the Fifth Circuit as recently as last month. *See*, *e.g.*, *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) ("*Jackson III*") (ban on abortions starting at six weeks); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268–69 (5th Cir. 2019) ("*Jackson II*") (ban on abortions starting at fifteen weeks); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015) (ban on abortions after six weeks), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards v. Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015) (ban on abortions after twelve weeks), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (ban on abortions starting at twenty weeks), *cert. denied*, 134 S. Ct. 905 (2014); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996) (ban on abortions starting at twenty weeks), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (ban on all abortions), *cert. denied*, 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992) (ban on all abortions), *cert. denied*, 506 U.S. 1011 (1992); *Bryant v. Woodall*, 363 F. Supp. 3d 611,

18

630–32 (M.D.N.C. 2019) (ban on abortions starting at twenty weeks), *appeal docketed*, No. 19-1685 (4th Cir. June 26, 2019); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH, 2019 WL 1233575, at *1 (W.D. Ky. Mar. 15, 2019) (ban on abortions after six weeks).

In 2019, several states passed a number of bans on abortion—and in each place where a ban restricted access to abortion, every single court blocked the ban from taking effect. *See, e.g.*, *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1059 (M.D. Ala. 2019) (ban on nearly all abortions); *SisterSong Women of Color Reprod. Justice Collective v. Kemp*, 410 F. Supp. 3d 1327, 1350 (N.D. Ga. 2019) (ban on abortions after six weeks); *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson*, 389 F. Supp. 3d 631, 640 (W.D. Mo. 2019), *as modified*, 408 F. Supp. 3d 1049, 1053 (W.D. Mo. 2019) (ban on abortions after various weeks), *appeal docketed*, Nos. 19-2882, 19-3134 (8th Cir. Oct. 3, 2019); *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213, 1324 (E.D. Ark. 2019) (ban on abortions after eighteen weeks), *appeal docketed*, No. 19-2690 (8th Cir. Aug. 9, 2019); *Jackson Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549, 252 (S.D. Miss. 2019), *aff'd*, 951 F.3d 246, 248 (5th Cir. 2020) (ban on abortions after six weeks); Order Granting Stipulated Preliminary Injunction as to State Defendants, *Planned Parenthood Ass'n of Utah v. Miner*, No. 2:19-cv-00238 (D. Utah Apr. 18, 2019), ECF No. 34 (ban on abortions after eighteen weeks).

The Fifth Circuit has consistently applied controlling precedent holding that states may not enact measures that ban all or nearly all previability abortions, including twice in just the last six months. *See Jackson III*, 951 F.3d at 248 (holding that previability abortion bans are "unconstitutional under Supreme Court precedent without resort to the undue burden balancing test," and striking down a ban on abortions as early as six weeks with exceptions); *Jackson II*, 945 F.3d at 268 (holding "[s]tates may *regulate* abortion procedures prior to viability so long as they

App.058

do not impose an undue burden on the woman's right, but they may not ban abortions," and striking down ban on previability abortions at fifteen weeks with exceptions); *Jackson I*, 760 F.3d at 459 (preliminarily enjoining abortion restriction that would shut down the only remaining clinic in the state and force patients to travel to a neighboring state as an unconstitutional undue burden); *see also Okpalobi v. Foster*, 190 F.3d 337, 357 (5th Cir. 1999) ("A measure that has the effect of forcing all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a pre-viability abortion, thus constituting an undue burden under *Casey*."), *vacated on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001); *Sojourner T.*, 974 F.2d at 29, 31 (striking down ban on all abortions with exceptions).

It is beyond dispute that the Attorney General's interpretation of the Executive Order has the effect of banning all abortions (other than those performed in an immediate medical emergency) in Texas starting at ten weeks LMP, and even earlier among patients for whom medication abortion is not appropriate. *Cf. Jackson II*, 945 F.3d at 271 (holding that challenged law was a previability *ban* on abortion and not a *regulation* on abortion because it "peg[ged] the availability of abortions to a specific gestational age that undisputedly prevents the abortions of some non-viable fetuses"). But the Attorney General's statement goes even further and appears to threaten enforcement against medication abortion in many instances as well, which has forced Plaintiffs to cancel hundreds of scheduled abortion appointments. In any event, whether or not the ban extends to medication abortion, it remains a ban on previability abortions, which contravenes decades of Supreme Court precedent, including *Roe*.

Because the Executive Order operates as a ban on previability abortion, this Court need not look further; however, even if the Court were to apply the undue-burden test from *Casey*, Plaintiffs would certainly succeed on the merits. "A finding of an undue burden is a shorthand for the

20

conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. A restriction that, "while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (alteration in original) (quoting *Casey*, 505 U.S. at 877). As the Supreme Court has held, "*Casey* requires courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2298.

Here, in terms of the burdens, the Attorney General's current enforcement threat operates as a ban, whether for all abortions or for all abortions after ten weeks.[30] The Executive Order is in effect for at least thirty days, and in fact could remain in effect for months, which would push many abortion patients past the legal limit for an abortion in Texas. Moreover, even if some patients affected by the order are able to obtain an abortion if the order is lifted sooner than anticipated, they will still suffer increased risks to their health by the delay in access to abortion care. Ferrigno Decl. ¶¶ 34, 36; Hagstrom-Miller Decl. ¶¶ 33, 35; Klier Decl. ¶ 18; Schutt-Aine Decl. ¶ 39. Thus, the Executive Order overwhelmingly harms individuals seeking an abortion.

These harms vastly outweigh any potential benefits from the Executive Order as interpreted by the Attorney General. The State asserts two interests—neither of which is furthered by the Attorney General's interpretation. On its face, the Executive Order is intended to preserve hospital capacity and PPE. Plaintiffs share those interests, but a blanket abortion ban does not serve either one and, in fact, as so interpreted the Executive Order is more likely to aggravate than alleviate the public health crisis arising from the pandemic. As to the first interest, legal abortion is safe,

---

[30] Even on the narrower construction, the Executive Order would not only ban abortion after ten weeks but also harm patients presenting before ten weeks for whom procedural abortion is medically indicated or the only appropriate option.

and complications associated with abortion—including those requiring hospital care—are exceedingly rare. *Whole Woman's Health*, 136 S. Ct. at 2311–2312, 2315. Nearly all abortions in Texas are provided in outpatient facilities, such as Plaintiffs' abortion facilities and ambulatory surgical centers, not hospitals.[31] Thus, Plaintiffs' provision of abortion would not deplete hospital capacity.

Regarding the second interest stated in the Executive Order—to preserve PPE—even in the absence of the Attorney General's threat to ban procedural abortion, Plaintiffs have already taken steps to preserve PPE, including by, for example, limiting the number of individuals allowed into the facility and during a procedural abortion and postponing other in-person, non-essential visits that may require PPE. Plaintiffs are exploring additional measures to preserve PPE, such as washable masks and gowns. Moreover, Plaintiffs either do not use N95 masks or do so only rarely, and this is the PPE that appears to be in shortest supply in battling the COVID-19 pandemic in Texas and around the country.[32] As such, banning abortions does little to nothing to prevent the

---

[31] Tex. Health & Human Servs., *Induced Terminations of Pregnancy, 2017 Selected Characteristics of Induced Terminations of Pregnancy (2018)*, https://hhs.texas.gov/about-hhs/records-statistics/data-statistics/itop-statistics (in 2017, 99.8% of abortions among Texas residents in Texas were provided in abortion facilities or ambulatory surgical centers).

[32] *See*, *e.g.*, Ariana Eunjung Cha et al., *Hospital Workers Battling Coronavirus Turn to Bandannas, Sports Goggles and Homemade Face Shields Amid Shortages*, Wash. Post (Mar. 19, 2020), https://www.washingtonpost.com/health/2020/03/19/hospital-workers-battling-coronavirus-turn-bandanas-sports-goggles-homemade-face-shields-amid-shortages/ ("Darrell Pile, CEO of the Southeast Texas Regional Advisory Council, which is responsible for distributing resources to local health providers from the Strategic National Stockpile, said the amount it had received so far is 'horribly inadequate to meet existing demand.'"); Mike Marut, *'We Are in a War': Austin Doctors Running Out of Protective Equipment to Treat Coronavirus Patients*, KVUE (Mar. 20, 2020), https://www.kvue.com/article/news/health/coronavirus/coronavirus-doctors-masks-austin-protective-equipment-goggles/269-a803b7ac-1ab0-4a6a-bfb8-af8b08d72028; Scott Friedman, *Running Low on Supplies, Firefighters, Paramedics Scramble to Find Ways to Protect Themselves Against COVID-19*, NBCDFW (Mar. 24, 2020), https://www.nbcdfw.com/news/coronavirus/as-north-texas-first-responders-tear-through-protective-masks-firefighter-says-unprecedented-is-a-good-word-to-be-using-right-now/2337271/; Amelia Nierenberg, *Where Are All the Masks?*, N.Y. Times (Mar. 22, 2020), https://www.nytimes.com/article/face-masks-coronavirus.html ("Many

App.061

"deplet[ion]" of the personal protective equipment needed "to cope with the COVID-19 disaster." Executive Order at 2.

Even before the Executive Order, Plaintiffs had taken steps to preserve PPE by minimizing the number of encounters a patient needs for care, Barraza Decl. ¶¶ 11–12; Wallace Decl. ¶ 13, but Texas law restricts this flexibility. Plaintiffs could make further progress in preserving PPE, as well as reducing overall contagion risks during the pandemic, were Defendants willing to consider temporarily waiving medically unnecessary abortion restrictions that limit their ability to adapt to this crisis—such as Texas's requirement that patients make an extra trip to the health center and receive an ultrasound before returning for an abortion.[33]

Indeed, far from being necessary to address the COVID-19 crisis, an interpretation of the Executive Order that broadly prohibits abortion could well exacerbate the COVID-19 crisis, including by forcing patients to attempt to travel to other states to try to access abortion care, and potentially using public transportation, even though public health experts have advised the public to minimize activities outside the home. Conner Decl. ¶ 11; Hagstrom-Miller Decl. ¶ 32; Klier Decl. ¶ 18; Schutt-Aine Decl. ¶¶ 37–38. Moreover, the Executive Order may delay access for patients experiencing health problems because providers are uncertain as to whether these problems meet the Executive Order's emergency exception, which could endanger those patients

---

doctors said they were being given just one mask, to use indefinitely. Between patients, they spray it down with a disinfectant or wipe it off, hoping for the best."); Associated Press, *US Struggles to Fill Requests for Protective Gear*, N.Y. Times (Mar. 18, 2020), https://www.nytimes.com/aponline/2020/03/18/business/ap-us-virus-outbreak-supplies.html (CDC sending masks from strategic stockpile that have exceeded their shelf life "due to the potential urgent demand caused by the COVID-19 public health emergency").

[33] As the Executive Order states, it is within the Governor's power to suspend regulatory requirements that "in any way prevent, hinder, or delay necessary action in coping with a disaster." Executive Order at 1 (quoting Tex. Gov't Code § 418.016(a)).

and potentially require that they receive *more* invasive care (with attendant use of PPE) or even hospital-based care. Schutt-Aine Decl. ¶ 36. Finally, delaying patients in accessing abortion ultimately requires increased use of PPE. Even if the Executive Order is ultimately limited to thirty days, this delay will push patients early in pregnancy now beyond the time for which they would be legally eligible for medication abortion (PPE is not needed to hand a patient pills), instead requiring one-day aspiration procedures. Ferrigno Decl. ¶ 35; Hagstrom-Miller Decl. ¶ 34; Schutt-Aine Decl. ¶ 35; Wallace Decl. ¶ 15. For some patients, the delay will push them into two-day D&E procedures, which necessarily require more PPE than a single visit or a medication abortion. Ferrigno Decl. ¶ 35; Hagstrom-Miller Decl. ¶ 34; Klier Decl. ¶ 18; Schutt-Aine Decl. ¶¶ 35, 39.

Even if banning or restricting abortion during the COVID-19 crisis would result in some small, temporary preservation of PPE, the harm to patients from not being able to access abortion for a month or more, if ever, is extreme and simply cannot be outweighed by any benefits of Defendants' application of the Executive Order. While Plaintiffs are mindful of the need for everyone in Texas and around the country to do their utmost to mitigate the effects of COVID-19 on our health systems, the reality is that very little, if any, PPE would actually be conserved by banning or restricting abortion. Most procedural abortions in Texas are single-day procedures, where a patient encounters either one or two clinicians, who each wear, at most, a paper mask (not an N95 respirator), two-to-three pairs of gloves, and a gown. Dewitt-Dick Decl. ¶ 16; Hagstrom-Miller Decl. ¶ 13; Klier Decl. ¶ 11; Schutt-Aine Decl. ¶ 25. However, patients forced by Defendants to wait until the middle of the second trimester or later might be forced to undergo a two-day procedure, which would mean two consecutive trips to a health center; twice as much contact with health care providers; and at least twice the amount of PPE used—for a total of three visits.

Patients who are prevented from obtaining abortions at all and thus who must seek prenatal care—or those who must seek prenatal care during the months they must wait for the Executive Order to expire—will also have to endure at least one (though often multiple) trips to heath care facilities to meet with health care providers and obtain services that involve the use of PPE. Schutt-Aine Decl. ¶ 26. Ultimately, then, pregnant patients will require care from health care providers using PPE, whether the pregnancy is terminated or not. Moreover, the public health crisis caused by the COVID-19 pandemic involves not only a shortage of PPE, but also a shortage of hospital beds. Unlike labor and delivery, hospital beds are not utilized in providing outpatient abortion.

The benefit of reducing the use of PPE in one segment of the healthcare system cannot possibly outweigh the burdens here, where abortion care is time-sensitive, and where barring abortion (but not any other essential surgery or procedure) would have only a minimal effect on the availability of PPE and no effect on the PPE in shortest supply (the N95 mask). Plaintiffs therefore have established that they are likely to succeed on the merits of their claim that the Executive Order violates the substantive due process rights of their patients.

## II.    PLAINTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM IF THE BAN IS ENFORCED.

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order and preliminary injunction. The Attorney General's interpretation of the Executive Order prevents Texans from exercising their fundamental constitutional right to terminate a pregnancy. It is well established that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary." (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995))); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (When "the constitutional right of privacy is 'either threatened or in fact being impaired,' . . . this conclusion mandates a finding of irreparable injury." (quoting *Elrod*, 427 U.S. at 373)).

In addition, as many medical professional organizations, including ACOG, have recently concluded, abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[34] Indeed, for some patients, such a delay will deprive them of any access to abortion. Tex. Health & Safety Code § 171.044 (prohibiting abortions after twenty-two weeks LMP). Forcing patients to forgo abortion care and remain pregnant against their will inflicts serious physical, emotional, and psychological consequences that alone constitute irreparable harm. *See e.g.*, *Elrod*, 427 U.S. at 373–74; *Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013). Likewise, a delay in obtaining abortion care causes irreparable harm by "result[ing] in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 832 (7th Cir. 2018) (alteration in original) (quoting *Van Hollen*, 738 F.3d at 796), *petition for cert. filed*, No. 18-1019 (Feb. 4, 2019). This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (internal quotation marks omitted), *cert. denied sub nom. Andersen v. Planned Parenthood of Kan. & Mid-Mo.*, 139 S. Ct. 638 (Mem.) (2018).

---

[34] ACOG et al., *supra* note 2.

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF.

Plaintiffs' requested relief will "essentially continue[] the status quo," tipping the balance of equities toward Plaintiffs and serving the public interest. *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd*, 760 F.3d 448 (5th Cir. 2014); *United States v. State of Texas*, 508 F.2d 98, 101 (5th Cir. 1975). In addition, given the duration of the Executive Order and the likelihood that it will be extended, it is likely that many of Plaintiffs' patients will be forced to forgo an abortion entirely and carry an unwanted pregnancy to term. As the Fifth Circuit has made clear, "the grant of an injunction will not disserve the public interest . . . when an injunction is designed to avoid constitutional deprivations." *Jackson Women's Health Org.*, 940 F. Supp. 2d at 424; *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Moreover, as set forth more fully above, the benefits of a limited potential reduction in the use of some PPE (and not the most limited PPE) by abortion providers is outweighed by the harm of eliminating abortion access in the midst of a pandemic that increases the risks of continuing an unwanted pregnancy, as well as the risks of traveling to other states in search of time-sensitive medical care. Particularly where Plaintiffs are already taking steps—in line with those required of other medical professionals who continue to provide essential health care—to preserve PPE as much as possible, Dewitt-Dick Decl. ¶ 11; Klier Decl. ¶¶ 13–14; Schutt-Aine Decl. ¶¶ 29–31; Wallace Decl. ¶ 13, injunctive relief here is supported by the balance of harms and the public interest.

## IV.    A BOND IS NOT NECESSARY IN THIS CASE.

This Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. The Fifth Circuit has long held "the [trial] court may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *see also Planned Parenthood of Greater Tex.*

App.066

*Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 39 974, 979 (W.D. Tex.

2017), *overruled on other grounds*, 913 F.3d 551 (5th Cir. 2019); *City of Atlanta v. Metro Atlanta*

*Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (waiving bond requirement where

plaintiffs engaged in public-interest litigation, "an area in which the courts have recognized an

exception to the Rule 65 security requirement"). This Court should use its discretion to waive the

bond requirement here, where the relief sought will result in no monetary loss to Defendant.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for a temporary restraining

order and/or preliminary injunction to enjoin enforcement of the Executive Order and Emergency

Rule, as interpreted by Defendants, to prohibit abortions.

Dated: March 25, 2020

Respectfully submitted,

/s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com

*Attorney for all Plaintiffs*

Julie Murray (*pro hac vice* pending)
Alice Clapman (*pro hac vice* pending)
Richard Muniz (*pro hac vice* pending)
Hannah Swanson (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800

App.067

julie.murray@ppfa.org
alice.clapman@ppfa.org
richard.muniz@ppfa.org
hannah.swanson@ppfa.org

Jennifer Sandman (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, and Planned Parenthood South Texas Surgical Center*

Molly Duane (*pro hac vice* pending)
Rabia Muqaddam (*pro hac vice* pending)
Francesca Cocuzza (*pro hac vice* pending)
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

*Attorney for Plaintiffs Southwestern Women's Surgery Center* and *Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center*

Stephanie Toti
Rupali Sharma (*pro hac vice* pending)
Sneha Shah (*pro hac vice* pending)
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

*Attorney for Plaintiffs Whole Woman's
Health and Whole Woman's Health Alliance*

**CERTIFICATE OF SERVICE**

I certify that on this 25th day of March, 2020, I personally emailed a copy of the above document to the following individuals:

Adam.Biggs@oag.texas.gov

Darren.McCarty@oag.texas.gov

Christopher.Hilton@oag.texas.gov

/s/ *Julie Murray*
Julie Murray

App.070

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, *et al*.,<br><br>      Plaintiffs,<br><br>      v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al*.,<br><br>      Defendants. | No. 1:20-cv-00323-LY |

## DECLARATION OF POLIN C. BARRAZA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Polin C. Barraza declares as follows:

1.     I am President and Board Chair of Plaintiff Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), a not-for-profit corporation headquartered in San Antonio. PPST Surgical Center operates a licensed ambulatory surgical center and a licensed abortion facility in San Antonio. PPST Surgical Center provides a range of reproductive health services, including medication and surgical abortions.

2.     I am responsible for the management of PPST Surgical Center (as well as the operations of its parent organization, Planned Parenthood South Texas), and therefore am familiar with our operations and finances, including the services we provide and the communities we serve.

3.     I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin Executive Order

App.072

No. GA-09, as interpreted by the Texas Attorney General to ban all previability abortion in the state except where immediately necessary to protect the life or health of a pregnant person, as well as the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order. I am familiar with the Executive Order, a press release by the Texas Attorney General interpreting it, and the Emergency Rule. PPST Surgical Center has adopted a policy to implement the Executive Order, a true and correct copy of which is attached as Exhibit A.

4.      The facts I state here are based on my experience, my review of PPST Surgical Center business records, information obtained in the course of my duties at PPST Surgical Center and PPST, and personal knowledge that I have acquired through my service at PPST Surgical Center and PPST. If called and sworn as a witness, I could and would testify competently thereto.

**PPST Surgical Center's Provision of Abortion Care**

5.      In 2019 PPST Surgical Center provided 1855 abortions, and of those, 1258 were medication abortions and 597 were surgical abortions.

6.      In January and February 2020, PPST Surgical Center performed 550 abortions, and of those, 396 were medication abortions and 154 were surgical abortions.

7.      Neither medication nor surgical abortion requires extensive PPE or otherwise would deplete PPE. In fact, for medication abortion, providing patients with the medication does not require the use of *any* PPE. And while surgical abortion at PPST Surgical Center requires the use of sterile gloves for each procedure, a surgical mask that includes protective eyewear (one per provider per day, unless a mask becomes soiled), disposable gowns (one per provider per

2

day, unless a gown becomes soiled), disposable hair and shoe covers, and reuable lab coats and face shields, only a small number of workers are physically present for these procedures or their preparation/recovery and therefore in need of PPE.[1]  PPST uses only non-sterile gloves or condoms to perform ultrasound or laboratory exam, including one that accompanies medication or surgical abortion.

8.      PPST Surgical Center does not use or have any N95 respirators, which I understand are the PPE in shortest supply during the COVID-19 pandemic.

9.      PPST Surgical Center does not provide inpatient care, nor is it set up to do so.

**PPST Surgical Center's Efforts to Prevent COVID-19 Spread and Conserve Needed Resources**

10.      PPST Surgical Center is committed to doing its part to reduce the spread of COVID-19 and to otherwise help ensure that our public health system has sufficient resources to meet the challenge of responding to a potential surge of illness.

11.      Since the COVID-19 outbreak, PPST Surgical Center has taken steps to preserve much-needed medical resources that are in short supply during the pandemic. Even before the Governor's Executive Order, for example, we had excluded residents and medical students from observing or participating in surgeries or procedures, which reduced the number of individuals requiring PPE.

12.      We have also taken numerous steps to help prevent the spread of COVID-19 infection in the communities where we offer services. Although in normal times we welcome support companions accompanying abortion patients, we have decided not to allow such

---

[1] Per CDC guidance, Plaintiffs provide patients for whom there is a concern for COVID-19 or other upper respiratory disease with a mask.

companions (except parents accompanying minors) to enter our health centers in order to reduce the number of overall people exposed to one another.

13.     We have also made dramatic changes to the flow of our patient care. Before patients may enter a health center, we screen them for COVID-19 symptoms. Only those individuals who are positively screened can proceed to the front desk to check in and provide their phone number. Patients are then asked to wait in their cars, where a medical assistant will contact them to do as much intake as possible by phone. Patients are only permitted to reenter the health center when a room has opened for them and a clinician is available to see them. We have reconfigured our waiting rooms and check-in practices to limit the number of people in our facility, as well as to ensure they can and are maintaining the recommended social-distance.

14.     More recently, PPST has curtailed other non-abortion services that can safely be delayed, such as annual well-person visits and routine STI tests.

15.     In light of the Executive Order, we have cancelled surgical abortions scheduled for this week, and PPST Surgical Center will cancel non-emergency future surgical abortions appointments unless and until the Executive Order and Emergency Rule expire or are rescinded, or unless the Court grants relief. Additionally, PPST Surgical Center has stopped providing non-emergency medication abortions because of concerns about whether these abortions are permissible under the Attorney General's interpretation of the Executive Order.

16.     I declare under penalty of perjury that the foregoing is true and correct.


Executed March 25, 2020

_____
Polin C. Barraza

4

App.075

# EXHIBIT A

**Planned Parenthood**

### Planned Parenthood
### Policy In Response to Texas Executive Order GA 09
### Relating to Hospital Capacity During the COVID-19 Disaster

### PURPOSE

In light of the global pandemic of COVID-19, Governor Abbott signed Executive Order ("EO") GA 09 on March 22, 2020, attached, which is in effect until 11:59 p.m. on April 21, 2020. EO GA 09 directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." EO GA 09 goes on to state that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID- 19 disaster."

### POLICY

To comply with EO GA 09, Planned Parenthood hereby establishes the following policies which shall remain in effect until rescinded or modified:

1. Surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician, and which would deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster, are not to be scheduled while this policy is in effect.

2. Physicians shall determine on a case-by-case basis whether a procedure that would deplete hospital capacity or personal protective equipment needed to cope with COVID-19 can be delayed without risk for serious adverse medical consequences or death.

3. Planned Parenthood physicians have made the determination that abortion is a time-sensitive service and an essential component of comprehensive care, for which a delay of 30 days, or even less, increases the risks to patients, or make abortion completely inaccessible, and that such delay in accessing or inability to access an abortion exposes patients to risk of a serious adverse medical consequence.

4. In making this determination, Planned Parenthood physicians considered or will consider the following:

**Planned Parenthood**®

a. The purpose and text of EO GA 09, namely: concern for "a shortage of hospital capacity or personal protective equipment" that could "hinder efforts to cope with the COVID-19 disaster."

b. The stated 30-day duration of a the delay, taking into account the Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery," issued March 18, 2020, which states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."

c. The fact that pregnancy has a duration of approximately forty weeks, as measured from the first day of a woman's last menstrual period (LMP) and that most abortions are banned in Texas beginning at 20 weeks gestation. Tex. Health & Safety Code § 171.044.

d. The fact that, while abortion is an extremely safe medical procedure, delay increases the risk to the health of the patient. *See, e.g.,* Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States at 77-78, 162-63 (2018). Delay is of particular concern during the COVID-19 crisis, given guidance from the Center for Disease Control ("CDC") and American College of Obstetricians and Gynecologists ("ACOG") that pregnant women may be at heightened risk of severe illness, morbidity, or mortality from viral respiratory infections such as COVID-19.[1]

e. The Joint Statement by the American College of Obstetricians and Gynecologists ("ACOG"), the American Association of Gynecologic Laparoscopists, *et al.*, on Elective Surgeries[2], issued March 16, 2020, which states that "Obstetric and gynecologic procedures for which a delay will negatively affect patient health and safety should not be delayed. This includes gynecologic procedures and procedures related to pregnancy for which delay would harm patient health. Obstetrician–

---

[1] Available at https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019 and https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html

[2] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-elective-surgeries

Proprietary and confidential property of Planned Parenthood South Texas

App.078

# Planned Parenthood®

gynecologists and other health care practitioners should be aware of the unintended impact that policies responding to COVID-19 may have, including limiting access to time-sensitive obstetric and gynecological procedures."

    f. The Joint Statement by the ACOG, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak[3], issued March 18, 2020, which states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

3. All procedures which cannot be reasonably delayed and thus which *are* scheduled and performed, in accordance with the above considerations and in compliance with EO GA 09, shall be performed while making every effort to conserve PPE and to reduce the possibility of spread and transmission of COVID-19.

---

[3] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak

Proprietary and confidential property of Planned Parenthood South Texas

App.079

 **Planned Parenthood**®

Parenthood Policy In Response to the Texas Executive Order GA 09 Policy Relating to Hospital Capacity During the COVID-19 Disaster has been reviewed and approved by:

_____
Polin C. Barraza
President & Chair

3.24.20
Date

_____
Gerard Honoré, MD
Medical Director

3/24/20
Date

Proprietary and confidential property of Planned Parenthood South Texas

App.080

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, et al., <br><br> Defendants. | No. 1:20-cv-00323-LY |

**DECLARATION OF ALICIA DEWITT-DICK IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

I, ALICIA DEWITT-DICK, declare as follows:

1.      I am the administrator of Plaintiff Southwestern Women's Surgery Center ("Southwestern").

2.      Southwestern operates a licensed ambulatory surgical center in Dallas. Southwestern provides medication abortion up to 10 weeks as measured from the first day of the woman's last menstrual period ("LMP") and procedural abortions through 21.6 weeks LMP, as well as miscarriage management and contraceptive services. Southwestern provides care to approximately 9000 patients a year.

3.      As administrator, I oversee operations at the clinic and am familiar with all aspects of our policies and practices. The facts I state here are based on my experience, my review of Southwestern's business records, information obtained in the course of my duties at Southwestern, and personal knowledge that I have acquired through my service at Southwestern.

4.      I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin the March 22, 2019 Executive Order No. GA-09 (the "Executive Order"), as interpreted by the Texas Attorney General on March 23, 2020 to ban all previability abortion procedures in the state except where immediately necessary to protect the life or health of a patient. I have reviewed the Executive Order and the interpretation by the Attorney General.

5.      The Executive Order, effective until 11:59 p.m. on April 21, 2020, although it may be extended, directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment ["PPE"] needed to cope with the COVID-19 disaster." *Id.*

6.      Southwestern understands the term PPE to refer to surgical masks, N95 respirators (a face covering designed to block at least 95 percent of very small test particles), sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. The services Southwestern provides do not involve significant amounts of PPE or deplete PPE.

7.      On Monday, March 23, 2020, the Attorney General issued a press release interpreting the Executive Order, titled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic." The press release states that the Executive

App.083

Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." The release invokes the order's application to abortion providers four times. It states that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose who violate the governor's order will be met with the full force of the law."

8.      Southwestern is uncertain as to the scope of the Executive Order and the subsequent press release by the Attorney General, and, as a result, largely stopped seeing patients on March 23, 2020. The clinic has cancelled approximately 225 appointments for the last two days, March 24 and March 25. Unless we obtain immediate relief, we intend to continue canceling appointments going forward.

**Southwestern's Response to COVID-19:**

9.      Approximately a month prior to the Executive Order, in late February, Southwestern began to take actions within the clinic to address the spread of COVID-19 around the country and developed practices directed at reducing the risk of transmission and preserving PPE.

10.     On February 24, 2020, the clinic began screening all patients for potential exposure to COVID-19, using screening questions related to existing respiratory symptoms and recent travel.  We instructed staff to stay home if they were experiencing any symptoms associated with COVID-19.

3

11.     On March 13, 2020, we also began limiting the number of people in waiting areas to ensure social distancing of at least 6 feet between all persons, and implemented staff techniques to minimize the use of PPE, including restricting the use of new surgical masks and gowns.

12.     On March 16, 2020, Southwestern began checking the temperatures of all patients upon arrival in addition to continuing to ask patients screening questions regarding their symptoms and travel. Southwestern also began requiring that patients complete admission paperwork and wait in their vehicles to be seen by the physician.

13.     On March 18, 2020, we began checking temperatures of staff daily.

14.     There have only been a few instances where staff have experienced potential symptoms or contact that raises a low but non-negligible possibility of infection, and we have sent the staff members home.

15.     Southwestern has only canceled an appointment for one patient due to concern for a possible COVID-19 infection.

16.     While we have a limited number of N95 masks at the clinic, we would only use them if we were treating a patient with a suspected or confirmed COVID-19 infection.  We have not used any of these masks to date during the pandemic.

17.     Southwestern has also suspended its training program for residents and fellows until the end of April and halted onboarding of new staff.

**Southwestern Uses Minimal PPE:**

18.     In 2019, Southwestern performed 8800 abortions, including 2321 medication abortions prior to 10 weeks LMP. Of the procedural abortions, 5689 were performed at or before 14.6 weeks LMP via suction procedure. The remaining 790 were performed from 15 weeks LMP through 21.6 weeks LMP. Southwestern also performed 240 miscarriage management procedures

in 2019. The clinic does not have 2020 data available yet, but the first months of 2020 are in line with these earlier figures.

19.     For consults and ultrasounds, Southwestern typically only uses one pair of non-sterile gloves per patient, but has reduced such use in light of the COVID-19 pandemic. PPE is not typically used for dispensing medication abortion. For procedures prior to approximately 15 weeks LMP, the physician will use 3 non-sterile gloves per patient, and assisting staff might use 2-3 additional pairs of non-sterile gloves per patient. For procedures beyond 15 weeks LMP, the physician typically uses a gown, face shield, and one pair of sterile gloves, and other staff assisting in the procedure wear non-sterile gloves. For some procedures beyond 15 weeks LMP, Southwestern may also use reusable eyewear. Staff assisting with abortion procedures will typically wear 1-2 pairs of shoe coverings every day.

20.     Based on Southwestern's patient load, in an average week, we use the following PPE: a few boxes of non-sterile gloves; approximately 15 pairs of sterile gloves for procedures after 15 weeks LMP;  approximately 15 gowns; around 24 pairs of shoe coverings per day; and a handful of simple surgical masks and reusable eyewear.

21.     The clinic has a small number of N95 masks on hand. In early March, when the clinic was taking action addressing the COVID-19 pandemic, we were in touch with Dallas County Health and Human Services who recommended that we keep some N95 masks on site.

**Harm to Southwestern and our Patients:**

22.     Although abortion is a very safe medical procedure, the health risks associated with an abortion procedure generally increase with gestational age. The complexity of the procedure, the PPE needed to complete the procedure, and the associated expense also increase with gestational age. Our patients generally seek abortion as soon as they are able, but many face

logistical obstacles that can delay their access to abortion care. Some come from over a hundred miles to receive care at our clinic.  Patients need to schedule an appointment, gather the resources to pay for the abortion and related costs, and arrange transportation to a clinic, time off of work, and possibly childcare during appointments. Texas law requires them to make these arrangements multiple times for repeated trips to the clinic, even though most patients could safely obtain care in one visit. These existing delays already result in higher financial and emotional costs for our patients.

23.     The COVID-19 pandemic has only exacerbated these burdens. It has limited public transit availability, caused layoffs and other work disruptions, shuttered schools and childcare facilities, and otherwise limited patients' options for transportation and childcare support during a time of recommended social-distancing.

24.     Many recent patients have expressed gratitude that they were able to receive care with us. Many have expressed that they feel protected by the clinic's measures, and that they are relieved that the clinic was operating and continuing to provide services that are so time-sensitive and essential.

25.     The patients whose appointments have been cancelled in light of the Executive Order and the Attorney General's interpretation have been extremely upset. Some of the dozens of patients we intended to see this week will be pushed out of eligibility for receiving a medication abortion. Others will be pushed into more complex procedures. And, some may not be able to return for their procedure with us at all.

26.     Southwestern reasonably fears the Attorney General's threat of enforcement, given that the Attorney General may understand the Executive Order to prohibit procedural abortions that our physicians deem necessary to "correct a serious medical condition of … a patient who

6

without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician," as permitted by the Executive Order. Our physicians also reasonably fear that the Attorney General will understand the Order to prohibit medication abortions, despite the fact that these are not "procedures" under the common medical understanding of the term, and therefore do not fall within the terms of the Executive Order as understood by our medical staff.

27.      Based on this enforcement risk, Southwestern is unsure how to proceed but plans to resume certain appointments where care does not involve new PPE.

28.      If the Executive Order, as interpreted by the Attorney General, is enforced, it will delay and deny access to care for our patients. It will, as a result, harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Alicia Dewitt-Dick

Executed March 25, 2020

App.088

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE; *et al.*, | ) ) ) | CIVIL ACTION |
| Plaintiffs, | ) ) | CASE NO. 1:20-cv-323-LY |
| v. | ) ) | |
| GREG ABBOTT, in his official capacity as Governor; *et al.*, | ) ) ) | |
| Defendants. | ) | |

## <u>DECLARATION OF ANDREA FERRIGNO</u>

ANDREA FERRIGNO hereby declares under penalty of perjury that the following statements are true and correct:

1.      I am the Corporate Vice-President with Whole Woman's Health ("WWH"), a plaintiff in this case.

2.      WWH is a consortium of limited liability companies, each incorporated under Texas law. The consortium includes a property management company,  healthcare management company specializing in the management of abortion clinics, and a  network of abortion clinics.

3.      WWH currently owns and operates two abortion clinics in Texas, one in Fort Worth (the "Fort Worth Clinic") and one in McAllen (the "McAllen clinic"). WWH also owns and operates an abortion clinic in Baltimore, Maryland; Minneapolis, Minnesota; and Alexandria, Virginia.

1

4.    My responsibilities as Corporate Vice-President include ensuring that each clinic complies with all statutes and regulations concerning the provision of the health services they offer, including abortion care, as well as recruiting physicians.

5.    I have worked at WWH in a variety of roles since 2004, when I first joined as a Patient Advocate. As a result, I am well-versed in abortion clinic operations and patient care.

6.    I provide the following testimony based on personal knowledge and review of WWH's business records.

## Provision of Abortion Care at the WWH Clinics in Texas

7.    Both the Fort Worth and McAllen clinics offer surgical abortions up to 17.6 weeks gestation, as measured from the first day of a patient's last menstrual period ("lmp"). Texas law prohibits licensed abortion facilities from providing surgical abortions past this gestational age. *See* Tex. Health & Safety Code § 171.004.

8.    Both clinics also offer medication abortions up to 10 weeks lmp. Texas law prohibits the provision of medication abortion past this gestational age. *See* Tex. Health & Safety Code § 171.063(a)(2).

## Use of PPE in WWH Clinics in Texas

9.    Texas law requires abortion patients who live within 100 miles of a licensed abortion facility to make two trips to obtain care. *See* Tex. Health & Safety Code § 171.012(a)(4), (b). During the first visit, we must provide the patient with State-mandated information and perform an ultrasound examination. *See id.* The physician cannot provide the patient an abortion until the second visit. *See id.*

10.    There is minimal use of personal protective equipment ("PPE") at the WWH clinics in Texas. Physicians do not use it to provide medication abortions and use sterile gloves and

surgical gowns to provide surgical abortions. Some physicians also use surgical masks, disposable shoe covers and reusable goggles for dilation & evacuation ("D&E") abortions.

11.     Additionally, physicians do not use PPE to perform an abdominal ultrasound examination before an abortion and use only gloves to perform a transvaginal ultrasound examination before an abortion.

12.     After a surgical abortion, a staff member examines the tissue removed from the patient in the pathology laboratory. To do so, the staff member may use gloves, a surgical gown, face shield, or disposable shoe covers.

13.     The WWH clinics in Texas do not have or intend to acquire any N-95 respirators, which are face coverings designed to block at least 95 percent of very small test particles.

14.     Our abortion patients rarely require hospitalization.

### WWH's Response to the COVID-19 Public Health Crisis

15.     WWH has adopted certain policies to help ensure the safety of its patients and staff during the COVID-19 public health crisis.

16.     We screen staff members for symptoms of COVID-19 and require anyone who is exhibiting them or has been exposed to someone with a confirmed case to self-quarantine for at least fourteen consecutive days.

17.     Additionally, staff members screen all potential patients by phone for symptoms of COVID-19. If a patient is exhibiting symptoms, we ask them to self-quarantine, contact their primary care provider, and not visit the clinic unless they have been asymptomatic for at least fourteen consecutive days.

18.     Further, we limit the number of people in a clinic at any given time and help ensure patients keep a safe distance from each other in the waiting room and recovery area.

19.     We also train staff on best practices to prevent the spread of infection and require them to observe strict practices for handwashing and disinfecting surfaces. Texas law prohibits the provision of State-mandated information using telemedicine. *See, e.g.*, Tex. Occ. Code § 111.005(c); Tex. Health & Safety Code § 171.063(c); 25 Tex. Admin. Code § 139.53(b)(5).

## Effect of the Governor's Executive Order

20.     On March 22, 2020, Governor Abbott issued Executive Order GA-09 ("Executive Order"), which concerns hospital capacity during the COVID-19 public health crisis, and applies until 11:59 p.m. on April 21, 2020, assuming it is not renewed. The Executive Order directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* at 1. The Executive Order clarifies that the prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *Id.*

21.     The Executive Order does not define PPE. We at WWH understand PPE to include surgical masks, N-95 respirators, sterile and non-sterile gloves, disposable protective eyewear, surgical gowns, and disposable shoe covers.

22.     Both the Fort Worth and McAllen clinics are willing and able to continue providing abortion care consistent with the Executive Order.

23.     On March 23, 2020, however, WWH received a copy of an email from the Texas Office of the Attorney General announcing a press release by Attorney General Paxton, entitled

"Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic."

24.    The press release states that the Executive Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." It states that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose who violate the governor's order will be met with the full force of the law."

25.    WWH's clinics in Texas were concerned that they would be prosecuted given the Attorney General's interpretation of the Executive Order as prohibiting "any type of abortion" even though the Executive Order permits abortions that physicians have determined are necessary to "correct a serious medical condition of … a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician," and/or those that "would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 health disaster."

26.    On March 24, the Fort Worth Clinic cancelled appointments for 13 abortion patients, who now are unable to obtain care anywhere in Texas. The following day, the clinic cancelled another 18 appointments for abortion patients, who now are unable to obtain an abortion in the State.

27.    On March 24, the McAllen Clinic cancelled appointments for two abortion patients, who now are unable to obtain care anywhere in Texas. The following day, the clinic cancelled

5

another two appointments for abortion patients, who now are unable to obtain an abortion in the State.

28.     People continue to seek appointments at both clinics. We must turn them away unless we are certain that no aspect of their care will involve the use of PPE. Between today and April 21, 2020, we anticipate turning away over 100 patients from the Fort Worth Clinic and at least 40 patients from the McAllen Clinic.

29.     Each of our abortion clinics has a maximum capacity based on the size of our facility and the availability of our physicians. The maximum capacity of the Fort Worth Clinic is 130 patients per week and the maximum capacity of the McAllen Clinic is about 60 patients per week. Even if we were able to resume abortion care on April 22, 2020, it would take us a significant amount of time to treat all of the patients that we will have to turn away between now and then, in addition to our regular patient load.

**Impact on Patients**

30.     A majority of the patients at the Fort Worth Clinic are people of color and Spanish speakers. They hail from all over Texas.

31.     A majority of the patients at the McAllen Clinic are Spanish speakers and many face immigration-related restrictions on traveling outside of the Rio Grande Valley.

32.     The patients at both clinics seek abortion care for a variety of reasons. Many are low-income, uninsured, and the parents of dependent children.

33.     And many would suffer substantial burdens if they were forced to seek abortion care out-of-state ordinarily. Such long-distance travel is virtually impossible now due to travel restrictions, more severe financial constraints for those in need of abortion care, school closures, and the unlikelihood of finding childcare.

6

34.     Consequently, our patients and would-be patients will be forced to live with an unwanted pregnancy for an indefinite amount of time—if they are able to obtain an abortion at all. This can involve physical symptoms, such as morning sickness, considerable stress and anxiety, and  the increased possibility that an abusive partner or family member will learn of the pregnancy.

35.     People who are delayed past ten weeks lmp will no longer be able to obtain a medication abortion. *See* Tex. Health & Safety Code § 171.063(a)(2).  Similarly, those who are delayed past 14-16 weeks lmp will no longer be able to obtain an aspiration abortion, a type of surgical abortion, and will instead have to receive a D&E, which is a lengthier and more complex procedure.  Those who are pushed past 18 weeks lmp, *see* Tex. Health & Safety Code § 171.004, will no longer be able to obtain an abortion at an abortion clinic, while those who are delayed past 22 weeks lmp will no longer be able to obtain an abortion in Texas at all, absent a medical emergency.  *See* Tex. Health & Safety Code § 171.044.

36.     The medical risks of abortion and pregnancy, as well as the costs of abortion care, increase with gestational age.

37.     Thus, the patients that WWH will be forced to turn away for fear of prosecution will suffer in significant and lasting ways.


Dated:  March 25, 2020

                                                            */S/Andrea Ferrigno*
                                                            Andrea Ferrigno
                                                            Corporate Vice-Present
                                                            Whole Woman's Health

App.096

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE; *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| | ) | CASE NO. 1:20-CV-00323-LY |
| v. | ) ) | |
| GREG ABBOTT, in his official capacity as Governor; *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF AMY HAGSTROM MILLER

AMY HAGSTROM MILLER hereby declares under penalty of perjury that the following statements are true and correct:

1.      I am the President and Chief Executive Officer ("CEO") of Whole Woman's Health Alliance ("WWHA"), a plaintiff in this case.

2.      WWHA is a nonprofit organization incorporated under Texas law. Its mission is to provide abortion care in underserved communities and shift the stigma around abortion in our culture.

3.      WWHA currently operates an abortion clinic in Austin, Texas (the "Austin clinic"), as well as abortion clinics in Indiana and Virginia. The Austin clinic opened in 2017 and is licensed in accordance with Texas law.

4.      As President and CEO of WWHA, I oversee all aspects of the organization's work.

5.      I have been working in the abortion care field since 1989. Prior to my work at WWHA, I founded a consortium of limited liability companies involved in the provision of abortion care throughout the United States. These companies do business under the name "Whole

1

Woman's Health." I continue to serve as President and CEO of Whole Woman's Health, which opened its first abortion clinic in 2003.

6.      I am thoroughly familiar with all aspects of abortion clinic operations and patient care.

7.      I provide the following testimony based on my personal knowledge and review of WWHA's business records.

### *Provision of Abortion Care at the Austin Clinic*

8.      The Austin clinic provides surgical abortions up to 17.6 weeks of pregnancy as measured from the first day of a patient's last menstrual period ("lmp"). Under Texas law, licensed abortion facilities are not permitted to provide surgical abortions beyond this gestational age. *See* Tex. Health & Safety Code § 171.004.

9.      The Austin clinic provides medication abortions up to 70 days lmp. Under Texas law, medication abortions are prohibited after this gestational age. *See* Tex. Health & Safety Code § 171.063(a)(2).

10.      In a typical week, the Austin clinic provides surgical abortions to approximately 30 patients.

11.      In a typical week, the Austin clinic provides medication abortions to approximately 30 patients.

12.      Texas law requires abortion patients who reside within 100 miles of a licensed abortion clinic to make two separate visits to the clinic to obtain care. *See* Tex. Health & Safety Code § 171.012(a)(4), (b). During the first visit, we must provide the patient with certain state-mandated information and perform an ultrasound examination. *See id.* During the second visit, we provide abortion care. Most of our patients reside within 100 miles of the Austin clinic.

13.     Providing abortion care requires minimal use of personal protective equipment ("PPE").  In fact, medical staff members at the Austin clinic do not utilize any PPE when providing medication abortion to patients.  Doctors who provide surgical abortions at the Austin clinic typically wear sterile or non-sterile gloves that are discarded after each procedure but do not utilize other forms of PPE.  If a patient is receiving sedation, a nurse is also present in the procedure room and will utilize sterile or non-sterile gloves.  One or more surgical assistants may also be present for a procedure, but they do not utilize any PPE.

14.     Likewise, pre-procedure ultrasound examinations require minimal PPE.  Use of PPE is typically not required at all for abdominal ultrasound examinations.  For vaginal ultrasound examinations, doctors and ultrasound technicians typically wear non-sterile gloves that are discarded after each scan.  When laboratory testing is required, technicians likewise utilize only non-sterile gloves.

15.     Following a surgical abortion procedure, the tissue removed from a patient is examined in the pathology laboratory.  This task is typically performed by a single staff member who utilizes one washable gown per shift, either one disposable face shield per shift or one set of reusable goggles, one set of disposable shoe covers per shift, one disposable hair cap per shift, and one or more sets of non-sterile gloves.

16.     WWHA does not use or have any N95 respirators.

17.     Abortion patients seldom require hospitalization.  The Austin clinic had only a single hospital transfer during all of last year.  Further, we keep detailed complication logs that record, among other things, when a patient receives hospital treatment after being discharged from the clinic.  This happens only a handful of times each year.

3

### *WWHA's Response to the COVID-19 Outbreak*

18.     In response to the COVID-19 outbreak, WWHA has adopted policies to protect its patients and staff members from exposure to the virus.

19.     For example, staff members screen all patients by telephone before they come to the Austin clinic to determine if they have symptoms of COVID-19.  Symptomatic patients are directed to self-quarantine and contact their primary healthcare providers.  We will not schedule a patient for a clinic visit unless the patient has been symptom free for fourteen days.  We are also limiting the number of people who enter the clinic and ensuring that patients maintain a safe distance from one another in the waiting room and recovery area.  In addition, we are screening staff members for symptoms and directing everyone who is symptomatic or who has come in contact with someone who has a confirmed case of the virus to self-quarantine for at least fourteen days.

20.     We have provided staff members with training on best practices to prevent the spread of infection, and we are vigilant about enforcing protocols for hand washing and disinfecting surfaces. In other states, we have begun using telehealth platforms for pre-abortion counseling, which reduces unnecessary trips to the clinic for patients and providers, but Texas law requires that certain mandatory disclosures be delivered in person prior to the abortion.

### *Suspension of Services Following the Governor's Executive Order*

21.     On March 22, 2020, Texas Governor Greg Abbott issued Executive Order GA-09 ("Executive Order"), relating to hospital capacity during the COVID-19 pandemic. It is in effect until 11:59 p.m. on April 21, 2020, although it may be extended. It directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve

4

the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *Id.*

22.     Although the order does not define PPE, I understand that term to refer to surgical masks, N95 respirators (a face covering that is designed to block at least 95 percent of very small test particles and which, when used appropriately, is a more effective filtration system than a surgical mask), sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers.

23.     I believe that the Austin clinic can continue to provide abortion care in a manner consistent with the Executive Order, and WWHA has adopted policies and procedures to ensure that the care that we provide while the Executive Order remains in effect is fully compliant with its letter and spirit.

24.     On Monday, March 23, 2020, WWHA received a copy of an email from the Texas Office of the Attorney General announcing a press release by Attorney General Ken Paxton. That press release was entitled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic."

25.     The press release states that the Executive Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type

of abortion that is not medically necessary to preserve the life or health of the mother." It states

that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-

19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose

who violate the governor's order will be met with the full force of the law."

26.     WWHA reasonably fears the Attorney General's threat of enforcement, given that

the Attorney General and other enforcement officials may understand the Executive Order to

prohibit "any type of abortion" that entails the use of PPE even though the Executive Order

expressly permits abortions that WWHA's physicians have determined are necessary to "correct a

serious medical condition of … a patient who without immediate performance of the surgery or

procedure would be at risk for serious adverse medical consequences or death, as determined by

the patient's physician," and/or those that "would not deplete the hospital capacity or the personal

protective equipment needed to cope with the COVID-19 health disaster."

27.     Based on this enforcement risk, WWHA has cancelled appointments for more than

20 abortion patients since receiving the Attorney General's press release. At least two of these

patients were in the second-trimester of pregnancy and will be past the legal limit for abortion in

Texas by the time the Executive Order expires.

28.     Patients continue to call the clinic to schedule appointments. We have to turn them

away unless we can be sure that no aspect of their care will require the use of PPE. We expect

that, between today and April 21, 2020, we will have to turn away dozens of patients.

29.     The Austin clinic's capacity is limited by the size of the facility, doctor availability,

and the need for most patients to make two trips to the clinic to obtain care. The maximum capacity

of the Austin clinic is sixty to seventy patients per week. Even if we were able to resume providing

6

abortion care on April 22, 2019, which is uncertain, we would not be able to treat all the patients who had been previously been turned away within a week.

### *Impact on Patients*

30.     Our patients seek abortion care for a variety of reasons.  Many do not have the resources to add an additional child to their family.  Some are students who want to complete their education before having children.  Some do not want to be tied financially or emotionally to the putative father, or fear abuse if their pregnancy is discovered.

31.     Many of the patients who seek care at the Austin clinic are low-income, and many are parents of dependent children.  The majority are uninsured.

32.     It would be difficult for many of our patients to travel out of state to access abortion care even during normal times.  But now, given the travel restrictions and business closures resulting from the COVID-19 crisis, it is nearly impossible.  Moreover, in the current circumstances, long-distance travel is both risky and nerve-wracking.

33.     Being forced to delay a wanted abortion is also nerve-wracking.  Patients who are delayed from accessing abortion must continue to cope with the physical symptoms of pregnancy, which for many include morning sickness.  Weight gain will require some to buy new clothes, which can be a financial strain.  The longer a patient remains pregnant, the more likely it is that others will discover the pregnancy, including abusive partners or family members.  Patients who are delayed from accessing abortion must also cope with the fear of not being able to obtain abortion care in time—and of the life-altering consequences of having to carry an unwanted pregnancy to term.

34.     Patients who are delayed past 70 days lmp are no longer eligible for a medication abortion.  *See* Tex. Health & Safety Code § 171.063(a)(2).  Patients who are delayed past 14-16

7

weeks lmp are no longer eligible for an aspiration abortion, a type of surgical abortion available early in pregnancy, and must instead have a D&E abortion, which is a lengthier and more complex procedure. Patients who are delayed past 17.6 weeks lmp are no longer eligible for an abortion at the Austin clinic or any abortion clinic in Texas. *See* Tex. Health & Safety Code § 171.004. Patients who are delayed past 22 weeks lmp are no longer able to obtain an abortion in Texas at all, absent a medical emergency. *See* Tex. Health & Safety Code § 171.044.

35.     The cost of abortion care (as well as the medical risks of pregnancy and abortion) increase significantly with gestational age.

36.     The patients that the Austin clinic is forced to turn away because of the Attorney General's threat of enforcement will therefore be harmed in significant and irreparable ways.

Dated: March 25, 2020

*Amy Hagstrom Miller*
AMY HAGSTROM MILLER

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

PLANNED PARENTHOOD CENTER FOR
CHOICE, et al.,

      Plaintiffs,

      v.

GREG ABBOTT, in his official capacity as
Governor of Texas, et al.,

      Defendants.

No. 1:20-cv-00323-LY

## DECLARATION OF JESSICA KLIER IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JESSICA KLIER, declares under penalty of perjury that the following statements are true and correct:

1. I am the Administrator at Austin Women's Health Center and Brookside Women's Medical Center, a position that I have held for 16 years. Along with the Medical Director, I provide overall leadership for the clinic. My responsibilities include carrying out the clinic's organizational goals, developing and implementing clinic policies and procedures with operational oversight of financial and budgetary activities, and ensuring compliance with all regulatory agencies governing health care delivery.

2. Austin Women's Health Center is a licensed abortion facility and Brookside Women's Medical Center is a gynecological and primary care practice. Together, these two facilities (collectively "Austin Women's") have provided high-quality reproductive services to Texas women for over 40 years. Austin Women's provides medication abortion up to 70 days of gestation and procedural abortions (sometimes referred to as "surgical abortions") up to 17

1

weeks, 6 days as dated from the first day of the patient's last menstrual period.  Austin Women's also provides contraception, miscarriage management, and gynecologic surgical procedures, including colposcopies, biopsies, and loop electrosurgical excision procedures ("LEEPs"), in which a layer of cervical tissue is removed to diagnose and treat cancer or precancerous cells.

3.      I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin Executive Order No. GA-09 (the "Executive Order"), as interpreted by the Texas Attorney General to ban all previability abortion procedures in the state except where immediately necessary to protect the life or health of a pregnant person. I have reviewed the Executive Order and a press release by the Texas Attorney General interpreting it.

4.      The facts I state here are based on my experience, my review of Austin Women's business records, information obtained in the course of my duties at Austin Women's, and personal knowledge that I have acquired through my service at Austin Women's.

5.      On March 22, 2020, Texas Governor Greg Abbott issued the Executive Order, relating to hospital capacity during the COVID-19 pandemic. That order is in effect until 11:59 p.m. on April 21, 2020, although it may be extended. It directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical

2

practice, would not deplete the hospital capacity or the personal protective equipment ["PPE"] needed to cope with the COVID-19 disaster." *Id.*

6.    Although the order does not define PPE, I understand that term to refer to surgical masks, N95 respirators, sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. Austin Women's stocks surgical masks, non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. We also have a small number of N95 respirators that we generally do not use.

7.    On Monday, March 23, 2020, Austin Women's received a copy of an email from the Texas Office of the Attorney General announcing a press release by Attorney General Ken Paxton, entitled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic."

8.    The press release states that the Executive Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." The release invokes the order's application to abortion providers four times. It states that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose who violate the governor's order will be met with the full force of the law."

9.    In 2019, Austin Women's performed 3058 abortions, 1601 of which were medication abortions.

10.     In January and February 2020, Austin Women's performed 570 abortions, 309 of which were medication abortions.

11.     Neither medication nor procedural abortion requires extensive, if any, PPE or otherwise would deplete PPE necessary to address the current pandemic. Before the COVID-19 outbreak, Austin Women's used no PPE for medication abortion, and limited PPE for procedural abortions—non-sterile gloves and disposable shoe covers for most procedures, with the addition of gowns, face masks, and face shields for second trimester procedures.

12.     An ultrasound or laboratory exam, including one that accompanies medication or procedural abortion at Austin Women's, requires only non-sterile gloves, similar to what are used in nearly all medical visits by health care providers.

13.     Since the COVID-19 outbreak began, Austin Women's has taken extra steps to conserve PPE while protecting our patients and staff from potential sources of transmission. Austin Women's primary physician, for example, has been wearing and reusing a single N95 mask during all face-to-face interactions with patients and switched to using washable gowns during procedural abortions.

14.     We have also taken numerous steps to help prevent the spread of COVID-19 infection in our facility. We have taken measures to ensure social distancing, including utilizing the large outdoor space around our clinic, where, where the weather is pleasant, we have set up chairs at least six feet apart. Inside the facility we have similarly spaced chairs in the waiting room at least six feet apart. We now ask patients to fill out paperwork and wait for their procedure in their car. In addition, although we normally welcome support companions accompanying abortion patients, we have decided not to allow such companions (except parents

accompanying minors or language translators) to enter our facility to reduce the number of overall people exposed to one another.

15.     We have also begun spacing out appointments to reduce crowding in our facility and have deactivated the automatic online appointment feature on our website to prevent double booking. We have also changed the patient flow in our facility so that each patient stays in their assigned patient room for the duration of their visit, instead of going back and forth to the waiting room in between visits with different staff members.

16.     We have also been screening patients both on the phone when they make their appointment and upon entry for potential infection, including: asking each patient if she has a fever or a cough, asking if she has been exposed to potential COVID-19 patients, and taking each patient's temperature upon entry to the facility. Beginning this week, we were planning to start screening staff members each day for fever and other potential symptoms.

17.     Based on the risk of enforcement of the Executive Order, we have already had to cancel nearly 100 abortion patient appointments, though we are still seeing some patients including for follow-ups and urgent gynecological care. If we are unable to see certain patients for the rest of the week, we will need to cancel dozens of additional patient appointments.

18.     Many, if not all of these patients, in addition to the patients Austin Women's planned to serve through April 21, will be significantly burdened by the delays in their access to care. Many will be unable to access abortion at all, while others will be forced to travel out of state. All will suffer increased risks to their health by the delay in access to abortion care. Many will also face increased costs related to abortion, as their abortion access is pushed to later gestational points when abortion is more expensive and may require a two-day procedure, instead of one, and thus additional use of PPE.

5

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jessica Klier

Executed March 25, 2020

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

PLANNED PARENTHOOD CENTER FOR
CHOICE, *et al.*,

     Plaintiffs,

     v.

GREG ABBOTT, in his official capacity as
Governor of Texas, *et al.*,

     Defendants.

No. 1:20-cv-00323-LY

## DECLARATION OF KEN LAMBRECHT IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Ken Lambrecht, declare as follows:

1.     I am the CEO of Planned Parenthood Greater Texas, Inc. ("PPGT") as well as of its related entity, Planned Parenthood of Greater Texas Surgical Health Services ("PPGTSHS"). I am responsible for the management of these organizations and therefore am familiar with our operations and finances, including the services we provide and the communities we serve.

2.     PPGT is a not-for-profit organization incorporated in Texas and headquartered in Dallas, Texas. It operates health centers throughout Central and North Texas, including Austin, Dallas, El Paso, Fort Worth, Paris, Tyler, Waco, and surrounding communities. PPGT provides comprehensive reproductive health care services, including birth control, emergency contraception, testing and treatment for sexually transmitted infections (STIs), pregnancy testing and prenatal referrals, clinical breast exams, breast and cervical cancer screenings, PrEP, PEP,

colposcopy, Loop Electrosurgical Excision Procedure (LEEP), and condyloma treatment. PPGT also provides Gender Affirming Hormone Therapy and hormone replacement therapy.

3. An ancillary of PPGT, PPGTSHS, also provides medication and procedural abortion at three health centers.

4. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin Executive Order No. GA-09, as interpreted by the Texas Attorney General to ban all previability abortion in the state except where immediately necessary to protect the life or health of a pregnant person, as well as the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order. I am familiar with the Executive Order, a press release by the Texas Attorney General interpreting it, and the Emergency Rule.

5. The facts I state here are based on my experience, my review of PPGT and PPGTSHS business records, information obtained in the course of my duties at PPGT and PPGTSHS, and personal knowledge that I have acquired through my service at PPGT and PPGTSHS. If called and sworn as a witness, I could and would testify competently thereto.

**The Executive Order and Threatened Enforcement**

6. On March 22, 2020, Texas Governor Greg Abbott issued the Executive Order, relating to hospital capacity during the COVID-19 pandemic. That order is in effect until 11:59 p.m. on April 21, 2020, although it may be extended. It directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician."

2

*Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment ["PPE"] needed to cope with the COVID-19 disaster." *Id.*

7.      Although the order does not define PPE, I understand that term to refer to surgical masks, N95 respirators (a face covering that is designed to block at least 95 percent of very small test particles and which, when used appropriately, is a more effective filtration system than a surgical mask), sterile and non-sterile gloves, protective eyewear, gowns, and shoe covers.

8.      PPGTSHS has adopted a policy to implement the Executive Order, a true and correct copy of which is attached as Exhibit A. That policy permitted PPGTSHS to continue offering procedural and medication abortion, consistent with the Executive Order's purpose and plain language and the views of trusted national medical organizations.

9.      On Monday, March 23, 2020, PPGTSHS received a copy of an email from the Texas Office of the Attorney General announcing a press release by Attorney General Ken Paxton that interprets the Executive Order and which threatens abortion providers with enforcement measures if they violate the order.

**PPGTSHS' Provision of Abortion Care**

10.      In 2019 PPGTSHS performed 6,982 abortions. Of those, 1,643 occurred beyond 10 weeks LMP, and were therefore necessarily performed as procedural abortion. Of those 5,339 occurring before 10 weeks LMP, 1,668 were done by procedural abortion and the remainder by medication abortion.

11.      In January and February 2020, PPGTSHS performed 924 abortions, 285 of which occurred beyond 10 weeks LMP and were therefore necessarily performed as procedural abortions.

3

Of those 639 abortions occurring before 10 weeks LMP, 197 were done by procedural abortion and the remainder by medication abortion.

12.     Neither medication nor procedural abortion requires extensive PPE or otherwise would deplete PPE. In fact, for medication abortion, providing patients with the medication does not require the use of *any* PPE. And while procedural abortion at PPGTSHS requires the use of five non-sterile gloves for each procedure, a procedural mask that includes protective eyewear (one per provider per day, unless a mask becomes soiled), disposable gowns and hair cover (one per provider per day, unless they become soiled), and disposable shoe covers, only a small number of workers are physically present for these procedures or their preparation/recovery and therefore in need of PPE.[1] For an ultrasound or laboratory exam, including one that accompanies medication or procedural abortion, our providers currently use non-sterile gloves. PPGTSHS does not use or have any N95 respirators, which I understand are the PPE in shortest supply during the COVID-19 pandemic.

13.     PPGTSHS does not provide inpatient care, nor is it set up to do so.

**PPGTSHS' Efforts to Prevent COVID-19 Spread and Conserve Needed Resources**

14.     PPGTSHS is committed to doing its part to reduce the spread of COVID-19 and to otherwise help ensure that our public health system has sufficient resources to meet the challenge of responding to a potential surge of illness.

15.     Since the COVID-19 outbreak, PPGTSHS has taken extensive steps to preserve much-needed medical resources that are in short supply during the pandemic and help prevent the

---

[1] Per CDC guidance, PPGTSHS provides patients for whom there is a concern for COVID-19 or other upper respiratory disease with a mask. Ctrs. for Disease Control & Prevention, *Frequently Asked Questions about Personal Protective Equipment* (Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html.

4

spread of COVID-19 in the communities where we offer services. Even before the Governor's order, for example, we had excluded residents and medical students from observing or participating in surgeries or procedures, which reduced the number of individuals requiring PPE. As a result of the outbreak, we have reduced our patient volume to ensure that we comply with current social-distancing recommendations. In addition, although in normal times we welcome support companions accompanying abortion patients, we have decided not to allow such companions (except parents accompanying minors) to enter our health centers in order to reduce the number of overall people exposed to one another.

16.     We have also made changes to the flow of patient care. Before patients may enter a health center, we screen them for COVID-19 symptoms, including by checking for fever. Only those individuals who are positively screened can proceed to the front desk to check in and provide their phone number. Patients are then asked to wait in their cars, where a nurse will call them to do as much intake as possible by phone. Patients are only permitted to reenter the health center when a room has opened for them and a clinician is available to see them.

**Harms Caused by the Executive Order and the Attorney General's Interpretation of It**

17.     PPGTSHS reasonably fears the Attorney General's threat of enforcement, given that the Attorney General may understand the Executive Order to prohibit procedural abortions that PPGTSHS's physicians have determined are necessary to "correct a serious medical condition of . . . a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician," as permitted by the Executive Order. It also reasonably fears that the Attorney General will understand the order to prohibit medication abortions, despite the fact that these are not "procedures" and therefore do not fall within the terms of the Executive Order at all.

5

18.     Based on this enforcement risk, PPGTSHS cancelled twenty-two medication abortions and six procedural abortions on Tuesday, March 24. Even if each one of these patients were able to access abortion after the order's current expiration date (i.e., even if the order is not extended), many of the medication abortion patients would require procedural abortions instead (and correspondingly greater amounts of PPE), and five of the six procedural abortion patients would require a comparatively more complicated procedural abortion method known as the D&E (or Dilation & Evacuation) technique. That technique requires more time in the clinic and a larger number of staff than aspiration abortion. Moreover, because these patients would continue to be pregnant for a longer period of time, they would be at increased risk of negative health outcomes if they are diagnosed with COVID-19.[2]

19.     Between Wednesday and Friday of this week, PPGTSHS has seventeen medication abortions and eleven procedural abortions scheduled. Even if each one of these patients were able to access abortion after the order's current expiration (i.e., it is not extended), many medication abortion patients would require procedural abortions instead (and correspondingly greater amounts of PPE). One of the procedural abortion patients would be beyond the legal gestational limit for abortion in Texas, another would be within days of that limit, and two others would be more than twenty weeks pregnant.

20.     PPGTSHS will cancel non-emergency future surgical abortion appointments unless and until the Executive Order and Emergency Rule expire or are rescinded, or unless the Court grants relief. Additionally, because of the AG's interpretation of the Executive Order, we have

---

[2] Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

cancelled all non-emergency medication abortions until we obtain clarity on the scope of the Executive Order or the Court grants relief.

21.    I declare under penalty of perjury that the foregoing is true and correct.


_____
Ken Lambrecht

Executed March 25, 2020

7

Case: 20-50264032 Document: 13 Page: 121 Date Filed: 03/30/2020

# EXHIBIT A

**Planned Parenthood of Greater Texas, Inc.**
**Policy In Response to Texas Executive Order GA 09**
**Relating to Hospital Capacity During the COVID-19 Disaster**

## PURPOSE

In light of the global pandemic of COVID-19, Governor Abbott signed Executive Order ("EO") GA 09 on March 22, 2020, attached, which is in effect until 11:59 p.m. on April 21, 2020. EO GA 09 directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." EO GA 09 goes on to state that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID- 19 disaster."

## POLICY

To comply with EO GA 09, Planned Parenthood of Greater Texas, Inc. (PPGT) hereby establishes the following policies which shall remain in effect until rescinded or modified:

1. Surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician, and which would deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster,  are <u>not</u> to be scheduled while this policy is in effect.

2. Physicians shall determine on a case-by-case basis whether a procedure that would deplete hospital capacity or personal protective equipment needed to cope with COVID-19 can be delayed without risk for serious adverse medical consequences or death.

3. PPGT's physicians have made the determination that abortion is a time-sensitive service and an essential component of comprehensive care, for which a delay of 30 days, or even less,  increases the risks to patients, or make abortion completely inaccessible, and that such delay in accessing or inability to access an abortion exposes patients to risk of a serious adverse medical consequence.

4. In making this determination, PPGT's physicians considered or will consider the following:

App.122

a. The purpose and text of EO GA 09, namely: concern for "a shortage of hospital capacity or personal protective equipment" that could "hinder efforts to cope with the COVID-19 disaster."

b. The stated 30-day duration of a the delay, taking into account the Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery," issued March 18, 2020, which states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."

c. The fact that pregnancy has a duration of approximately forty weeks, as measured from the first day of a woman's last menstrual period (LMP) and that most abortions are banned in Texas beginning at 20 weeks gestation. Tex. Health & Safety Code § 171.044.

d. The fact that, while abortion is an extremely safe medical procedure, delay increases the risk to the health of the patient. *See, e.g.,* Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States at 77-78, 162-63 (2018). Delay is of particular concern during the COVID-19 crisis, given guidance from the Center for Disease Control ("CDC") and American College of Obstetricians and Gynecologists ("ACOG") that pregnant women may be at heightened risk of severe illness, morbidity, or mortality from viral respiratory infections such as COVID-19.[1]

e. The Joint Statement by the American College of Obstetricians and Gynecologists ("ACOG"), the American Association of Gynecologic Laparoscopists, *et al.*, on Elective Surgeries[2], issued March 16, 2020, which states that "Obstetric and gynecologic procedures for which a delay will negatively affect patient health and safety should not be delayed. This includes gynecologic procedures and procedures related to pregnancy for which delay would harm patient health. Obstetrician–gynecologists and other health care practitioners should be aware of

---

[1] Available at https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019 and https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html

[2] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-elective-surgeries

the unintended impact that policies responding to COVID-19 may have, including limiting access to time-sensitive obstetric and gynecological procedures."

    f.   The Joint Statement by the ACOG, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak[3], issued March 18, 2020, which states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

3.   All procedures which cannot be reasonably delayed and thus which *are* scheduled and performed, in accordance with the above considerations and in compliance with EO GA 09, shall be performed while making every effort to conserve PPE and to reduce the possibility of spread and transmission of COVID-19.

Kenneth S. Lambrecht

[NAME, TITLE]

President & CEO

PP Greater TX

---

[3] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

PLANNED PARENTHOOD CENTER FOR
CHOICE, *et al*.,

      Plaintiffs,

      v.

GREG ABBOTT, in his official capacity as
Governor of Texas, *et al*.,

      Defendants.

No. 1:20-cv-00323-LY

### DECLARATION OF ANN SCHUTT-AINE, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Ann Schutt-Aine, M.D., declare as follows:

1.      I am a board-certified obstetrician and gynecologist licensed to practice in the state of Texas, and I have been practicing in Houston, Texas, since 2008. I have served as the Chief Medical Officer of Planned Parenthood Center for Choice ("PPCFC") since 2017.

2.      PPCFC is a Texas not-for-profit corporation that is headquartered in Houston. It operates a licensed ambulatory surgical center in Houston and a licensed abortion facility in Stafford. PPCFC and its predecessor organizations have provided abortion in Houston and southeast Texas since 1973.

3.      In my current role at PPCFC, I supervise physicians and clinicians and have oversight responsibility for PPCFC's medical services. This includes responsibility for the quality assurance of those medical services, as well for the promulgation of and adherence to the medical protocols pursuant to which the services are provided. I also provide abortion care.

4.      I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin Executive Order No. GA-09 as interpreted by the Texas Attorney General to ban all previability abortion in the state except where immediately necessary to protect the life or health of a pregnant person, as well as the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order. I am familiar with the Executive Order, the Emergency Rule, and a press release by the Texas Attorney General interpreting the Executive Order.

5.      The facts and opinions included here are based on my education, training, practical experience, information, and personal knowledge I have obtained as an OBGYN and an abortion provider; my attendance at professional conferences; review of relevant medical literature; and conversations with other medical professionals. If called and sworn as a witness, I could and would testify competently thereto.

6.      My curriculum vitae, which sets forth my experience and credentials more fully, is attached as Exhibit A.

**The Executive Order and Threatened Enforcement**

7.      On March 22, 2020, Texas Governor Greg Abbott issued the Executive Order, relating to hospital capacity during the COVID-19 pandemic. That order is in effect until 11:59 p.m. on April 21, 2020, although it may be extended. It directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician."

2

*Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment ["PPE"] needed to cope with the COVID-19 disaster." *Id.*

8.      Although the order does not define PPE, I understand that term to refer to surgical masks, N95 respirators (a face covering that is designed to block at least 95 percent of very small test particles and which, when used appropriately, is a more effective filtration system than a surgical mask), sterile and non-sterile gloves, protective eyewear, gowns, and shoe covers.

9.      PPCFC has adopted a policy to implement the Executive Order, a true and correct copy of which is attached as Exhibit B. That policy permitted PPCFC to continue offering procedural and medication abortion, consistent with the Executive Order's purpose and plain language and the views of trusted national medical organizations.

10.      On Monday, March 23, 2020, PPCFC received a copy of an email from the Texas Office of the Attorney General announcing a press release by Attorney General Ken Paxton. A true and correct copy of that release, entitled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic," is attached as Exhibit C.

11.      The press release states that the Executive Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." It states that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-

3

19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose

who violate the governor's order will be met with the full force of the law."

**PPCFC's Provision of Abortion Care**

12.     Legal abortion is one of the safest medical procedures in the United States.[1] There

are two main methods of abortion: medication abortion and procedural abortion. Both methods are

effective in terminating a pregnancy.[2] Complications from both medication and procedural

abortion are rare, and when they occur they can usually be managed in an outpatient clinic setting,

either at the time of the abortion or in a follow-up visit. Major complications—defined as

complications requiring hospital admission, surgery, or blood transfusion—occur in less than one-

quarter of one percent (0.23%) of all abortion cases:  in 0.31% of medication abortion cases, in

0.16% of first-trimester procedural abortion cases, and in 0.41% of procedural cases in the second

trimester or later.[3] Abortion-related emergency room visits constitute just 0.01% of all emergency

room visits in the United States.[4]

13.     Medication abortion involves a combination of two pills: mifepristone and

misoprostol.[5] The patient takes the first medication in the health center and then, typically twenty-

four to forty-eight hours later, takes the second medication at a location of their choosing, most

---

[1] Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United
States 77–78, 162–63 (2018).

[2] Luu Doan Ireland et al., *Medical Compared With Surgical Abortion for Effective
Pregnancy Termination in the First Trimester*, 126 Obstetrics & Gynecol. 22 (2015).

[3] Ushma Upadhyay, et al., *Incidence of Emergency Department Visits and Complications
After Abortion*, 125 Obstetrics & Gynecol. 175 (2015).

[4] Ushma Upadhyay, et al., *Abortion-related Emergency Room Visits in the United States:
An Analysis of a National Emergency Room Sample*, 16(1) BMC Med. 1, 1 (2018).

[5] Nat'l Acads., *supra* note 1, at 51.

4

often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage. Medication abortion is not a "procedure."

14.     Current medical evidence demonstrates that medication abortion is safe and effective through eleven weeks of pregnancy as measured from the first day of a pregnant patient's last menstrual period ("LMP"). However, Texas law, Tex. Health & Safety Code § 171.063, restricts the first drug used in medication abortion to use as described in the federally approved label, which is for pregnancies less than ten weeks. *See* FDA, *Mifeprex (mifepristone) Information* (last updated Feb. 5, 2018), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information. Accordingly, although PPCFC would provide medication abortion up to eleven weeks LMP if it could legally do so, it currently cannot provide this method of abortion in Texas beyond ten weeks LMP (through seventy days).

15.     Texas law also requires that medication abortion be preceded by an ultrasound, Tex. Health & Safety Code § 171.012(a)(4), and followed by an in-person follow-up appointment within fourteen days, Tex. Health & Safety Code § 171.063(a)(2), (e), even though neither step is medically necessary in every case.

16.     While sometimes referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery"; it involves no incision, no need for general anesthesia, and no requirement of a sterile field. Up to approximately fifteen weeks LMP, clinicians use the aspiration abortion technique, which involves dilating the natural opening of the cervix using medications and/or small, expandable rods, inserting a narrow, flexible tube into the uterus, and emptying the uterus through suction. This procedure typically takes five to ten minutes. To perform abortions after that gestational point in pregnancy, clinicians must dilate the cervix further and use instruments to empty the uterus, which is called the dilation and evacuation ("D&E") technique.

5

Later in the second trimester, the clinician may begin cervical dilation the day before the procedure itself. In the absence of a lethal fetal anomaly, PPCFC performs procedural abortion up to twenty-one weeks, six days LMP.

17.    For some patients with pregnancies less than ten weeks LMP, medication abortion is not available because it is contraindicated or there are other factors that necessitate a procedural abortion, such as where the patient has an allergy to the medications or other medical conditions that make procedural abortion relatively more safe.[6]

18.    In 2019, PPCFC performed 6,152 abortions. Of those, 1,083 occurred beyond ten weeks LMP, and were therefore necessarily performed as procedural abortion. Of those 5,069 occurring before ten weeks LMP, 2,877 were done by procedural abortion and the remainder by medication abortion.

19.    In January and February 2020, PPCFC performed 1,074 abortions, 216 of which occurred beyond ten weeks LMP and were therefore necessarily performed as procedural abortions. Of those 858 abortions occurring before ten weeks LMP, 429 were done by procedural abortion and the remainder by medication abortion.

20.    Individuals seek abortion for a multitude of complicated and personal reasons. By way of example, some patients have abortions because they conclude it is not the right time to become a parent or have additional children,[7] they desire to pursue their education or career, or they lack the necessary financial resources or a sufficient level of partner or familial support or

---

[6] Nat'l Acads., *supra* note 1, at 51–52.

[7] Indeed, a majority of women having abortions in the United States already have at least one child. Guttmacher Inst., Induced Abortions in the United States 1 (2018), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf; *see also* Jenna Jerman, Rachel K. Jones & Tsuyoshi Onda, Guttmacher Inst., Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008, at 6, 7 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

6

stability.[8] Other patients seek abortions because continuing with the pregnancy could pose a greater risk to their health.[9] Indeed, while much is unknown about COVID-19, including whether it can complicate pregnancy, some pregnant people may be exposed to additional health risks from the disease. The American College of Obstetricians and Gynecologists ("ACOG") has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[10]

21.     The window during which a patient can obtain an abortion in Texas is limited. Pregnancy is generally forty weeks in duration, but Texas prohibits abortion after twenty-two weeks LMP. *See* Tex. Health & Safety Code § 171.044.[11]

22.     Although abortion is a very safe medical procedure, the health risks associated with it increase with gestational age.[12] As ACOG and other well-respected medical professional organizations have observed, abortion "is an essential component of comprehensive health care"

---

[8] That strain is all the more apparent if one considers that the vast majority—approximately 75%—of abortion patients nationwide are poor or have low incomes. Guttmacher Inst., Induced Abortions in the United States 1, *supra* note 7.

[9] M. Antonia Biggs et al., *Understanding Why Women Seek Abortions in the US*, 13 BMC Women's Health 7 (2013).

[10] Am. Coll. of Obstetricians & Gynecologists, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/ novel-coronavirus-2019; see also Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

[11] This provision prohibits an abortion when "the probable post-fertilization age of the unborn child is 20 or more weeks." *Id.* "Post-fertilization age" means "the age . . . as calculated from the fusion of a human spermatozoon with a human ovum," *id.* § 171.042, which is two weeks before a patient's last menstrual period. Thus, twenty weeks post-fertilization age is twenty-two weeks LMP.

[12] Nat'l Acads., *supra* note 1, at 77–78, 162–63.

7

and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[13]

23.    Patients generally seek abortion as soon as they are able, but many face logistical obstacles that can delay access to abortion care. Patients will need to schedule an appointment, gather the resources to pay for the abortion and related costs,[14] and arrange transportation to a clinic, time off of work (often unpaid, due to a lack of paid time off or sick leave), and possibly childcare during appointments.[15] Texas law requires most patients to make these arrangements multiple times even though they could just as safely obtain care in one visit. Tex. Health & Safety Code § 171.012 (mandating that patients receive an ultrasound at least twenty-four hours before an abortion procedure).[16] Delay results in higher financial and emotional costs to the patient. Minor patients, unless emancipated, must also obtain written consent from a parent or a judicial order before they can receive care. Tex. Family Code § 33.003.

24.    The COVID-19 pandemic has only exacerbated these burdens on patients seeking abortion care. It has limited public transit availability, caused layoffs and other work disruptions,

---

[13] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[14] Texas prohibits public insurance, including Medicaid, and insurance purchased on the state health exchange from covering abortion services except in the very limited circumstances where a patient's physical health or life is at risk, or where the pregnancy is a result of rape or incest that has been reported to law enforcement. Tex. Insurance Code § 1218.001; Tex. Human Resources Code § 32.024.

[15] Jerman et al., *supra* note 7; Sarah E. Baum et al., *Women's Experience Obtaining Abortion Care in Texas After Implementation of Restrictive Abortion Laws: A Qualitative Study*, 11 PLoS One 1, 7–8, 11 (2016); Lawrence B. Finer, Lori F. Frohwirth, Lindsay A. Dauphinee, Susheela Singh, & Ann M. Moore, T*iming of Steps and Reasons for Delays in Obtaining Abortions in the United States*, 74 Contraception 334, 335 (2006).

[16] A patient who lives more than 100 miles from the nearest abortion provider can rely on a waiver of the twenty-four requirement, but will still be subjected to a two-hour requirement. *See id.*

8

shuttered schools and childcare facilities, and otherwise limited patients' options for transportation

and childcare support during a time of recommended social-distancing.[17] Indeed, jobless claims

are soaring due to the virus.[18]

25.    Neither medication nor procedural abortion requires extensive PPE or otherwise

would deplete PPE. In fact, for medication abortion, providing patients with the medication does

not require the use of *any* PPE. And while clinicians performing procedural abortion at PPCFC

use some PPE, such as gloves for each procedure, a mask, and protective eyewear, only a small

number of workers are physically present for these procedures or their preparation/recovery and

therefore in need of PPE.[19] For an ultrasound or laboratory exam, including one that accompanies

medication or procedural abortion, we use only non-sterile gloves.

---

[17] Tex. Exec. Order No. GA-08 (Mar. 19, 2020) (closing Texas schools and discouraging Texans from participating in non-essential activities); Jacqulyn Powell, *Will Child Care Centers Shut Down During COVID-19 Outbreak?*, KXAN, Mar. 23, 2020, https://www.kxan.com/news/ education/will-child-care-centers-shut-down-during-covid-19-outbreak/ ("Statewide, the Department of Health and Human Services says 2,400 child care operations have reported closures due to COVID-19."); Metro. Transit Authority of Harris Cty., *METRO Response to Coronavirus (COVID-19)*, https://www.ridemetro.org/Pages/Coronavirus.aspx (last visited Mar. 24, 2020) (public transit authority in Harris County noting a "sharp ridership decline" and announcing reduced frequency of bus services and reducing customer seating); *see also* White House, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse.gov/ wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf; Rebecca Shabad, *Fauci Predicts Americans Will Likely Need to Stay Home for at Least Several More Weeks*, NBC News, Mar. 20, 2020, https://www.nbcnews.com/politics/donald-trump/fauci-predicts-americans-will-likely-need-stay-home-least-several-n1164701.

[18] *See* Matt Largey, *COVID-19 Is Costing People Their Jobs. Here's How to Apply for Unemployment in Texas*, KUT 90.5, Mar. 19, 2020, https://www.kut.org/post/covid-19-costing-people-their-jobs-heres-how-apply-unemployment-texas (Texas unemployment claims between March 15 and March 18 were eleven times higher than for the same period in 2019); Tex. Workforce Comm'n, *TWC Extends Call Center Hours* (Mar. 23, 2020), https://twc.texas.gov/ news/twc-extends-call-center-hours (Texas Workforce Commission reporting that it has received "an unprecedented call volume as a result of COVID-19").

[19] Per CDC guidance, PPCFC provides patients for whom there is a concern for COVID-19 or other upper respiratory disease with a mask. Ctrs. for Disease Control & Prevention,

26.     By comparison, even if a provider of prenatal care reduces the scheduling of such care during the COVID-19 outbreak, it will still involve use of masks, sterile gloves, and potentially other PPE during multiple visits.[20] A patient continuing a pregnancy will thus require significantly more PPE than a patient presenting for abortion. Furthermore, every time a pregnant person presents to the hospital for evaluation prior to labor, which could happen multiple times, this will require the use of masks and sterile gloves. An actual birth could involve anywhere from seven to ten gowns, masks, and sterile gloves.

27.     PPCFC does not use or have any N95 respirators, which I understand are the PPE in shortest supply during the COVID-19 pandemic.

28.     PPCFC does not provide inpatient care, nor is it set up to do so.

**PPCFC's Efforts to Prevent COVID-19 Spread and Conserve Needed Resources**

29.     PPCFC is committed to doing its part to reduce the spread of COVID-19 and to otherwise help ensure that our public health system has sufficient resources to meet the challenge of responding to a potential surge of illness.

30.     Since the COVID-19 outbreak, PPCFC has taken steps to preserve much-needed medical resources and help prevent the spread of COVID-19 in the communities where we offer services. Even before the Governor's order, for example, we had reduced our patient volume to ensure that we comply with current social-distancing recommendations. In addition, although in normal times we welcome support companions accompanying abortion patients, we have decided

---

*Frequently Asked Questions about Personal Protective Equipment* (Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html.

[20] ACOG, *Examples of Alternate or Reduced Prenatal Care Schedules* (Mar. 24, 2020), https://www.acog.org/en/Clinical%20Information/Physician%20FAQs/-/media/287cefdb936e4c da99a683d3cd56dca1.ashx.

10

not to allow such companions (except parents accompanying minors) to enter our health centers in order to reduce the number of overall people exposed to one another.

31.     We have also made dramatic changes to the flow of our patient care. Before patients may enter a health center, we screen them for COVID-19 symptoms, including by checking for fever. Only those individuals who are thoroughly screened can proceed to the front desk to check in and provide their phone number. Patients are then asked to wait in their cars, where a nurse will call them to do as much intake as possible by phone. Patients are only permitted to reenter the health center when a room has opened for them and a clinician is available to see them.

**Harms Caused by the Executive Order and the Attorney General's Interpretation of It**

32.     PPCFC reasonably fears the Attorney General's threat of enforcement, given that the Attorney General may understand the Executive Order to prohibit procedural abortions that PPCFC's physicians have determined are necessary to "correct a serious medical condition of … a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician," as permitted by the Executive Order. It also reasonably fears that the Attorney General will understand the order to prohibit medication abortions, despite the fact that these are not "procedures" and therefore do not fall within the terms of the Executive Order at all.

33.     Based on this enforcement risk, PPCFC has already cancelled services for more than fifty abortion patients through Wednesday of this week.

34.     PPCFC will cancel non-emergency future procedural abortion appointments unless and until the Executive Order and Emergency Rule expire or are rescinded, or unless the Court grants relief. Additionally, because of the AG's interpretation of the Executive Order, we have

11

cancelled all non-emergency medication abortions until we obtain clarity on the scope of the Executive Order or the Court grants relief.

35.     Even if each one of these patients were able to access abortion after the order's current expiration date (i.e., even if the order is not extended), many of the medication abortion patients would require procedural abortions instead (and correspondingly greater amounts of PPE), and some procedural abortion patients would require a comparatively more complicated procedural abortion method using the D&E technique. That technique requires more time in the clinic and a larger number of staff than aspiration abortion, another method of procedural abortion. Moreover, because these patients would continue to be pregnant for a longer period of time, they would also be at increased risk of negative health outcomes if they are diagnosed with COVID-19.[21] Other patients could be foreclosed from receiving an abortion altogether because the delay of the order would extend their pregnancies beyond the legal gestational limit for abortion in Texas.

36.     The Executive Order could well exacerbate the COVID-19 crisis, by delaying abortion care for patients with health problems until they need intensive emergency care or by forcing patients to travel to other states, potentially using public transportation, even though public health experts have advised the public to minimize activities outside the home. If the Executive Order, as interpreted by the Attorney General, is enforced, it will deprive PPCFC's patients of the freedom to make a very personal decision, in consultation with their families and doctors, regarding whether to continue or end their pregnancies. It will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families.

---

[21] Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women*, *supra* note 10.

37.     Without access to PPCFC's abortion services and those of other Texas abortion providers, some patients will be forced to travel hundreds of miles across state lines to try to access abortion care. Given the logistical hurdles of traveling out-of-state, particularly during the COVID-19 pandemic, these patients are likely to obtain abortions later than they would have had they accessed care from PPCFC, which necessarily entails greater risks than an earlier procedure.[22] Efforts to travel are also likely to expose both patients and other people to additional risk of contagion, at a time when other states and Texas's most populous counties have given urgent directives to their citizens to stay home as much as possible to avoid inadvertently spreading the COVID-19 virus.

38.     For other patients, travel to another state will simply not be possible to the extent travel remains legally possible during the pandemic. As a result, these patients will be forced to carry unwanted pregnancies to term, resulting in a deprivation of their fundamental right to determine when and whether to have a child or to add to their existing families, as well as greater health and other risks to them and their children.

39.     Even if some patients affected by the Executive Order *are* able to obtain an abortion after the order is lifted, they will still suffer increased risks to their health by the delay in access to abortion care.[23] Many will also face increased costs related to abortion, as their abortion access is

---

[22]    As of this filing, eighteen Texas counties have issued stay-at-home orders. *See* Wes Wilson, *Here's Which Texas Cities and Counties Have Issued Stay-at-Home Orders*, KXAN (last updated Mar. 24, 2020), https://www.kxan.com/news/coronavirus/heres-which-texas-cities-and-counties-have-issued-stay-at-home-orders/; Alex Samuels, *Texas' Largest Counties Are Issuing Stay-at-Home Orders*, Tex. Tribune (Mar. 23, 2020), https://www.texastribune.org/2020/03/23/austin-travis-county-issue-stay-home-order-tuesday/. In some counties, non-compliance with these orders is punishable by fines or jail time. *See, e.g., Texas County's Curfew Amid Coronavirus Spread is Punishable by Fines Up to $1,000, Jail Time*, WHNT News 19 (Mar. 21, 2020), https://whnt.com/news/texas-countys-curfew-amid-coronavirus-spread-is-punishable-by-fines-up-to-1000-jail-time/.

[23] Nat'l Acads., *supra* note 1, at 77–78, 162–63.

13

pushed to later gestational points when abortion is more expensive and may require a two-day procedure, instead of one. These costs, in turn, will likely lead to additional delay and present an even greater hardship to vulnerable populations during the economic fallout of the COVID-19 pandemic.

40.     Although the Order indicates that it will expire after a 30-day period, the likelihood that it will be extended is high. Certainly it is clear that the pandemic is likely to continue well beyond this period.[24]

41.     I declare under penalty of perjury that the foregoing is true and correct.

Ann Schutt-Aine, M.D.

Executed March 25, 2020

---

[24] *See, e.g.*, Ctrs. for Disease Control & Prevention, *Healthcare Supply of Personal Protective Equipment*, (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html.

14

# EXHIBIT A

## Ann I. Schutt-Ainé, MD, FACOG

EDUCATION AND TRAINING

UNDERGRADUATE:
September 1992 – May 1996

Yale University
New Haven, CT
BS, Biology, 1996
*cum laude*, distinction in Biology

GRADUATE:
September 1996 – June 2000

Harvard Medical School
Boston, MA
MD, 2000

POSTGRADUATE:
June 2000 – June 2004

Magee-Womens Hospital of the
University of Pittsburgh Medical Center
Pittsburgh, PA

Obstetrics, Gynecology and Reproductive Sciences

PROFESSIONAL EXPERIENCE

August 2017 – Present

Chief Medical Officer
Planned Parenthood Gulf Coast
Houston, TX

April 2017 – August 2017

Medical Director
Planned Parenthood Gulf Coast
Houston, TX

September 2008 – Present

Assistant Professor, Obstetrics and Gynecology
Baylor College of Medicine
Houston, TX

September 2011 – March 2017

Associate Medical Director
Planned Parenthood Gulf Coast and PPCfC
Houston, TX

August 2008 – Present

Contract Physician
Planned Parenthood Center for Choice (PPCfC)
Houston, TX

August 2007 – July 2008

Associate Medical Director, Ob/Gyn

App.141

Planned Parenthood Golden Gate
San Francisco Bay Area

July 2004 – July 2007

Obstetrician/Gynecologist
Primary Care Health Services, Inc.
Pittsburgh, PA

March 2004 – June 2007
Planned Parenthood of Western Pennsylvania

Contract Physician

Pittsburgh, PA

### ADDITIONAL TRAINING/EXPERIENCE

October 2018 – March 2019

US Physician Leadership Academy
*A six-month program produced by Deloitte and the Wharton School, "targeted to practicing physicians who have taken on increasing levels of leadership and administrative responsibility in their careers and aspire to be enterprise-wide leaders."*

February 2015

Excellence in Family Planning Research Course
*An intensive one week course in epidemiology, research design, and evidence-based medicine.*

September 2009 – April 2010

Fellow – Leadership Training Academy
Physicians for Reproductive Choice and Health
*An eight-month, intensive program aimed to develop and internalize the skills and attributes needed to be a powerful, effective advocate for comprehensive sexual and reproductive health care.*

### APPOINTMENTS AND POSITIONS

#### ACADEMIC

September 2008 – present
Director – Ryan Residency Training Program in Family Planning (2010-2018)

Assistant Professor, Obstetrics and Gynecology

July 2004 – July 2007

Clinical Assistant Professor of Obstetrics, Gynecology and Reproductive Sciences
University of Pittsburgh School of Medicine

#### NON-ACADEMIC

April 2011 – April 2019

Board of Directors, National Abortion Federation

App.142

Chair, Quality Assessment and Improvement Committee
Chair-Elect, Board of Directors: 2015-2016
Chair, Board of Directors: 2016-2018

COMMITTEES/OTHER ACTIVITIES

ACOG District XI Legislative Committee (2013)
ACOG Committee on Healthcare for Underserved Women (2015-2019)
Baylor College of Medicine, Department of Ob/Gyn Clinical Competencies Committee
Ben Taub Hospital Ob/Gyn Quality Committee
Ben Taub OB/GYN Peer Review Committee
Houston Endowment's Improving Maternal Health Initiative – Implicit Bias Workgroup
Society of Family Planning Clinical Affairs Subcommittee
Trainer – Merck/Nexplanon contraceptive implant (2011 – 2016)

CERTIFICATION AND LICENSURE

MEDICAL LICENSURE:
Texas medical license
Louisiana medical license
California medical license (expired)
Pennsylvania medical license (expired)
DEA license

SPECIALTY CERTIFICATION:
Certified Diplomate of the American Board of Obstetrics and Gynecology, December 2006

MEMBERSHIP IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

American College of Obstetricians and Gynecologists, 1999 – present
National Medical Association, 2001 – present
Pennsylvania Medical Society, 2005 – 2007
Pittsburgh Obstetrical and Gynecology Society, 2005 – 2007
Association of Reproductive Health Professionals, 2007 – present
Harris County Medical Society, 2007 – present
Houston Medical Forum, 2009 – present
National Abortion Federation, 2010 – present
Society of Academic Specialists in General Obstetrics and Gynecology, 2013 – present

HONORS

National Health Service Corps Scholarship Recipient, 1997
Medical Student Teaching Award, 2001
National Medical Association/NIH Resident Travel Award, 2001
Fulbright and Jaworski Faculty Excellence Award in Training and Evaluation, 2012

LANGUAGES SPOKEN

English
Spanish

PUBLICATIONS

Schutt-Aine A, Crabtree D, Peck M and Levy JS. R1022: 34-year-old G2P2 Caucasian female who
desires contraception [Internet]. Newtown Square, PA: CaseNetwork; 2015.
http://cases.casenetwork.com.

Contraceptive Procedures
Beasley A and Schutt-Ainé A. Obstet Gynecol Clin North Am. 2013 Dec;40(4):697-729.

Schutt-Aine AI and Timmins AE (2013). Sexual Assault Examination. In EF Reichman (Ed.),
Emergency Medicine Procedures (Second Edition). New York: McGraw Hill Education.

Linares AC and Schutt-Aine, AI (2011). Contraception. In R. Rakel and D.Rakel (Eds.), Textbook
of Family Medicine (Eighth Edition). Philadelphia: Saunders.

INVITED PRESENTER/PANELIST

"What do women need and want with respect to contraception after medical abortion?" – Gynuity
Health Projects Conference, Contraception after Medical Abortion: Evidence-based Practice
to Meet Women's Needs; Santa Monica, CA; March 2016

"Real World Systems Change" – Physicians for Reproductive Health Alumni Professional
Development Summit; Washington, DC; May 2016

"Métodos y esquemas medicamentosos para la interrupción lega del embarazo (ILE)" – Gynuity
Health Projects and Corporación Miles Conference, Uso de Mifepristona y Misoprostol en la
Ginecología y Obstetricia; Santiago, Chile; August 2017.

"In Pursuit of Healthcare Equality, The Healthcare Crisis for Women in Texas:  Maternal Mortality
and Other Medical Issues" – Anti-Defamation League Women's Initiative Breakfast;
Houston, TX; March 2018

Keynote Address – ACLU of Texas Reproductive Freedom in Action Annual Conference; April
2018

# EXHIBIT B

**Planned Parenthood Center for Choice ("PPCFC")**
**Policy in Response to Texas Executive Order GA 09**
**Relating to Hospital Capacity During the COVID-19 Disaster**

### PURPOSE

In light of the global pandemic of COVID-19, Governor Abbott signed Executive Order ("EO") GA 09 on March 22, 2020, attached, which is in effect until 11:59 p.m. on April 21, 2020. EO GA 09 directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." EO GA 09 goes on to state that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID- 19 disaster."

### POLICY

To comply with EO GA 09, PPCFC hereby establishes the following policies which shall remain in effect until rescinded or modified:

1. Surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician, and which would deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster, are <u>not</u> to be scheduled while this policy is in effect.

2. Physicians shall determine on a case-by-case basis whether a procedure that would deplete hospital capacity or personal protective equipment needed to cope with COVID-19 can be delayed without risk for serious adverse medical consequences or death.

3. PPCFC's physicians have made the determination that abortion is a time-sensitive service and an essential component of comprehensive care, for which a delay of 30 days, or even less, increases the risks to patients, or make abortion completely inaccessible, and that such delay in accessing or inability to access an abortion exposes patients to risk of a serious adverse medical consequence.

4. In making this determination, PPCFC's physicians considered or will consider the following:

a. The purpose and text of EO GA 09, namely: concern for "a shortage of hospital capacity or personal protective equipment" that could "hinder efforts to cope with the COVID-19 disaster."

b. The stated 30-day duration of a the delay, taking into account the Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery," issued March 18, 2020, which states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."

c. The fact that pregnancy has a duration of approximately forty weeks, as measured from the first day of a woman's last menstrual period (LMP) and that most abortions are banned in Texas beginning at 20 weeks gestation. Tex. Health & Safety Code § 171.044.

d. The fact that, while abortion is an extremely safe medical procedure, delay increases the risk to the health of the patient. *See, e.g.,* Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States at 77-78, 162-63 (2018). Delay is of particular concern during the COVID-19 crisis, given guidance from the Center for Disease Control ("CDC") and American College of Obstetricians and Gynecologists ("ACOG") that pregnant women may be at heightened risk of severe illness, morbidity, or mortality from viral respiratory infections such as COVID-19.[1]

e. The Joint Statement by the American College of Obstetricians and Gynecologists ("ACOG"), the American Association of Gynecologic Laparoscopists, *et al.*, on Elective Surgeries[2], issued March 16, 2020, which states that "Obstetric and gynecologic procedures for which a delay will negatively affect patient health and safety should not be delayed. This includes gynecologic procedures and procedures related to pregnancy for which delay would harm patient health. Obstetrician–

---

[1] Available at https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019 and https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html

[2] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-elective-surgeries

gynecologists and other health care practitioners should be aware of the unintended impact that policies responding to COVID-19 may have, including limiting access to time-sensitive obstetric and gynecological procedures."

    f.    The Joint Statement by the ACOG, the American Board of Obstetrics & Gynecology, *et al.,* on Abortion Access During the COVID-19 Outbreak[3], issued March 18, 2020, which states that to "the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

3.    All procedures which cannot be reasonably delayed and thus which *are* scheduled and performed, in accordance with the above considerations and in compliance with EO GA 09, shall be performed while making every effort to conserve PPE and to reduce the possibility of spread and transmission of COVID-19.

---

[3] Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak

# EXHIBIT C





Menu


(https://www.texasattorneygeneral.gov/)

**March 23, 2020**

# Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic

Texas Attorney General Ken Paxton today warned all licensed health care professionals and all licensed health care facilities, including abortion providers, that, pursuant to Executive Order GA 09 issued by Gov. Greg Abbott, they must postpone all surgeries and procedures that are not immediately medically necessary.

App.150

On Saturday, Gov. Abbott issued an executive order that "all licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." This prohibition applies throughout the State and to all surgeries and procedures that are not immediately medically necessary, including routine dermatological, ophthalmological, and dental procedures, as well as most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother.

The COVID-19 pandemic has increased demands for hospital beds and has created a shortage of personal protective equipment needed to protect health care professionals and stop transmission of the virus. Postponing surgeries and procedures that are not immediately medically necessary will ensure that hospital beds are available for those suffering from COVID-19 and that PPEs are available for health care professionals. Failure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time.

"We must work together as Texans to stop the spread of COVID-19 and ensure that our health care professionals and facilities have all the resources they need to fight the virus at this time," said Attorney General Paxton. "No one is exempt from the governor's executive order on medically unnecessary surgeries and procedures, including abortion providers. Those who violate the governor's order will be met with the full force of the law."

For information on the spread or treatment of Coronavirus (COVID-19), please visit the Texas Department of State Health Services (https://dshs.texas.gov/coronavirus/) website.

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | | |
| Plaintiffs, | | |
| v. | | No. 1:20-cv-00323-LY |
| GREG ABBOTT, in his official capacity as Governor of Texas, et al., | | |
| Defendants. | | |

### DECLARATION OF PLAINTIFF ROBIN WALLACE, M.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Robin Wallace, M.D., declare as follows:

1.      I am a board-certified family medicine physician, with additional specialty training in family planning, and an M.A.S. in clinical research. I am licensed to practice in Texas. I am a Plaintiff in this case, representing myself and my patients.

2.      I am the co-medical director of Southwestern Women's Surgical Center ("Southwestern"), a licensed ambulatory surgical center in Dallas, Texas. Southwestern provides medication abortion through 10 weeks as measured from the first day of the patient's last menstrual period ("LMP") and procedural abortion services through 21.6 weeks LMP. Southwestern does not provide inpatient care, nor is it set up to do so.

3.      As co-medical director, my responsibilities include: review and development of clinic protocols, training of all new physician staff, quality assurance review, and representing the medical staff on the administrative management team and governing board. In addition to my other

responsibilities as co-medical director, I also personally provide abortion care to patients through 21.6 weeks LMP.

4.      I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin Executive Order No. GA-09 (the "Executive Order"), as interpreted by the Texas Attorney General to ban all previability abortion procedures in the state except where immediately necessary to protect the life or health of a pregnant person. I have reviewed the Executive Order and a press release by the Texas Attorney General interpreting it.

5.      The facts I state here are based on my experience, my review of Southwestern's business records, information obtained in the course of my duties at Southwestern, and personal knowledge that I have acquired through my service at Southwestern. If called and sworn as a witness, I could and would testify competently thereto.

**The E*e*uti*e* Order and Threatened En*o*r*ement**

6.      On March 22, 2020, Texas Governor Greg Abbott issued the Executive Order, relating to hospital capacity during the COVID-19 pandemic. That order is in effect until 11:59 p.m. on April 21, 2020, although it may be extended. It directs "all licensed health care professionals and all licensed health care facilities" to "postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* at 1. The Executive Order states that this prohibition does not apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not

deplete the hospital capacity or the personal protective equipment ["PPE"] needed to cope with the COVID-19 disaster." *Id.*

7.      Southwestern understands the term PPE to refer to surgical masks, N95 respirators (a face covering designed to block at least 95 percent of very small test particles), sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. The services Southwestern provides do not involve significant amounts of PPE or deplete PPE.

8.      On Monday, March 23, 2020, the Attorney General issued a press release interpreting the Executive Order, titled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic." The press release states that the Executive Order applies to "all surgeries and procedures that are not immediately medically necessary," including "most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." The release invokes the order's application to abortion providers multiple times. It states that a "[f]ailure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time" and warns that "[t]hose who violate the governor's order will be met with the full force of the law."

9.      Southwestern is uncertain as to the scope of the Executive Order and the subsequent press release by the Attorney General, and, as a result, largely stopped seeing patients on March 23, 2020. The clinic has cancelled approximately 225 appointments for the last two days, March 23 and March 24. Unless we obtain immediate relief, we intend to continue canceling appointments.

10. The window during which a patient can obtain an abortion in Texas is limited. Pregnancy is generally forty weeks in duration, but Texas prohibits abortion after twenty-two weeks LMP except in very narrow circumstances. See Tex. Health   Safety Code   171.044.

**Southwestern's E orts to Pre ent COVID-19 Spread and Conser e Needed Resour es**

11. Southwestern is committed to doing its part to minimize spread of COVID-19 and to otherwise help ensure that our public health system has sufficient resources to meet the challenge of responding to a potential surge of illness.

12. Neither medication nor procedural abortion requires extensive PPE or otherwise would deplete PPE. In fact, for medication abortion, providing patients with the medication does not require the use of any PPE. Based on Southwestern's patient load, in an average week, we use the following PPE: a few boxes of non-sterile gloves; approximately 15 pairs of sterile gloves for procedures after 15 weeks LMP; approximately 15 gowns; around 24 pairs of shoe coverings per day; and a handful of simple surgical masks and reusable eyewear.

13. Since the COVID-19 outbreak, and prior to the Executive Order, Southwestern took extensive steps to protect patients and staff and minimize the use of PPE. For example, we have been screening our patients and staff for COVID-19; we have cancelled trainings for medical students, residents, and fellows; and have begun restricting the use of new surgical masks and gowns.

**Harms Caused    the E e uti e Order and the Attorne General's Interpretation o It**

14. Southwestern reasonably fears the Attorney General's threat of enforcement, given that the Attorney General may understand the Executive Order to prohibit procedural abortions that Southwestern's physicians have determined are necessary to "correct a serious medical condition of … a patient who without immediate performance of the surgery or procedure would

4

be at risk for serious adverse medical consequences or death, as determined by the patient's physician," as permitted by the Executive Order. It also reasonably fears that the Attorney General will understand the order to prohibit medication abortions, despite the fact that these are not "procedures" and therefore do not fall within the terms of the Executive Order at all.

15.     Based on this enforcement risk, Southwestern cancelled 225 appointments scheduled for Tuesday, March 24 and Wednesday, March 25. Southwestern is unsure how to proceed but plans to resume certain appointments where care does not involve new PPE. Still, some patients who would have had medication abortions as scheduled prior to the Executive Order will require procedural abortions instead (and correspondingly greater amounts of PPE). And, some procedural patients may be pushed within days of the limit in Texas or beyond it.

16.     If the Executive Order, as interpreted by the Attorney General, is enforced, it will deprive some patients of the freedom to make an intimate and personal decision essential to their dignity and autonomy. It will immeasurably harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Dr. Robin Wallace

Executed March 25, 2020

5

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE; *et al.*, | ) ) ) | CIVIL ACTION |
| Plaintiffs, | ) ) | CASE NO. 1:20-cv-323-LY |
| v. | ) ) | |
| GREG ABBOTT, in his official capacity as Governor; *et al.*, | ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF KAMYON CONNER, M.S.W.

KAMYON CONNER, M.S.W. hereby declares under penalty of perjury that the following statements are true and correct:

1.      I am the Executive Director of the North Texas Equal Access Fund ("TEA Fund"), a Dallas-based nonprofit organization that provides direct financial assistance to people who want to end a pregnancy but cannot afford abortion care in Texas.

2.      I have provided services at TEA Fund for nearly fifteen years, first as a volunteer fielding calls for assistance to our hotline, known as the Helpline, from 2006 to 2013, and then as a Board Member and Intake Coordinator until 2018.  In the latter roles, I helped shape the mission and strategy of the organization based on our clients' experiences, and I participated in the TEA Fund's financial and resource distribution planning .

3.      In my current role as Executive Director of the TEA Fund, I oversee our Helpline; Client Engagement Program, which supports clients throughout the process of terminating a pregnancy, including in-person support during an abortion procedure; Caller Engagement Program, which organizes people throughout Texas to advocate for abortion access with dignity,

1

including by sharing stories of their abortion experiences; and Communications. These programs are run by six other staff members and over 125 active volunteers.

4.      I provide the following testimony based on personal knowledge acquired through my service at the TEA Fund and review of the organization's business records.

**Ongoing Challenges to Obtaining Abortion Care in Texas**

5.      In 2019, the Helpline received over 6,500 calls from people seeking help paying for an abortion. The calls came from 110 counties in Texas, many of them rural. At least 70% of the callers already had a child. Texas requires most patients to make two trips to obtain abortion care, which imposed transportation and childcare costs on many of the callers while depriving them of wages. For some, efforts to gather resources on their own had forced them to delay their appointments, which only increased the cost of their abortion care because it occurred at a later gestational age.

6.      The TEA Fund allocates funds for abortions per week and only provides financial assistance for those scheduled within seven days of a call. A caller can qualify for assistance depending on their financial circumstances, the amount of financial aid they are able to obtain from other sources, and the total cost of the abortion.  When a caller qualifies, the TEA Fund sends a financial voucher to the abortion provider with whom the patient's appointment is scheduled and pays the provider after the patient has received care. In 2019, the TEA Fund provided over $277,000 to assist 924 Texas residents in obtaining abortions.

7.      Unfortunately, financial constraints prevent us from providing financial assistance to every caller who needs it and from covering the full cost of the abortion for the callers we can help. In 2019, we were able to provide financial assistance to about one-quarter of the people who requested it. Through our Client Engagement Program, we have observed that some callers who

receive our assistance experience an emotional strain from having to meet the remaining costs, which makes their overall abortion experience stressful.

### Impact of Executive Order

8.      The public health crisis precipitated by COVID-19 has exacerbated the difficulties Texans, particularly low-income people and people of color, have affording abortion care. Many of our recent callers are struggling with layoffs and furloughs, dealing with the possibility of eviction, experiencing other unforeseen medical costs, and contending with increased utility bills caused by sheltering at home.

9.      I understand that Attorney General Paxton has interpreted an Executive Order by Governor Abbott concerning the public health crisis to ban most abortions. I also understand that this interpretation would eliminate most or all abortion care for my clients, which would have a devastating effect on their well-being.

10.     The TEA Fund began committing funding for abortions in Texas for the current seven-day period on Thursday, March 19. The Attorney General publicized its interpretation on Monday, March 23. Between March 19 and 23, we committed funding to more than two dozen clients, many of whom will now be unable to obtain an abortion in Texas while the Executive Order remains in effect. At least four of those clients are over 18 weeks lmp. They will undoubtedly lose the ability to obtain an abortion in Texas before the Executive Order expires on April 21, 2020.

11.     The inability to receive an abortion in Texas usually drives TEA Fund clients to seek that care out-of-state, including New Mexico, Colorado, and Louisiana. But long-distance travel is increasingly dangerous and difficult during the public health crisis given the toll of COVID-19 on already-limited resources and the pronounced difficulty of securing childcare

3

during the crisis. Moreover, my understanding from collaborating with abortion funds and providers in other states is that abortion care is presently unavailable in Louisiana. Clients who are unable to access abortion in Texas or do so in another State are forced to remain pregnant against their will, which can cause them and their families extreme anguish, and potentially forced to carry to term.

Dated: March 25, 2020

*/S/ Kamyon Conner*
Kamyon Conner
Executive Director
TEA Fund

4

**Exhibit 3:** State Defendants' Response to Plaintiffs' Motion for a Temporary Restraining Order (with attached exhibits)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § § § | |
| Plaintiffs, | § § | Civil Action No. 1:20-cv-00323-LY |
| v. | § § | |
| GREG ABBOTT, et al., | § § | |
| Defendants. | § § | |

---

## STATE DEFENDANTS'[1] RESPONSE TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

---

[1] Defendants Greg Abbott, in his official capacity as Governor of Texas, Ken Paxton, in his official capacity as Attorney General of Texas, Phil Wilson, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission, Stephen Brint Carlton, in his official capacity as Executive Director of the Texas Medical Board, and Katherine A. Thomas, in her official capacity as the Executive Director of the Texas Board of Nursing (collectively "State Defendants").

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................. 1

INTRODUCTION ...................................................................................... 3

STATEMENT OF FACTS .......................................................................... 5

    A.   The COVID-19 Pandemic Presents the Gravest Public Health
        Emergency to Texas in Over a Century ......................................... 5

        1.   Absent extraordinary measures, the Texas healthcare system
             could face the same systemic collapse now unfolding in other
             places. ..................................................................................... 6

        2.   Health systems in New York and Louisiana stand on the brink
             of collapse ............................................................................. 7

    B.   Texas Takes Extraordinary Measures to Prepare for a Surge of
        COVID-19 Infections. ................................................................... 9

        1.   Governor Abbott issues EO GA-09 to ensure the survival of
             Texas healthcare. ................................................................. 10

        2.   EO GA-09 imposes a blanket ban on medical procedures that are
             not medically necessary to preserve needed resources ......................... 11

LEGAL STANDARD ................................................................................ 12

ARGUMENT ........................................................................................... 13

I.   The Court Should Deny the Motion for Temporary Restraining Order. ............ 13

    A.   Plaintiffs Have No Likelihood of Success on the Merits. ............................ 13

        1.   EO GA-09 applies to all physicians and clinics, including
             Plaintiffs. .......................................................................... 13

             a.   Elective abortions are not "immediately medically
                 necessary" ..................................................................... 13

             b.   Surgical abortions use valuable PPE. ............................... 14

             c.   Abortions may result in complications, which will impact
                 hospitals ...................................................................... 15

             d.   Medication abortions are a "procedure" within the scope
                 of EO GA-09. ................................................................. 15

             e.   Abortion clinics may contribute to the spread of COVID-
                 19 by remaining open. .................................................... 18

        2.   EO GA-09 is a valid exercise of state power. ........................... 19

             a.   Longstanding precedent permits States to exercise their
                 police power in an emergency to protect public health ................ 19

App.166

       b.    Individual rights, including abortion, may be temporarily curtailed in a time of emergency. ................................................... 20

       c.    The *Casey* standard does not categorically exempt abortion from any curtailment for any reason, even pre-viability. ............................................................................... 23

    3.    EO GA-09 is Not An Unconstitutional Undue Burden. ........................ 25

       a.    EO GA-09 imposes no greater burden on women seeking abortions in the next three weeks than it does on other people seeking surgeries or procedures. ......................................... 25

       b.    The benefits of EO GA-09 are compelling. ..................................... 28

  B.    Plaintiffs Cannot Satisfy the Other Elements Necessary for a Temporary Restraining Order. ..................................................................... 31

II.  Numerous Jurisdictional Defects Bar Any TRO. ............................................... 33

  A.    Plaintiffs' claims against the Governor and the Attorney General are barred by sovereign immunity and Plaintiffs' lack of standing. ........... 33

    1.    The *Ex parte Young* doctrine does not allow suit against the Governor and Attorney General, who do not have independent authority to enforce the Executive Order. ............................................... 33

    2.    Plaintiffs lack article III standing to sue the Governor and Attorney General because, as to these defendants, Plaintiffs have not alleged injury in fact or redressability. ................................... 35

  B.    Plaintiffs lack third-party standing to challenge EO GA-09 on behalf of their unidentified patients. ............................................................. 37

  C.    The Court lacks jurisdiction to opine on the meaning of state law under *Pennhurst*. ....................................................................................... 39

  D.    The *Pullman* abstention doctrine prohibits the Court from issuing a TRO. ......................................................................................................... 39

CONCLUSION ............................................................................................................... 40

CERTIFICATE OF FILING AND SERVICE ............................................................ 42

## INTRODUCTION

The State of Texas faces its worst public health emergency in over a century. Never in our lifetimes have so many Texans been threatened with severe illness or death due to a pandemic sweeping the globe. The novel coronavirus ("COVID-19") infections has turned New York City hospitals into triage wards operating under battlefield conditions as doctors make life-or-death decisions about which intensive-care patients will receive a ventilator and which will die. Absent extraordinary measures, Texas will soon face a similar landscape.

Against that backdrop, Governor Abbott swiftly implemented emergency measures to protect our communities, hospitals, healthcare providers, and patients. Executive Order GA-09 orders every single physician and health clinic in the State to temporarily refrain from performing any medical procedure that is not "immediately medically necessary." DX-4 (EO GA-09). This Executive Order will save countless lives by preventing further spread of the disease by unnecessary contact and ensuring the conservation of personal protective equipment ("PPE") and hospital capacity necessary to protect the healthcare professionals who will save Texans from this disease.

But Plaintiffs—a collection of abortion clinics and one abortionist physician—ask this Court to grant them a special exemption, claiming a right to deplete or endanger precious PPE resources and hospital capacity in the name of providing abortions. They have no right to special treatment. After all, "the law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

The State's efforts to stop the spread of COVID-19 are far-reaching precisely because COVID-19 presents a grave threat to public health. Because of the COVID-19

pandemic, counties in Texas and elsewhere have closed all but the most essential businesses and ordered residents to shelter-in-place. Throughout the country, millions of people lost their livelihoods almost overnight. Churches may no longer gather for worship services, groups of more than 10 people may no longer assemble (for expressive purposes or even private gatherings), schools and universities have closed, and people may no longer visit loved ones in nursing homes or assisted care facilities.

These measures are no doubt inconvenient in many cases, and catastrophic in others. They undoubtedly restrict Texans' freedom to carry on our lives as we normally would. But they are necessary. Government authorities expect a surge of COVID-19 cases in the very near future, and Texas is trying to ensure that we have adequate medical supplies, hospital capacity, and healthcare workers to prevent the system from collapsing. That happened already in Italy, and the situation is very grim in New York City and New Orleans. Every person affected by these temporary measures could argue that his individual actions won't spread the virus, so his individual noncompliance won't have a negative effect on public health. But the rules must apply to *all* to protect us *all*.

The Court should deny the motion for temporary restraining order for five reasons: (1) plaintiffs cannot establish a likelihood of success on the merits of their claims because they are being treated exactly like every other physician and clinic in the State of Texas during a national emergency, and the right to abortion does not have preeminence over all of the other individual liberties that are being temporarily curtailed; (2) plaintiffs fail to allege irreparable harm because they have not alleged that even a single patient will not be able to receive an abortion after the expiration of EO GA-09 in three weeks; and (3) the balance of the equities weighs in the State's favor

because the critical need to protect public health justifies this temporary order; (4) preserving across-the-board application of EO GA-09 is overwhelmingly in the public's interest; (5) and the Court cannot issue a TRO in any event because it lacks jurisdiction.

## STATEMENT OF FACTS

### A. The COVID-19 Pandemic Presents the Gravest Public Health Emergency to Texas in Over a Century.

The spread of COVID-19, the disease caused by the novel coronavirus known as SARS-CoV-2, has become a global pandemic. Thompson Decl. ¶ 3 (DX-8). As of March 29, the virus has infected 721,584 people around the world and killed 33,958.[2] There are currently 124,686 cases in the United States and that number continues to grow exponentially.[3] After an Imperial College of London study predicted high fatalities in the United States without decisive action, the White House issued sweeping new recommendations on March 16, 2020, including that people not gather in groups of more than 10.[4] Epidemic modeling estimates on the impact of the virus are dire. One of the authors of the Imperial College of London study stated:

> We estimate that the world faces an unprecedented acute public health emergency in the coming weeks and months. Our findings suggest that all countries face a choice between intensive and costly measures to suppress transmission or risk health systems becoming rapidly overwhelmed. However, our

---

[2] Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://gisanddata.maps.arcgis .com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.
[3] *Id.*
[4] Sheri Fink, *White House Takes New Line After Dire Report On Death Toll*, (N.Y. Times, Mar. 16, 2020), https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html.

results highlight that rapid, decisive and collective action now will save millions of lives in the next year.[5]

1. **Absent extraordinary measures, the Texas healthcare system could face the same systemic collapse now unfolding in other places.**

A very serious concern is that the healthcare system will collapse from the sudden influx of very ill patients. Italy was hit hard by the virus in early March. Within a few weeks, its healthcare system was on the brink of collapse, with doctors having to ration care based on which patients were more likely to survive.[6] In only a "matter of days, the system was being felled by a virus that . . . Italians[] had failed to take seriously."[7] A group of Italian physicians wrote last week in the New England Journal of Medicine that the outbreak is "out of control":[8]

> Our own hospital is highly contaminated, and we are far beyond the tipping point: 300 beds out of 900 are occupied by Covid-19 patients. Fully 70% of ICU beds in our hospital are reserved for critically ill Covid-19 patients with a reasonable chance to survive. The situation here is dismal as we operate well below our normal standard of care. Wait times for an intensive care bed are hours long. Older patients are not being resuscitated and die alone without appropriate palliative care, while the family is notified over the phone . . . . Most hospitals are overcrowded, nearing collapse while medications, mechanical ventilators, oxygen, and personal protective equipment are not available. Patients lay on floor mattresses. The health care system struggles to deliver regular services — even pregnancy care and child delivery — while

---

[5] Ryan O'Hare, *Coronavirus Pandemic Could Have Caused 40 Million Deaths If Left Unchecked*, https://www.imperial.ac.uk/news/196496/coronavirus-pandemic-could-have-caused-40/.

[6] Mattia Ferraresi, *A Coronavirus Cautionary Tale From Italy: Don't Do What We Did*, (Boston Globe, Mar. 13, 2020), https://www.bostonglobe.com/2020/03/13/opinion/coronavirus-cautionary-tale-italy-dont-do-what-we-did/.

[7] *Id.*

[8] Mirco Nacoti, et al, *At the Epicenter of the Covid-19 Pandemic and Humanitarian Crises in Italy: Changing Perspectives on Preparation and Mitigation*, NEJM Catalyst: Innovations in Care Delivery, Mar. 22, 2020), https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0080.

App.171

cemeteries are overwhelmed, which will create another public health problem.[9]

### 2. Health systems in New York and Louisiana stand on the brink of collapse.

There are signs of similar strain beginning to show in the United States. New York City is one of the epicenters of the disease. Footage of overflowing emergency rooms in New York is sobering.[10] On March 27, New York City had 21,873 COVID-19 infections, 281 deaths, and at least 3,900 hospitalized.[11] One day later, on March 28, it was reporting 30,765 infections.[12] On March 29, 2020, 33,474 cases are reported.[13] At one hospital in Queens, thirteen people died in a single day.[14] Temporary morgues have been pieced together using refrigerated trucks, while medical staff lack adequate PPE and are putting themselves in harm's way to care for the sick.[15]

> Several doctors, nurses and paramedics told The Associated Press of deteriorating working conditions in emergency rooms and ICUs that make caretakers even more vulnerable. Sick patients are placed in beds packed end-to-end. Limited supplies of face masks, gowns and shields have them wearing the same protective equipment all day. A lack of available ventilators could soon put doctors and nurses in the agonizing position of prioritizing who gets them and who does not.[16]

---

[9] *Id.*

[10] *See* Bernard Condon, Jim Mustian, and Jennifer Peltz, *Video Shows New York City Emergency Room Overflowing With Patients as City on Frontlines of Coronavirus Outbreak*, (Associated Press, Mar. 28, 2020), https://abc7ny.com/jamaica-hospital-queens-new-york-city-nyc-coronavirus/6058195/.

[11] *Id.*

[12] Coronavirus Disease Daily Data Study, https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.

[13] *Id.*

[14] *Id.*

[15] *See* Condon, *supra* note 11 ("A nurse died from coronavirus after working nonstop for weeks at a hospital where staffers frustrated with dwindling supplies posed in gowns made of trash bags.")

[16] *Id.*; Patrick Madden, Ashley Dean, *New Orleans Officials Point to Increasing*

Closer to Texas (and specifically the Houston metropolitan area), New Orleans is another growing epicenter. In Louisiana, Orleans Parish has the highest COVID-19 death rate per capita in the nation.[17] On March 22, Louisiana Governor Edwards issued a statewide "stay at home" order, "citing fears that the Louisiana health care system could run out of capacity in as short a time as a week."[18] PPE shortage is a major concern, with Louisiana healthcare workers reporting "a lack of protective equipment amid a surge in new coronavirus cases in the region."[19] At one hospital in New Orleans, 60 employees have already tested positive for the virus and another 300 are quarantined. Marier Decl. ¶ 13 (DX-9). State health experts are projecting that during the first week of April, "there are going to be more sick patients in the greater New Orleans region than there are hospital beds to care for them."[20] One official described this as "absolutely frightening."[21] Another said, "This is a disaster that will define us for generations."[22]

───────────────

*Spread of COVID-19 Cases*, https://www.npr.org/sections/coronavirus-live-updates/2020/03/27/822461580/new-orleans-officials-point-to-increasing-spread-of-covid-19-cases.

[17] Missy Wilkinson, *New Orleans ER Workers Say Hospitals Are Verging On 'Systemic Collapse,'* https://www.vice.com/en_us/article/7kzjby/covid-19-new-orleans-louisiana-hospitals-coronavirus-emergency.

[18] *Id.*

[19] Andrea Gallo, Blake Paterson and Matt Sledge, *Louisiana Nurses Face Start Choice Between Personal Protection, Coronavirus Patient Care*, https://www.nola.com/news/coronavirus/article_5ffada98-7071-11ea-9c12-0bbed00fccd5.html.

[20] Rosemary Westwood, *'This Is Absolutely Frightening': Louisiana Hospitals Brace For The Worst of COVID-19*, https://www.wwno.org/post/absolutely-frightening-louisiana-hospitals-brace-worst-covid-19.

[21] *Id.*

[22] Vann R. Newkirk II, *Watch New Orleans*, (The Atlantic, Mar. 27, 2020), https://www.theatlantic.com/politics/archive/2020/03/coronavirus-pandemic-coming-new-orleans/608821/.

**B. Texas Takes Extraordinary Measures to Prepare for a Surge of COVID-19 Infections.**

COVID-19 has also spread to Texas. The number of cases in Texas has jumped 156% from just five days ago. *See* DX-3. An "exponential increase" in COVID-19 cases is expected over the next few days and weeks. Abraham Decl. ¶4 (DX-6). Such a drastic increase will pose serious threats to the ability of Texas's emergency healthcare system to continue providing effective care. *Id.* According to Dr. Heidi Abraham, the Associate EMS Medical Director for Austin/Travis County Emergency Medical Services, unless the infection rate can be slowed and PPE and hospital capacity preserved, emergency healthcare in Austin and Travis County is "in danger of becoming overburdened in a very short time." Abraham Decl. ¶ 9.

Texas law makes the Governor "responsible for meeting the dangers to the state and people presented by disasters." Tex. Gov't Code § 418.011. Governor Abbott declared a statewide disaster on March 13, 2020 pursuant to Texas Government Code section 418.014. DX-1. The Government Code grants the Governor broad authority once he has declared a disaster. In a disaster, the Governor may "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." *Id.* § 418.016. The Governor may even "commandeer or use any private property if the governor finds it necessary to cope with a disaster." *Id.* § 418.017(c). These powers are exercised by the Governor through the issuance of executive orders, proclamations, and regulations, which the Governor also has the power to amend or rescind. *Id.* at § 418.012. Executive orders, proclamations, and regulations "have the force and effect of law." *Id.*

On March 19, 2020, Dr. John Hellerstedt, Commissioner of the Department of State Health Services, declared a public health disaster under Texas Health and Safety Code section 81.082 because the virus "poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas." DX-2.

### 1. Governor Abbott issues EO GA-09 to ensure the survival of Texas healthcare.

Avoiding collapse requires the entire healthcare system to conserve resources. Abraham Decl. ¶¶ 8-9. But despite guidance "from the President's Coronavirus Task Force, the CDC, the U.S. Surgeon General, and the Centers for Medicare and Medicaid Services" to postpone elective procedures, "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient." DX-4.[23]

The national shortage of PPE along with an increased need for it to deal with highly infectious patients is a major concern. Abraham Decl. ¶¶ 4-6. Many hospitals in Texas are critically short on supplies. After the disaster declaration, the State

---

[23] *See also* Jenny Gold, *Some Hospitals Continue With Elective Surgeries Despite COVID-19 Crisis*, (Kaiser Health News, Mar. 20, 2020), https://khn.org/news/some-hospitals-continue-with-elective-surgeries-despite-covid-19-crisis/ ("[E]xperts interviewed . . . found it troubling that hospitals would continue to perform elective surgeries in the face of the coronavirus threat, both because of the toll on scarce national supplies and because it puts staff and patients at unnecessary risk of exposure.")

Medical Operations Center had received 2,178 requests for PPE from health care fa-
cilities in Texas. Hoogheem Decl. ¶ 5 (DX-10).[24] One of North Texas's largest hospi-
tals, Parkland, is in danger of running out of protective masks "in as little as three
weeks, a drastic drop from normal times when the supply could last for three
months."[25] At Anson General Hospital, north of Abilene, "the supply of N95 masks
was down to 14 on Monday [March 23]."[26] At Goodall-Witcher Hospital, north of
Waco, the hospital administrator "said he had read that between shift breaks and
staffing changes, treating a single COVID-19 patient might require as many as 40
masks per day. On Monday [March 23], his 25-bed hospital had fewer than 75."[27]

### 2. EO GA-09 imposes a blanket ban on medical procedures that are not medically necessary to preserve needed resources.

Based on these concerns, on March 22, 2020, the Governor issued an executive
order designed to increase the capacity of Texas's healthcare system to absorb a surge
of COVID-19 patients and address the severe shortage of PPE. DX-4 (EO GA-09). The
order applies to all licensed health care professionals and all licensed health care
facilities in the State. It requires that they "postpone all surgeries and procedures
that are not immediately necessary to correct a serious medical condition of, or to
preserve the life of, a patient who without immediate performance of the surgery or

---

[24] To put this in perspective, Texas had 407 hospitals as of 2017. Laura Dyrda, *How Many Hospitals Does Each State Have?*, (Becker's Hosp. Rev., Feb. 2, 2017), https://www.beckershospitalreview.com/hospital-transactions-and-valuation/how-many-hospitals-does-each-state-have.html.

[25] Scott Friedman, Eva Parks, Jose Sanchez and Jack Douglas Jr., *Desperate to Keep Protective Gear in Stock, North Texas Nurses Told to Re-Use Face Masks*, https://www.nbcdfw.com/investigations/desperate-to-keep-protective-gear-in-stock-north-texas-nurses-told-to-re-use-face-masks/2337375/.

[26] Emma Platoff, *Texas Hospitals Brace for Coronavirus Surge With Uncertain Stocks of Protective Gear*, (Tex. Tribune, Mar. 25, 2020).

[27] *Id.*

11

procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* It does not, however, apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *Id.* The Order is effective until April 21, 2020. *Id.* According to Dr. Robert Marier, Vice Chairman of Hospital Medicine for the Ochsner Health System and a board-certified infectious disease expert, this measure has a "sound basis," especially in light of the "risk of transmission in health care settings." Marier Decl. ¶ 14. According to Dr. Abraham, "uniform compliance" with EO GA-09 is "vital for the immediate safety of our community." Abraham Decl. ¶ 9.

## LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). "[T]he enormity of the relief is difficult to overstate." *Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 785 (S.D. Miss. 2011) (citing Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2948 (noting that courts describe such requests as "drastic," "extraordinary," and the requesting party must make a "clear showing")). The Court should proceed with caution in this context, where the issuance of a TRO would have the effect of countermanding an executive order issued by the Governor to protect public safety in a national emergency.

12

## ARGUMENT

I. **The Court Should Deny the Motion for Temporary Restraining Order.**

Plaintiffs have not satisfied any of the four requirements for a TRO.

A. **Plaintiffs Have No Likelihood of Success on the Merits.**

1. **EO GA-09 applies to all physicians and clinics, including Plaintiffs.**

The plain language of EO GA-09 temporarily curtails "surgeries and procedures," unless they are (1) "not immediately necessary to correct a serious medical condition of, or preserve the life of a patient," or (2) would not deplete hospital capacity or use needed PPE resources. Elective abortions—whether medical or surgical—do not meet either of these criteria and are therefore prohibited by EO GA-09. And according to Dr. Timothy Harstad, the perinatal medical director at St. David's Medical Center in Austin, "suspending elective abortion procedures would help preserve valuable PPE and hospital capacity." Harstad Decl. ¶5 (DX-7).

a. **Elective abortions are not "immediately medically necessary"**

Abortions are considered an elective procedure unless they are therapeutic, meaning performed for medical reasons. *See id.* ¶ 3, 5. Therapeutic abortions are rare and are performed in hospitals, not abortion clinics. *Id.* ¶ 3. And "elective abortions are never 'immediately medically necessary.'" Thompson Decl. ¶ 5. Thus, under the plain text of EO GA-09, "abortion providers should not be exempted." *Id.* To the extent Plaintiff argue that they could somehow comply with EO GA-09 and still perform elective abortions, Pls. Mot. TRO 12-13, they are mistaken.

Because the plain text shows otherwise, Plaintiff argue that abortion is "essential health care" and therefore should not be included in any measures taken to expand hospital capacity for COVID-19 cases, and that they should be able to use opinions of

industry groups to justify their decision to flout the law. Pls. Mot. TRO 12-13. The American College of Obstetricians and Gynecologists (ACOG) issued a statement opposing the categorization of abortion as a procedure that can be delayed during the COVID-19 pandemic, asserting that "abortion is an essential component of comprehensive health care." Pls. Mot. TRO 14. But 86% of OB/GYNS do not even perform abortions.[28] Regardless, EO GA-09 does not refer to "essential health care." Under the language of EO GA-09, elective abortions are not "immediately necessary," nor do they "correct a serious medical condition." *See also* Thompson Decl. ¶ 5; Harstad Decl. ¶5. Thus, EO GA-09 clearly prohibits the performance of elective abortions, like other elective procedures, for a limited period of time.

### b.   Surgical abortions use valuable PPE.

Plaintiff admit that they use PPE when performing surgical abortions. Compl. ¶ 54. They claim that they will try to use less in light of the shortage. Compl. ¶ 51. While that is admirable, the point of EO GA-09 is to preserve *all possible* PPE for the vital purpose of protecting healthcare workers on the front lines of fighting COVID-19—a measure that is essential to preventing a systemic collapse due to the spread of infection to those workers. Abraham Decl. ¶¶ 5-6, Hoogheem ¶ 3; *see also* Marier Decl. ¶ 6, 11-13. Plaintiffs' use of PPE for *any* non–medically necessary procedures is prohibited by EO GA-09.

---

[28] Debra Stulberg, et al., *Abortion Provision Among Obstetrician-Gynecologists*, Obstet. Gynecol. 2011 Sep; 118(3): 609–614, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3170127/.

### c. Abortions may result in complications, which will impact hospitals.

Plaintiffs admit that abortion complications occur and that they sometimes require hospitalization or treatment at an emergency room. Compl. ¶ 40. Planned Parenthood has conceded that at least 210 women each year in Texas are hospitalized after seeking an abortion. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 595 (5th Cir. 2014). That is about four women every week. Using the rate Plaintiffs give for major complications, 0.23%, Compl. ¶ 40, that is two women every week. And because abortion doctors are not required to have admitting privileges at a nearby hospital, *see Hellerstedt*, 136 S. Ct. at 2299, they cannot admit and take care of their own patients. Instead, patients suffering complications are sent to an emergency room. Thus, aside from taking up needed beds in the midst of this pandemic, abortion patients will also further burden overtaxed emergency departments during a surge of COVID-19 cases. *See* Abraham ¶ 9.

### d. Medication abortions are a "procedure" within the scope of EO GA-09.

Plaintiffs argue that medication abortions are not a "procedure" within the meaning of the Order. The definition of "procedure" in the medical context is "a series of steps for doing something." *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (7th ed. 2003). That encompasses medication abortion. According to the Texas Medical Board's FAQs, the term "procedure" under EO GA-09 excludes only "physical examinations, non-invasive diagnostic tests, the performing of lab tests, or obtaining specimens to perform laboratory tests."[29] And Plaintiffs

---

[29] *Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Non-Urgent, Elective Surgeries and Procedures During Texas Disaster Declaration for*

15

themselves treat medication abortion as a "medical procedure."[30] Medication abortions frequently result in complications that require surgical intervention, and thus use PPE and impact hospital capacity, as discussed above.

    i.    Undergoing a medication abortion is not like taking an aspirin. As Planned Parenthood states, "[t]he abortion pill process has several steps and includes two different medicines."[31] The procedure begins with the patient taking Mifepristone, which causes the fetus to die.[32] Because of "the risks of serious complications," Mifeprex is "available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the Mifeprex REMS Program."[33] A REMS "is a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks."[34]

    Between 24 and 48 hours later, the woman is instructed to take a second medi-

---

[30] *COVID-19 Pandemic*, Mar. 29, 2020, http://www.tmb.state.tx.us/idl/228ABC7B-2985-16D5-9C9F-2099C0DADC24.

[30] Planned Parenthood Gulf Coast, *Disclosure and Consent Form for Medical, Surgical, and Diagnostic Procedures*, https://www.plannedparenthood.org/files/6114/0168/3065/C107e_Disclosure_and_Consent_for_Medical_Surgical_Diagnostic_ProcedureTexas.pdf.

[31] *See* Planned Parenthood, *How Does the Abortion Pill Work?*, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-does-the-abortion-pill-work.

[32] *See* Mifeprex Medication Guide 17, https://www.fda.gov/media/72923/download.

[33] Mifeprex label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[34] FDA, *Risk Evaluation and Mitigation Strategies*, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems.

cation, misoprostol, which causes her uterus to contract and expel the fetus and pla-

centa.[35] Women experience bleeding and cramping during this process.[36] With some

frequency, these drugs do not completely empty the uterus, which can result in a

serious infection.[37] Thus, the provider is required to schedule a follow-up appoint-

ment with the patient to make sure that the abortion is complete.[38]

Before prescribing drugs to induce an abortion, Texas law requires a physician

to examine the patient.  Texas law also requires that "the attending physician, ad-

vanced practice registered nurse, or physician assistant . . . obtain[] and document[]

a pre-procedure history, physical exam, and laboratory studies, including verification

of pregnancy." Tex. Health & Safety Code § 171.063(c).  This physical examination

and interaction with staff will require some use of PPE such as gloves or masks, es-

pecially during a pandemic where close physical contact (like in the healthcare con-

text) can result in virus transmission, and even asymptomatic people may transmit

the virus. Marier Decl. ¶ 6; Abraham Decl. ¶.

ii.   It is possible the woman could end up in a hospital and divert COVID-19

resources as a result of a medication abortion.  Incomplete medication abortions are

common. To even become certified to prescribe mifepristone, the FDA requires pro-

viders to agree that they have the "ability to provide surgical intervention in cases of

incomplete abortion or severe bleeding, or to have made plans to provide such care

through others, and ability to assure patient access to medical facilities equipped to

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*; Tex. Health & Safety Code § 171.063(e)-(f); 25 Tex. Admin. Code 139.53(b)(4).

provide blood transfusions and resuscitation, if necessary."[39]  Mifeprex is currently approved for use up to 70 days (10 weeks) gestation.[40] But Mifeprex has an 8% incomplete abortion rate before 49 days (7 weeks) and a more than 15% incomplete abortion rate beyond that gestational age[41] There were 17,050 medication abortions in Texas in 2017, so about 328 per week. Assuming the lower 8% incomplete abortion rate, at least 26 women per week in Texas would require surgical intervention. The surgical procedure necessary to complete the abortion or stop the hemorraging will require PPE, and the patient may require hospitalization or a blood transfusion.[42] Thus, medication abortion risks impacting hospital resources just like other outpatient elective procedures that may  result in a complication or hospital visit, even if that is not typical.

### e.  Abortion clinics may contribute to the spread of COVID-19 by remaining open.

Aside from impacting PPE supplies and hospital capacity, *see* Harstad Decl. ¶ 5, Plaintiff' clinics can contribute to the spread of the virus by continuing to perform non-medically necessary procedures. Abraham ¶¶ 7-8. People infected with COVID-19 may infect others prior to the onset of symptoms, and even healthcare workers

---

[39]  Mifeprex REMS, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf.

[40] Mifeprex Medication Guide 16, *supra*.note 34.

[41] Am. Coll. of Obstetricians and Gynecologists, *Medical Management of First-Trimester Abortion, Practice Bulletin 143* (2016), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2014/03/medical-management-of-first-trimester-abortion.

[42] Blood supplies are critically low due to the pandemic. *See* Am. Red Cross, *American Red Cross Faces Severe Blood Shortage As Coronavirus Outbreak Threatens Availability of Nation's Supply*, https://www.redcross.org/about-us/news-and-events/press-release/2020/american-red-cross-faces-severe-blood-shortage-as-coronavirus-outbreak-threatens-availability-of-nations-supply.html.

wearing N95 masks cannot completely eliminate the risk of contracting the virus. Marier Decl. ¶¶ 6-8, 11-13; Abraham Decl. ¶ 4. Plaintiffs, however, admit they do not wear N95 masks, Pls. Mot. TRO 22, so they are at increased risk of becoming infected themselves and spreading the virus. Marier Decl. ¶¶ 11-13.Moreover, as Plaintiff state, women travel from other locations to receive abortions at their clinics, and traveling to other parts of the State is exactly what is causing the spread of the virus. *See* Compl. ¶ 72; Dewitt-Dick Decl. ¶ 22 ("Some [patients] come from over a hundred miles to receive care at our clinic."); Ferrigno Decl. ¶30 (patients "hail from all over Texas"). In 2017, there were 53,843 abortions performed in Texas. DX-5. That is over 1,000 abortions per week. That is a high volume of people traveling "all over" the State and coming through medical facilities, which risks spreading the illness further. *See* Abraham Decl. ¶7.

### 2.    EO GA-09 is a valid exercise of state power.

EO GA-09 is a proper exercise of the State's police power, and the right to an abortion recognized by precedent does not preempt public health measures taken in a time of emergency.

### a.    Longstanding precedent permits States to exercise their police power in an emergency to protect public health.

The Tenth Amendment reserves to the States all powers that are not given to the United States or otherwise prohibited by the Constitution. U.S. Const. Amend. X. This reservation of power includes the police power, which enables the State to act to protect public health. The Supreme Court has "distinctly recognized the authority of a state to enact quarantine laws and health laws of every description." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905). When faced with potential

19

epidemics or crises caused by infectious diseases, the Supreme Court has held repeatedly that States may act to protect their citizens without violating the Constitution. *See id.* (upholding a mandatory vaccination program for small pox against a Fourteenth Amendment challenge); *Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of La.*, 186 U.S. 380 (1902) (upholding quarantine law that prevented a ship from landing in New Orleans because of infectious disease there against Commerce Clause and procedural due process challenges); *Rasmussen v. State of Id.*, 181 U.S. 198 (1901) (upholding a law that permitted the Governor to ban certain sheep from being imported if evidence of disease was found against a Commerce Clause challenge); *see also, e.g.*, *Benson v. Walker*, 274 F. 622 (4th Cir. 1921) (upholding board of health resolution that prevented carnivals and circuses from entering a certain county in response to the Spanish flu epidemic).

### b. Individual rights, including abortion, may be temporarily curtailed in a time of emergency.

1. While the Constitution is not suspended during a national crisis, Supreme Court precedent allows for States trying to protect public health to take action that may restrict personal liberty to some degree:

> There is, of course, a sphere within which the individual may assert the supremacy of his own will . . . But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Jacobson*, 197 U.S. at 29.

> This is true for enumerated rights, like property rights:

> That a state, in a bona fide exercise of its police power, may interfere with private property, and even order its destruction. . . . For instance, meats, fruits, and vegetables do not cease to become private property by their decay;

20

but it is clearly within the power of the state to order their destruction in times of epidemic, or whenever they are so exposed as to be deleterious to the public health. . . . No property is more sacred than one's home, and yet a house may be pulled down or blown up by the public authorities, if necessary to avert or stay a general conflagration.

*Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 704-05 (1897).

This is also true for substantive due process rights involving bodily or personal autonomy. For instance, the "liberty secured" by the Fourteenth Amendment includes the right to "'live and work where [one] will.'" *Jacobson*, 197 U.S. at 29 (quoting *Allgeyer v. Louisiana*, 165 U.S. 578 (1897)). Yet to protect the public against the spread of disease, a states may impose mandatory quarantine orders even as to individuals who are not sick themselves. *See id.* States may also require mandatory vaccinations, notwithstanding the Fourteenth Amendment. *See Jacobson*, 197 U.S. at 27-38; *see also Phillips v. City of N.Y.*, 775 F.3d 538 (2d Cir. 2015) (rejecting a substantive due process challenge to New York's vaccination requirement for public-school children, relying on *Jacobson*, 197 U.S. 11). There is no reason a non-enumerated right like abortion should receive greater preference or protection.

2.    Further, temporary curtailment in this context is not a denial of the right altogether. Take, for example, this Court's closure due to the danger of COVID-19. The Court has postponed criminal jury trials until May 1, 2020, a longer period than that at issue with EO GA-09.[43] Certainly, the Constitution expressly establishes the right to "speedy and public trial" by jury. U.S. Const. am. VI. But this Court evidently

---

[43] Order Regarding Court Operations Under the Exigent Circumstances Created By the COVID-19 Pandemic, (W.D. Tex. Mar. 13, 2020), https://www.txwd.uscourts.gov/wp-content/uploads/2020/03/Order-Re-COVID-19.pdf.

21

does not consider the temporary suspension of that right because of the "exigent circumstances" presented by the "severity of the risk" of COVID-19 to "public health" to be an outright *denial* of the constitutional right to speedy trial by jury.[44] *Id.* The Court has limited its functions to only the most urgent matters, while postponing others, even though those matters are still important.[45] That is precisely what EO GA-09 does with medical procedures that are not "immediately medically necessary"; such procedures must be postponed until April 21, 2020, to prepare the healthcare system to absorb a sharp increase in COVID-19 cases.

Further, the right to vote is "the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). It is also expressly protected by the Constitution. U.S. Const. am. XIV § 2, XV, XVII, XIX, XXIV. Yet the Ohio Supreme Court just rejected an effort to challenge the Ohio Department of Health's order postponing the State's March 17 primary election until June 2, 2020, due to public health concerns related to COVID-19.[46]

---

[44] The Court also suspended application of the Speedy Trial Act, 18 U.S .C. § 3161 (h)(7)(A), finding "that the ends of justice served by ordering these continuances outweigh the best interests of the public and each defendant's right to a speedy trial. In fact, the best interests of the public are served by these continuances." *Id.*

[45] Additional Order Regarding Sentencing Hearings Under the Exigent Circumstances Created By the COVID-19 Pandemic, (W.D. Tex. Mar. 24, 2020) (continuing all sentencings for which the presentence report calculates the bottom of the Guidelines range as 21 months' imprisonment or more), https://www.txwd.uscourts.gov/wp-content/uploads/2020/03/Amended%20Order%20Re%20Court%20Operations%20032420.pdf.

[46] *See State ex rel. Speweik v. Wood Cty. Bd. of Elections*, No. 2020-0382, 2020 WL 1270759 (Ohio Mar. 17, 2020); J. Edward Moreno, *Ohio Supreme Court Denies Challenge to State Primary Delay* (The Hill Mar. 17, 2020), https://thehill.com/home-

* * *

EO GA-09's temporarily suspension of abortion procedures—like *all other proce-dures* that are not "immediately medically necessary" for reasons directly related to the public health—is not an outright denial of that right. Nor is it a de facto violation of the Constitution, given the legitimate exercise of the State's police power to protect public health in this emergency situation.

      c.   **The *Casey* standard does not categorically exempt abortion from any curtailment for any reason, even pre-viability.**

Plaintiffs' arguments completely fail to consider the State's police power to pro-tect the public health during a pandemic. Instead, they argue that abortion has spe-cial protection, notwithstanding clear authority allowing the State to take strong measures to protect the public health. They base this argument on *Planned Parenthood of Southeastern Pennsylvania v. Casey*'s holding that the State may not prohibit abortion before viability. 505 U.S. 833 (1992); Pls. Mot. TRO 17-20; *see also Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019).

But *Casey* did not insulate previability abortions from any incursion whatsoever, no matter how justified. Rather, *Casey* drew a line at viability because "viability marks the earliest point *at which the State's interest in fetal life* is constitutionally adequate to justify a legislative ban on nontherapeutic abortions." *Casey*, 505 U.S. at 860 (emphasis added). After viability, the Court reasoned, the State's interests in protecting the fetus's life are strong enough to support restriction because viability "is the time at which there is a realistic possibility of maintaining and nourishing a

---

news/state-watch/487983-ohio-supreme-court-denies-challenge-to-state-primary-de-lay.

App.188

life outside the womb, so that the independent existence of the second life can in rea-
son and all fairness be the object of state protection that now overrides the rights of
the woman." *Id.* The State's interest in fetal life is not at issue here, but the State's
interest in *everyone*'s life is. *Casey*, and consequently *Dobbs*, are simply not applicable
to a situation like this one, nor do they purport to be.[47]

The Fifth Circuit recognizes that where the State has compelling interests, such
as public health, it may take action that has the effect of completely restricting abor-
tions without running afoul of the Constitution. In *Jackson Women's Health Org. v.
Currier*, 760 F.3d 448, 457 (2014), the Fifth Circuit held that a law requiring admit-
ting privileges for abortion doctors was unconstitutional because it would result in
closing the sole abortion clinic in the state. The Court said that the closure would
"effectively extinguish [the right to pre-viability abortion] within Mississippi's bor-
ders." *Id.* But the Fifth Circuit nevertheless clarified that it was not a *per se* undue
burden for the State to apply health standards to close that sole clinic, even if it had
the effect of banning abortions in the State: "Nothing in this opinion should be read
to hold that any law or regulation that has the effect of closing all abortion clinics in
a state would inevitably fail the undue burden analysis." *Id.* at 458.

This makes perfect sense. Obviously, if a clinic or doctor is endangering its pa-
tients, the State may close that clinic or suspend the doctor's license to practice med-
icine to protect the public, even if that clinic or doctor were the only one performing
abortions in the State. In that circumstance, as here, the compelling interest of pro-
tecting public health justifies the resulting loss of abortion access.

---

[47] The same is true of the cases cited by plaintiffs striking down pre-viability abortion
restrictions. Pls. Mot. TRO 18-19. None of the cited cases involve a law of general
applicability enacted to preserve medical resources in a time of national crisis.

### 3.    EO GA-09 is Not An Unconstitutional Undue Burden.

Plaintiffs alternatively argue that if the undue burden test applies, EO GA-09 is unconstitutional under that standard. Pls. Mot. TRO 20-21. Under *Casey*, a law imposes an "undue burden" when it places "a substantial obstacle in the path of a woman seeking an abortion." 505 U.S. at 878. *Casey* made clear that "[n]ot all burdens on the right to decide whether to terminate a pregnancy will be undue." 505 U.S. at 876. Yet even if state regulation "increas[es] the cost or decreas[es] the availability," or makes it "more difficult or more expensive to procure an abortion," that "cannot be enough to invalidate it" *if the law serves a "valid purpose . . . not designed to strike at the right itself." Id.* at 874 (emphasis added). Rather, if a law amounts to a "substantial obstacle," the Court "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016).

### a.    EO GA-09 imposes no greater burden on women seeking abortions in the next three weeks than it does on other people seeking surgeries or procedures.

EO GA-09 imposes only a temporary burden on abortion access. For just three weeks, physicians and clinics are prohibited from performing abortion procedures unless the procedure is "immediately medically necessary" or if the procedure would not deplete the hospital capacity or PPE needed to cope with the COVID-19 disaster. DX-4.[48]  Delay of a few weeks for public health reasons does not amount to a total denial.

-------

[48] Plaintiffs claim that EO GA-09 "could remain in effect for months." Pls. Mot. TRO at 21. That is speculation and should be disregarded. EO GA-09 expires on April 21, 2020, three weeks from now, and plaintiffs point to nothing to support their assertion that it would be indefinitely effective. Texas law authorizes the Governor to issue executive orders during a state of disaster, and states that a "state of disaster may not continue for more than 30 days unless renewed by the governor." Tex. Gov't Code § 418.014(c).

*See* Part I.A.2.b.2. *supra*; *see also Casey*, 505 U.S. at 886 (acknowledging mandatory waiting period may sometimes result in a delay of "much more than a day" but concluding that it was not an undue burden even if it increased costs and potential delays).

a.   EO GA-09 does not burden Plaintiff' patients more than anyone else. It applies to *every* physician and *every* clinic in the State of Texas, so it is obviously not "designed to strike at the right itself." *Casey*, 505 U.S. at 874. It also applies to *every* medical procedure—women seeking abortions are being treated no differently than anyone else seeking a medical procedure at this time. Many people across the State will not be able to have a desired surgery for the next three weeks because of the grave threat of COVID-19, which will unfortunately impose some hardship. Physicians have been postponing surgeries for cancer patients, for patients with heavy bleeding that can be controlled temporarily with medication, for orthopedic procedures, bariatric surgeries, and tubal ligations. Harstad Decl. ¶ 5, Thompson Decl. ¶ 4. All physicians at UT Southwestern Medical Center are restricted to performing surgery only in life-threatening cases. Thompson Decl. ¶ 4. Nationwide, stent procedures for clogged arteries, surgeries for breast, thyroid, prostate, and kidney cancer, mammograms, colonoscopies, and fertility treatments are being postponed because of the threat of COVID-19.[49]

A pandemic does not present ideal circumstances for anyone. The temporary burden on women seeking abortion is commensurate with—and arguably exceeded in some cases—by the burdens being placed on many other Texans seeking other types

---

[49] Marilynn Marchione, *Cancer, Heart Surgeries Delayed as Coronavirus Alters Care* (Associated Press Mar. 18, 2020), https://www.usnews.com/news/health-news/articles/2020-03-18/cancer-heart-surgeries-delayed-as-coronavirus-alters-care.

of procedures during this unprecedented disaster. The State took emergency action to do what it can to preserve limited medical resources in the next few weeks to prevent a complete breakdown of the healthcare system in Texas, and the action it took is consistent with recommendations by the Surgeon General and the American College of Surgeons.[50] *See* Abraham Decl. ¶ 8-9.

    b.    Plaintiffs also assert that abortion is one of the "safest medical procedures in the United States," Compl. ¶ 40, yet also claim that "a delay of several weeks or even days may increase the risks." Compl. ¶ 71. But if abortion really is as safe as Plaintiff claim, these "risks" can only be minimal. Planned Parenthood made the same argument in *Casey*, but the plurality rejected it, concluding that "in the vast majority of cases, a 24-hour delay does not create any appreciable health risk." *Casey*, 505 U.S. at 885. And certainly, they would not exceed those of a cancer patient waiting for surgery, or a heart patient with a blockage waiting for a stent. The costs or risks of other procedures may rise as a result of the delay—cancer may metastasize, and tumors may grow and become more difficult to remove. But that alone does not invalidate a valid exercise of the State's police power to protect the public health, especially when it applies across the board to all providers.

    c.    Plaintiffs also raise concerns about unnamed women being "forced to continue a pregnancy against their will," Compl. ¶ 70, having the expense of "buy[ing]

---

[50] Vice Adm. Jerome M. Adams, M.D., *Surgeon General: Delay Elective Medical, Dental Procedures to Help Us Fight Coronavirus*, (USA Today Mar. 22, 2019), https://www.usatoday.com/story/opinion/2020/03/22/surgeon-general-fight-corona-virus-delay-elective-procedures-column/2894422001/; Am. College of Surgeons, *COVID-19: Elective Case Triage Guidelines for Surgical Care*, Mar. 24, 2020, https://www.facs.org/covid-19/clinical-guidance/elective-case.

new clothes" due to "weight gain," Hagstrom-Miller Decl. ¶ 33, or being subjected to childbirth.[51] But again, they do not plead that there is any actual patient at any one of the seven plaintiff clinics that will not be able to receive an abortion because of EO GA-09's effectiveness for three weeks, Compl. ¶¶ 35-74.[52]

> **b. The benefits of EO GA-09 are compelling.**

By contrast, the benefits of EO GA-09 are significant. *See* Abraham Decl. ¶ 8; Marier Decl. ¶ 14; Harstad Decl. ¶ 4. Plaintiffs claim that the Executive Order serves no benefit as to them, so this Court should exempt them from it. That is incorrect for four reasons.

First, restricting contact between patients, medical staff, and physicians at this time is beneficial to help prevent the spread of COVID-19, even if Plaintiffs' claims of taking steps to reduce contact are true. Abraham Decl. ¶ 7; *see* Marier Decl. ¶¶ 6, 11-12. Even if Plaintiffs' claims of low PPE usage are true, they are still using PPE that instead could be used for healthcare workers on the front lines of caring for COVID-19 patients. *See* Harstad Decl. ¶5. Even one extra mask could save the life of a physician or nurse caring for COVID-19 patients. The same goes for hospital beds and patients. *See* Part I.A.1.c *supra*. "Under current circumstances, available PPE should be directed to healthcare workers on the front lines of treating COVID-19 patients."

---

[51] Plaintiffs claim that the risk of dying in childbirth is fourteen times higher than from having an abortion. Compl. ¶ 41. But "this statement is unsupported by the literature and there is no credible scientific basis to support it." Byron Calhoun, *The Maternal Mortality Myth in the Context of Legalized Abortion*, Linacre Q. 2013 Aug. 80(3): 264-276, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6027002/.

[52] If there were any such patients, it is unlikely there would be many, given that only 3% of abortions in Texas occur after 17 weeks LMP (15 weeks post-fertilization). DX-5. Any woman so affected could seek as-applied relief—a far narrower demand than plaintiffs', which is to exempt all abortion doctors and clinics from a generally applicable executive order.

Abraham Decl. ¶ 6.

Second, if despite that the Court were inclined to think Plaintiff' impact on the healthcare system was insignificant, small effects can add up in a public health crisis. Even a few extra patients take up resources that could otherwise be used to treat COVID-19 patients, and if the healthcare system is stretched to its breaking point, those are resources that cannot be spared. To cite an earlier example, a mere 14 masks separates Anson General Hospital from risking transmission and further spread of COVID-19 from patients to healthcare workers.[53]

Indeed, the shortage of masks is critical. Abraham Decl. ¶ 6. The CDC told healthcare workers that they can use bandanas if nothing else is available.[54] The public is donating homemade masks to healthcare workers,[55] and Texas enlisted the help of inmates at Gatesville Correctional Facility to make cotton masks for the same reason.[56] There is no doubt that the surgical masks that Plaintiffs regularly use could help protect healthcare workers where N95 masks are unavailable.

Third, if one looks only at a small handful of providers or clinics, the impact on the State healthcare system could look small. But *every* individual physician or clinic could make the same argument. If Plaintiffs can perform abortions, why can't a plastic surgeon do face lifts, or an oral surgeon do dental surgery? Her procedures are

---

[53] Platoff, *supra* note 24.

[54] Centers for Disease Control and Prevention, *Strategies for Optimizing the Supply of Facemasks*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html.

[55] David Enrich, Rachel Abrams, and Steven Kurutz, *A Sewing Army, Making Masks for America*, (N.Y. Times, Mar. 25, 2020), https://www.nytimes.com/2020/03/25/business/coronavirus-masks-sewers.html.

[56] Deanna Hackney and Eric Levenson, *Texas Turns To Prison Labor to Help Cover Face Mask Shortages*, https://www.cnn.com/2020/03/22/us/texas-coronavirus-mask-trnd/index.html.

performed on an outpatient basis, complications are rare, and she promises to minimize use of PPE. Her procedures alone would not impact the whole State, as Plaintiffs also argue. But following Plaintiffs" logic would lead to demands for exceptions that would swallow the rule. Under current circumstances, the State must treat all providers the same, and must attempt to solve problems quickly and in the aggregate. We have just days or weeks before a surge of COVID-19 cases here in Texas. If Texas has any hope of avoiding a situation like (or worse) than Italy's,  and it is critical for everyone to do their part to prepare now. *See* Abraham Decl. ¶ 8.

Fourth, regardless of PPE or hospital bed capacity, requiring Plaintiff to comply with EO GA-09 benefits patients, the public, and Plaintiff themselves. As the Supreme Court stated in *Roe v. Wade*, the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U.S. 113, 150 (1973). During this public health crisis, "maximum safety" for patients—and medical staff—is to minimize contact with others, especially in view of PPE shortage. If Plaintiff' facilities continue performing abortions, they will create continued close contact and encourage traveling, which will further spread the virus. Abraham Decl. ¶ 7; Marier Decl. ¶¶ 11-13.

\* \* \*

Reading *Casey* like the Plaintiff do would mean that while the government could suspend basic liberty, property, and voting rights in the name of protecting public health in exigent circumstances, *see* Part I.A.2 *supra*, abortion rights alone are untouchable. But that reading is incorrect. Consistent with the longstanding precedent discussed above, abortion does not take precedence over every other right recognized

under the Constitution. Where the State's interests are sufficiently compelling—as they undoubtedly are here—the State may restrict individual liberties for a temporary period to address emergency situations. *Casey* and *Dobbs* are not to the contrary, and do not create a categorical exception for abortion that protects it from being regulated or restricted like other medical procedures in a public health crisis.

### B. Plaintiffs Cannot Satisfy the Other Elements Necessary for a Temporary Restraining Order.

Plaintiffs cannot show irreparable harm. *See Ridgely*, 512 F.3d at 734. As already discussed in Part I.A.3.a, Plaintiff' patients' alleged harm is limited to a three-week delay in receiving an abortion. And Plaintiffs did not allege in the Complaint that any particular patients of theirs will not be able to receive an abortion after EO GA-09 expires on April 21. They also fail to show any injury of their own. *See infra* II.

Conversely, public health will be harmed by continued performance of abortion procedures, so the balance of equities weighs decisively in the State's favor. *See Ridgely*, 512 F.3d at 734. COVID-19 is a serious and imminent threat to public health. Abraham ¶ 3. EO GA-09 is a necessary but temporary measure designed to prepare for an anticipated surge in COVID-19 infections over the next few days and weeks. *See* Part I.A.3.b; Abraham Decl. ¶ 3, 9; *see also* Marier Decl. ¶ 14.

The public interest also weighs heavily against the grant of a temporary restraining order. Uniform compliance with EO GA-09 is essential. Abraham Decl. ¶ 9. As explained above in Part I.A.3.b, when healthcare resources are stretched to the breaking point, every available resource helps. And allowing for exceptions defeats the purpose of the strong measures taken by the Governor to protect the public. In *Jacobsen*, where a plaintiff challenged a mandatory vaccination law because he did not agree with the benefits and wanted an exception—much like Plaintiff here—the Supreme

31

Court identified the fatal flaw with that kind of argument:

> We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent . . . may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of a minority, then a like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population.

197 U.S. at 37–38. In a pandemic, if even one person fails to comply with measures designed to slow the spread of the disease, devastating consequences can result. South Korea's "Patient 31" is one example. She "traveled extensively through South Korea, even after doctors had suggested she isolate herself due to a high likelihood that she had been infected. The Korean Center for Disease Control found that she ultimately had contact with approximately 1,160 people."[57]

Moreover, giving Plaintiff an exception may embolden others not pleased at having to postpone procedures. Instead of fighting the virus during the very short and precious time we have before a COVID-19 surge arrives (as it is beginning to in other States), the State will be fighting to keep its rule intact in court, to the great detriment of the public it is trying to protect.

* * *

Plaintiffs have failed to meet the exacting burden required to merit the extraordinary remedy of a temporary restraining order. The Court should reject Plaintiff

---

[57] Editorial Board, *Keep Your Distance: Patient 31 Illustrates Need for Social Distancing*, (Pittsburgh Post-Gazette, Mar. 20, 2020), https://www.post-gazette.com/opinion/editorials/2020/03/20/Patient-31-South-Korea-social-distancing-stories/202003190019.

attempt to undermine the Governor's efforts to protect Texans in a time of unprece-

dented danger to public health.

## II.  Numerous Jurisdictional Defects Bar Any TRO.

"A district court's obligation to consider a challenge to its jurisdiction is non-

discretionary." *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019). Before this Court can

issue any order at all, it must assure itself of its own jurisdiction. *See id.*

### A.  Plaintiffs' claims against the Governor and the Attorney General are barred by sovereign immunity and Plaintiffs' lack of standing.

The Court cannot issue a TRO binding the Governor or the Attorney General

because neither of these defendants has enforcement authority. In its absence, Plain-

tiffs cannot invoke the *Ex parte Young* exception to sovereign immunity. Similarly,

Plaintiffs lack article III standing because, as to the Governor and Attorney General,

they have shown neither an injury in fact nor redressability.

### 1.  The *Ex parte Young* doctrine does not allow suit against the Governor and Attorney General, who do not have independent authority to enforce the Executive Order.

Plaintiffs' claims against the Governor and the Attorney General are barred by

sovereign immunity because these defendants do not enforce EO GA-09 or the Emer-

gency Rule. The State's sovereign immunity generally bars suits against state officers

in their official capacities. The Supreme Court has carved out a narrow exception, the

*Ex parte Young* doctrine, for cases where "a federal court commands a state official to

do nothing more than refrain from violating federal law." *Va. Office for Prot. & Advo-

cacy v. Stewart*, 563 U.S. 247, 255 (2011); *see Ex parte Young*, 209 U.S. 123, 157

(1908). The exception "rests on the premise—less delicately called a 'fiction'—that

when a federal court commands a state official to do nothing more than refrain from

violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Id.* *Ex parte Young* allows suit only when the defendant enforces the challenged statute. *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). That is because, absent such a connection, the plaintiff has simply "ma[de] [the official] a party as a representative of the state," and such a suit is barred by the State's sovereign immunity. *Ex parte Young*, 209 U.S. at 157.

Plaintiffs do not allege the Governor has authority to prosecute or bring enforcement actions based on the Executive Order. *See* Compl. ¶ 21. Any prosecution would be brought by local officials, and any administrative enforcement action would be initiated by HHSC, the TMB, or the TBN. Because Plaintiffs' claims against the Governor are premised on making him a party purely "as a representative of the state," *Ex parte Young*, 209 U.S. at 157, those claims are barred by sovereign immunity and must be dismissed.

The claims against the Attorney General are also barred. He has no authority to implement the Emergency Rule. *Compare* Compl. ¶ 22, *with id.* ¶¶ 24, 66. As to criminal enforcement under EO GA-09, "[w]hile the Attorney General may offer assistance in certain criminal cases . . . county and district attorneys are granted the authority to prosecute criminal matters." *Starr v. County of El Paso*, No. EP-09-CV-353-KC, 2010 WL 3122797, at *5 (W.D. Tex. Aug. 5, 2010). The Attorney General can assist only "[a]t the request of a district attorney, criminal district attorney, or county attorney." Tex. Gov't Code § 402.028(a); *see* Compl. ¶ 22 & n.2.

The plaintiff seeking to invoke *Ex parte Young* must show that official "is likely to" enforce the statute against it. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). Plaintiffs do not allege any of the District Attorney Defendants is likely to

seek assistance from the Attorney General, much less that such a request is immi-
nent. Injury that relies on such an "attenuated chain of inferences" does not suffice.
*Clapper*, 568 U.S. at 414 n.5. Because no such action is likely, the Court lacks juris-
diction to enjoin the Attorney General. *See id.*; *see, e.g.*, *Entm't Software Ass'n v. Foti*,
451 F. Supp. 2d 823, 827–28 (M.D. La. 2006). Plaintiffs' claims against the Attorney
General, like those against the Governor, are barred by sovereign immunity.

> **2.  Plaintiffs lack article III standing to sue the Governor and At-
> torney General because, as to these defendants, Plaintiffs have
> not alleged injury in fact or redressability.**

For much the same reasons, Plaintiffs lack standing to sue the Governor and
Attorney General. *See City of Austin*, 943 F.3d at 1002–03 (discussing the relation-
ship between *Ex parte Young*'s requirements and article III standing). A plaintiff
seeking relief in federal court must first plausibly allege "an injury in fact—an inva-
sion of a legally protected interest which is (a) concrete and particularized, and (b)
actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504
U.S. 555, 560 (1992) (internal citations and quotation marks omitted). The "threat-
ened injury must be certainly impending to constitute injury in fact, and . . . allega-
tions of possible future injury are not sufficient." *Clapper v. Amnesty Intern. USA*,
568 U.S. 398, 410 (2013) (quotations and brackets omitted). "By ensuring a future
injury is not 'too speculative,' the imminence requirement [of article III standing] 're-
duce[s] the possibility of deciding a case in which no injury would have occurred at
all.'" *Ctr. for Biological Diversity v. United States Envt'l Prot. Agency*, 937 F.3d 533,
537 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 564 n.2).

Plaintiffs have not alleged an injury in fact traceable to the Governor or the At-
torney General. A plaintiff's decision to forego action based on speculation is not an

injury sufficient to confer standing." *Zimmerman v. City of Austin*, 881 F.3d 378, 389–90 (5th Cir. 2018); *see also Ctr. for Biological Diversity*, 937 F.3d at 540–42; *Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018). Because there is no likelihood these officials will take enforcement action, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant." *Lujan,* 504 U.S. at 560 (quotation and alterations omitted).

Next, the plaintiff must show it is "likely," as opposed to merely "speculative," that the claimed injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Plaintiffs' claims against the Governor and the Attorney General do not meet this standard. Plaintiffs seek an order enjoining the Governor and the Attorney General from "enforc[ing ] the Executive Order and Emergency Rule, as interpreted by Defendants, to prohibit abortions." Pls. Mot. TRO 28.

That order would not accomplish anything. Plaintiffs want the Court to order the Governor not to do something he cannot do anyway; the Governor does not enforce either the Executive Order or the Emergency Rule. The same is true as to the Attorney General, whose involvement in any potential prosecution is speculative at best. *See* Part II.A.1 *supra.* So an order against the Governor or the Attorney General would not redress Plaintiffs' claimed injury—the threat of prosecution and administrative enforcement. Plaintiffs do not have article III standing to sue the Governor or the Attorney General.

**B.** **Plaintiffs lack third-party standing to challenge EO GA-09 on behalf of their unidentified patients.**

Plaintiffs are abortion clinics and an abortion doctor, not women seeking abortions.[58] Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[Plaintiffs] [a]re required to prove some violation of their personal rights."). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a section 1983 claim because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

And even if section 1983 did not prohibit Plaintiffs from relying on the rights of third parties, the Supreme Court's doctrine of prudential standing would. To have standing in a typical lawsuit, a litigant must assert his own rights, not those of a third party. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). A litigant may assert a third party's rights only when (1) the litigant has a "close" relationship with the third party; and (2) some "hindrance" affects the third party's ability to protect her own

---

[58]    *See* Compl. ¶¶ 69, 74–79 (alleging claims based on "patients' fundamental right to abortion"); Pls. TRO Mot. 25 (arguing "[t]he Attorney General's interpretation of the Executive Order prevents Texans from exercising their fundamental constitutional right to terminate a pregnancy").

interests. *Id.* at 130; *see also South Carolina v. Regan*, 465 U.S. 367, 380 (1984) (explaining that third-party standing is "the exception rather than the rule"). Neither requirement is met here.

As to a "close relationship," plaintiffs pointedly do not identify any particular patient who will be unable to obtain "abortion care" as a result of EO GA-09. Instead, they refer to hypothetical "patients" whose "abortions will be delayed, and in some cases, denied altogether." Compl. ¶ 69. A hypothetical relationship does not support third-party standing. *See Kowalski*, 543 U.S. at 131. The lack of an existing relationship with the patients on whose behalf plaintiffs bring suit prohibits application of the third-party-standing doctrine. *See id.* Moreover, there is no genuine obstacle to a woman challenging an abortion regulation. *See id.* at 130. Women can and do bring such challenges. *See, e.g., J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) (per curiam); *Doe v. Parson*, 368 F. Supp. 3d 1345 (E.D. Mo. 2019).

Neither the Fifth Circuit nor the Supreme Court has allowed third-party standing under factual circumstances like the ones here. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981), is not to the contrary. In *Deerfield*, the Fifth Circuit allowed third party standing for a would-be abortion clinic challenging a city commission's decision to deny it a conditional-use license to operate in the city's business district. 661 F.2d at 334. It is hard to see how a woman seeking an abortion— even in the early months of her pregnancy—could challenge a land-use decision, then have an abortion performed at the not-yet operational clinic. But there is no barrier to a woman challenging EO GA-09 if she believes it burdens her rights.[59]

---

[59] And even if *Deerfield* forecloses a challenge to third-party standing, State Defendants raise the issue to preserve it for further review. The Supreme Court is presently examining the issue in *June Medical Services, LLC v. Russo*, No. 18-1323.

### C. The Court lacks jurisdiction to opine on the meaning of state law under *Pennhurst.*

Under Pennhurst, federal courts lack authority to order state officials to comply with state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* The gravamen of Plaintiffs' complaint is that the Attorney General has misinterpreted state law in the press release—without the press release, they say "Plaintiffs' provision of [abortions] is entirely consistent with the Governor's Executive Order." Pls. Mot. TRO 2; *see also id.* at 12–14; Compl. ¶¶ 4, 63. To the extent plaintiffs ask the Court to interpret EO GA-09 to permit their abortion procedures, their claim is beyond this Court's jurisdiction. This Court cannot issue a TRO on this basis. *See Papasan*, 478 U.S. at 277; *Pennhurst*, 451 U.S. at 106.

### D. The *Pullman* abstention doctrine prohibits the Court from issuing a TRO.

Where an antecedent question of state law would obviate the need to address a federal constitutional question, *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941), the Supreme Court has instructed federal courts to abstain from "employ[ing] their "historic powers as [courts] of equity," *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring). This doctrine applies where the state law question would "significantly modify" the federal analysis. *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 512 (1972).

Plaintiffs allege that *as interpreted in the Attorney General's press release* the Executive Order violates their patients' federal constitutional rights. *See* Compl. ¶¶ 75, 78. Their constitutional challenge would be obviated if they are correct that

EO GA-09 permits them to continue performing abortions (though they are not). *See* Compl. ¶¶ 4, 63; Pls. Mot. TRO 2, 12–14. On Plaintiffs' own theory, then, the application of the Executive Order to plaintiffs' abortions is "uncertain." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). If Plaintiffs are right about that, the Court should abstain from unnecessarily addressing the constitutional questions.

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny the motion for a temporary restraining order.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
BENJAMIN S. WALTON
Texas Bar No. 24075241
Assistant Attorneys General
General Litigation Division

HEATHER GEBELIN HACKER
Assistant Solicitor General
Texas Bar No. 24103325

App.205

Office of the Attorney General
300 West 15th Street
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)
(512) 320-0667 (fax)

Attorneys for State Defendants

41

## CERTIFICATE OF FILING AND SERVICE

I certify that on March 30, 2020, this document was served through the Court's CM/ECF Document Filing System or through electronic mail, upon the following counsel of record:

Patrick J. O'Connell
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, TX 78731
(512) 852-5918
pat@pjofca.com

Julie Murray
Alice Clapman
Richard Muniz
Hannah Swanson
Planned Parenthood Federation of America
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
alice.clapman@ppfa.org
richard.muniz@ppfa.org
hanna.swanson@ppfa.org

Jennifer Sandman
Planned Parenthood Federation of America
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

Molly Duane
Rabia Muqaddam
Francesca Cocuzza
Center for Reproductive Rights
199 Water St. 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

Stephanie Toti
Rupali Sharma
Sneha Shah
Lawyering Project
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Assistant Attorney General

42

**DX-1**



GOVERNOR GREG ABBOTT

March 13, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:20 AM O'CLOCK

MAR 1 3 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation certifying that COVID-19 poses an imminent threat of disaster in the state and declaring a state of disaster for all counties in Texas.

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# PROCLAMATION

BY THE

## Governor of the State of Texas

---

TO ALL TO WHOM THESE PRESENTS SHALL COME:

WHEREAS, the novel coronavirus (COVID-19) has been recognized globally as a contagious respiratory virus; and

WHEREAS, as of March 13, 2020, there are more than 30 confirmed cases of COVID-19 located in multiple Texas counties; and

WHEREAS, there are more than 50 Texans with pending tests for COVID-19 in Texas; and

WHEREAS, some schools, universities, and other governmental entities are beginning to alter their schedules, and some venues are beginning to temporarily close, as precautionary responses to the increasing presence of COVID-19 in Texas; and

WHEREAS, costs incurred to prepare for and respond to COVID-19 are beginning to mount at the state and local levels; and

WHEREAS, the State of Texas has already taken numerous steps to prepare for COVID-19, such as increasing laboratory testing capacity, coordinating preparedness efforts across state agencies, and working with local partners to promote appropriate mitigation efforts; and

WHEREAS, it is critical to take additional steps to prepare for, respond to, and mitigate the spread of COVID-19 to protect the health and welfare of Texans; and

WHEREAS, declaring a state of disaster will facilitate and expedite the use and deployment of resources to enhance preparedness and response.

NOW, THEREFORE, I, GREG ABBOTT, Governor of the State of Texas, do hereby certify that COVID-19 poses an imminent threat of disaster. In accordance with the authority vested in me by Section 418.014 of the Texas Government Code, I hereby declare a state of disaster for all counties in Texas.

Pursuant to Section 418.017 of the code, I authorize the use of all available resources of state government and of political subdivisions that are reasonably necessary to cope with this disaster.

Pursuant to Section 418.016 of the code, any regulatory statute prescribing the procedures for conduct of state business or any order or rule of a state agency that would in any way prevent, hinder, or delay necessary action in coping with this disaster shall be suspended upon written approval of the Office of the Governor. However, to the extent that the enforcement of any state statute or administrative rule regarding contracting or procurement would impede any state agency's emergency response that is necessary to cope with this declared disaster, I hereby suspend such statutes and rules for the duration of this declared disaster for that limited purpose.

In accordance with the statutory requirements, copies of this proclamation shall be filed

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:26AM O'CLOCK

MAR 1 3 2020

App.210

**Governor Greg Abbott**
March 13, 2020

Proclamation
Page 2

with the applicable authorities.



IN TESTIMONY WHEREOF, I have
hereunto signed my name and have
officially caused the Seal of State to be
affixed at my office in the City of
Austin, Texas, this the 13th day of
March, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_11:20 AM_ O'CLOCK

MAR 1 3 2020

DX-2



## Commissioner John W. Hellerstedt, M.D.

## DECLARATION OF A PUBLIC HEALTH DISASTER IN THE STATE OF TEXAS

### March 19, 2020

TO ALL TO WHOM THESE PRESENTS SHALL COME:

I, John W. Hellerstedt, M.D., Commissioner of the Department of State Health Services, do hereby certify that the introduction and spread of the communicable disease known as COVID-19 in the State of Texas has created an immediate threat, poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas.

THEREFORE, in accordance with the authority vested in me by Section 81.082(d) of the Texas Health and Safety Code, I do hereby declare a state of public health disaster for the entire State of Texas.

Pursuant to Section 81.002 of the code, each person shall act responsibly to prevent and control communicable disease. The following actions, taken immediately, will reduce and delay the spread of COVID-19:

- People, businesses and communities should immediately undertake hygiene, cleanliness and sanitation practices that are accessible, affordable and known to be effective against COVID-19.
  - Wash hands often for 20 seconds and encourage others to do the same.
  - If no soap and water are available, use hand sanitizer with at least 60% alcohol.
  - Cover coughs and sneezes with a tissue, then throw the tissue away.
  - Avoid touching your eyes, nose, and mouth with unwashed hands.
  - Disinfect surfaces, buttons, handles, knobs, and other places touched often.
  - Avoid close contact with people who are sick.
- People who are known to have, or are under investigation or monitoring, for COVID-19, should adhere to the direction provided to them by duly authorized persons, including public health officials. Failure to abide by such direction may result in involuntary quarantine or isolation for the purposes of preventing further community spread of COVID-19.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:45 A.M. O'CLOCK

MAR 1 9 2020

Page **1** of **2**

App.213

Case: 20-50264 Document: 3 Page: 214 Date Filed: 03/30/2020

- People who are ill, especially those with symptoms consistent with influenza or COVID-19, should isolate themselves at home until they recover. Such persons should only present for medical evaluation and treatment if their symptoms are such that they cannot continue to be cared for in their home. And, when seeking medical care should call their doctor or health care facility before arriving to allow them to prepare.
- Limit trips into the public to essential outings. Traveling to work, the grocery store, the pharmacy or to seek medical care would be considered essential trips.
- Limit as much as possible close contact with other people. Stay six feet away.
- Do not gather in social groups of more than ten (10) individuals.
- Employers should allow work at home alternatives to the greatest extent possible.
- Restaurants should not allow dine-in options, either inside or outside. Take-out and curbside options with minimal contact are permitted and highly encouraged.

The Texas Department of State Health Services will continue to provide the most current and practical advice on how to control the spread of COVID-19 and encourages all Texans to seek additional information from a trusted source such as https://www.dshs.texas.gov/coronavirus/ or from the Centers for Disease Control and Prevention at https://www.cdc.gov/coronavirus/.

Adherence to these rules and the sound public health principles that support them will provide optimal protection for the people of Texas. These measures are necessary to advance the health and safety of all Texans.

Copies of this proclamation will be filed with applicable authorities.

Given under my hand this the

\_\_19\_\_ day of March, 2020.

JOHN W. HELLERSTEDT, M.D.
Commissioner of Public Health

ATTESTED BY:

Ruth Hughs
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
11:95AM O'CLOCK

MAR 1 9 2020

Page **2** of **2**

App.214

**DX-3**



Source: *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times,
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

**DX-4**



GOVERNOR GREG ABBOTT

March 22, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:30 PM O'CLOCK

MAR 22 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-09 relating to hospital capacity during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor
GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# 𝕰𝖝𝖊𝖈𝖚𝖙𝖎𝖛𝖊 𝕺𝖗𝖉𝖊𝖗

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 22, 2020**

**EXECUTIVE ORDER**
**GA 09**

*Relating to hospital capacity during the COVID-19 disaster.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Texas Department of State Health Services has determined that, as of March 19, 2020, COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, on March 19, 2020, I issued an executive order in accordance with the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC), and mandated certain obligations for Texans that are aimed at slowing the spread of COVID-19; and

WHEREAS, a shortage of hospital capacity or personal protective equipment would hinder efforts to cope with the COVID-19 disaster; and

WHEREAS, hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient, contrary to recommendations from the President's Coronavirus Task Force, the CDC, the U.S. Surgeon General, and the Centers for Medicare and Medicaid Services; and

WHEREAS, various hospital licensing requirements would stand in the way of implementing increased occupancy in the event of surge needs for hospital capacity due to COVID-19; and

WHEREAS, the "governor is responsible for meeting . . . the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders . . . hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and



FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:39 PM O'CLOCK

MAR 2 2 2020

*Governor Greg Abbott*
March 22, 2020

*Executive Order GA-09*
Page 2

WHEREAS, under Section 418.173, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable by a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both fine and confinement.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order that, beginning now and continuing until 11:59 p.m. on April 21, 2020, all licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician;

PROVIDED, however, that this prohibition shall not apply to any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster.

At the request of the Texas Health and Human Services Commission, I hereby suspend the following provisions to the extent necessary to implement increased occupancy in the event of surge needs for hospital capacity due to COVID-19:

25 TAC Sec. 133.162(d)(4)(A)(iii)(I);
25 TAC Sec. 133.163(f)(1)(A)(i)(II)–(III);
25 TAC Sec. 133.163(f)(1)(B)(i)(III)–(IV);
25 TAC Sec. 133.163(m)(1)(B)(ii);
25 TAC Sec. 133.163(t)(1)(B)(iii)–(iv);
25 TAC Sec. 133.163(t)(1)(C);
25 TAC Sec. 133.163(t)(5)(B)–(C); and
any other pertinent regulations or statutes, upon written approval of the Office of the Governor.

This executive order shall remain in effect and in full force until 11:59 p.m. on April 21, 2020, unless it is modified, amended, rescinded, or superseded by me or by a succeeding governor.

Given under my hand this the 22nd day of March, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
4:39 Pm O'CLOCK

MAR 2 2 2020

**DX-5**

Induced Terminations of Pregnancy by Procedure and Post-Fertilization Age - 2017 * **

| PROCEDURE | TOTAL | <9 WEEKS | 9-10 WEEKS | 11-12 WEEKS | 13-14 WEEKS | 15-16 WEEKS | 17-20 WEEKS | 21-24 WEEKS | >=25 WEEKS | NOT STATED |
|---|---|---|---|---|---|---|---|---|---|---|
| SUCTION CURETTAGE | 33,444 | 27,310 | 3,730 | 1,676 | 628 | 54 | 13 | 0 | 0 | 33 |
| MEDICAL (NON SURGICAL) | 17,050 | 16,975 | 12 | 1 | 6 | 8 | 16 | 6 | 1 | 25 |
| DILATION AND EVACUATION | 3,255 | 100 | 172 | 576 | 897 | 730 | 771 | 7 | 0 | 2 |
| INTRA-UTERINE INSTILLATION | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| SHARP CURETTAGE (D&C) | 6 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| HYSTEROTOMY/HYSTERECTOMY | 4 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | 0 |
| OTHER/NOT STATED | 82 | 78 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| TOTAL | 53,843 | 44,467 | 3,915 | 2,255 | 1,531 | 796 | 803 | 15 | 1 | 60 |

Notes:

* Based on the 83rd Texas Legislature requirement, starting with 2014 Induced Terminations of Pregnancy (ITOP) data, fetus age is reported in weeks post-fertilization versus the previously reported weeks of gestation. Post-Fertilization Age (PFA) is generally two weeks less than gestational age. For out-of-state records, post-fertilization age is estimated based on gestational age.

** Includes reported abortions that were either performed in Texas on out of state residents (1,174) or were performed on Texas residents elsewhere (566).

Definitions:

Dilation and evacuation: Surgical procedures performed after 14 weeks 0 days gestation are called dilation and evacuation (D & E) procedures. This type of surgical procedure typically requires a greater degree of cervical dilation and the use of grasping forceps.

Hysterotomy: Evacuation of the pregnancy through incision of the uterus.

Induced termination of pregnancy: Any act or procedure performed after a pregnancy is medically verified with the intent to cause the termination of an intra-uterine pregnancy other than for the purpose of either the birth of a live infant or removing a dead fetus.

Intrauterine Instillation: Injecting saline or prostaglandin into the uterus to cause contractions, which expel the contents of the uterus.

Medical (Nonsurgical) Abortion: Administration of medications for the purpose of inducing an abortion.

Sharp Curettage (dilation and curettage: D&C, or surgical curettage): A surgical procedure in which the uterine contents are removed with curette.

Suction Curettage (Vacuum Aspiration): Removal of uterine contents through a flexible tube attached to a suction apparatus.

Data Sources: Reports of induced termination of pregnancy sent to Texas Health and Human Services per the Texas Abortion Facility Reporting and Licensing Act, Health and Safety Code, Chapter 245 and through public health surveillance agreements with other states.

Prepared by: Data Dissemination, Center for Analytics and Decision Support, Texas HHSC, February 2019
Filename: 2017 ITOP by Post-Fertilization Age and Procedure_Final.xlsx

End of worksheet

Page 1 of 1

**DX-6**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § § § § § § § § | |
| Plaintiffs, | | |
| v. | | CAUSE NO. 1:20-CV-00323-LY |
| GREG ABBOTT, et al., | | |
| Defendants. | | |

---

## DECLARATION OF HEIDI ABRAHAM, M.D., FAEMS

---

I, Heidi Abraham, M.D., FAEMS, declare the following:

1. I am an Associate EMS Medical Director for Austin/Travis County Emergency Medical Services. I am also the Medical Director for the New Braunfels Fire Department, and I am an ER physician. I make this Declaration based upon my personal knowledge and am competent to testify thereto.

2. I am a medical doctor licensed in the State of Texas and in good standing with the Texas Medical Board. I am a Fellow of the Academy of Emergency Medical Services. I completed my emergency medicine residency as a chief resident at the Wright State University Integrated Residency in Emergency Medicine. I also completed a fellowship in EMS and Disaster Medicine at The University of Texas at Houston.

3. The recent spread of COVID-19 in central Texas has created a crisis for emergency medical care. The Austin/Travis County area is already experiencing significant community spread of COVID-19. An exponential increase in COVID-19

Page 1 of 4

cases is expected over the next few days and weeks. Such a drastic increase in COVID-19 cases poses serious threats to the ability of our local emergency healthcare system to continue providing effective care both for COVID-19 patients and for other patients in need of emergency medical care.

4. One threat posed by a sudden increase in COVID-19 cases is the threat of insufficient personal protective equipment ("PPE"). PPE includes things like masks, gloves, gowns, and face shields. It is critical that all healthcare personnel be adequately supplied with PPE. If even one person providing care is carrying COVID-19 but not yet symptomatic, the results could be devastating if that person is not equipped with proper PPE. An infectious individual could unknowingly transmit COVID-19 to dozens if not hundreds of patients before that individual becomes symptomatic and is removed from patient interactions.

5. A related threat posed by insufficient PPE is a decrease in the number of available healthcare workers. Emergency medical personnel in Austin/Travis County have already been infected with COVID-19 and placed under quarantine. Inadequate PPE fails to protect healthcare workers from becoming infected and potentially infecting other healthcare workers and patients. This is another reason why ensuring adequate supplies of PPE is critical to protect healthcare workers on the front lines of treating COVID-19 patients.

6. The current COVID-19 crisis has caused a dangerous shortage of PPE. For example, hospitals and other emergency medical personnel in Austin/Travis County are currently experiencing shortages of proper masks (both N95 masks and regular surgical masks), gowns, and face shields. Most healthcare workers are having to

Page 2 of 4

reuse PPE because of the shortage. Normally, PPE is discarded between patients to prevent transmission of pathogens. The current shortages must be corrected immediately to prevent the spread of COVID-19 from becoming exponentially worse over the next few days and weeks. Under current circumstances, available PPE should be directed to healthcare workers on the front lines of treating COVID-19 patients.

7. An important way to slow the spread of COVID-19 is to enforce social distancing and minimize contact wherever possible. The emergency medical community needs everyone to strictly comply with these standards.

8. The next few days and weeks are critical for slowing the spread of COVID-19 in Texas. Immediate and drastic action is necessary. As part of the effort to slow the spread of COVID-19 and protect the capacity of the Texas healthcare system to handle a surge of COVID-19 patients, it is important for all medical facilities to cease any procedures that require personal interactions between patients and staff, use PPE, or impact hospital capacity, unless such procedures are immediately medically necessary, as described in the Governor's recent order dated March 22, 2020.

9. Unless the infection rate can be slowed and PPE and hospital capacity preserved, emergency medical healthcare personnel and facilities in the Austin/Travis County area are in danger of becoming overburdened in a very short time. Uniform compliance with the Governor's recent order is therefore vital for the immediate safety of our community.

//

//

Page 3 of 4

App.226

## DECLARATION UNDER PENALTY OF PERJURY

I, Heidi Abraham, M.D., FAEMS, a citizen of the United States and a resident of Texas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this ___ day of March, 2020.

Heidi Abraham, M.D., FAEMS

Page **4** of **4**

**DX-7**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § § § § | |
| Plaintiffs, | § | |
| v. | § § | CAUSE NO. 1:20-CV-00323-LY |
| GREG ABBOTT, et al., | § § § | |
| Defendants. | § | |

## DECLARATION OF TIMOTHY HARSTAD, M.D.

I, Timothy Harstad, M.D., declare the following:

1. I am the Medical Director of Texas Perinatal Group, located in Austin, Texas. I am also the perinatal medical director at St. David's Medical Center, in Austin, Texas. I make this Declaration based upon my personal knowledge and am competent to testify thereto.

2. I am a medical doctor licensed in the State of Texas and in good standing with the Texas Medical Board. I attended medical school at the University of Wisconsin School of Medicine, and I completed a family medicine internship at the University of Illinois Medical School. I completed my OB-GYN residency at St. Mary's Hospital in Milwaukee, Wisconsin, and my fellowship training in maternal-fetal medicine at University of Texas Southwestern Medical Center in Dallas, Texas. I am board certified in both OB-GYN and maternal-fetal medicine. I am a member of the American College of Obstetricians and Gynecologists and the Society for Maternal-Fetal Medicine.

3. Due to the nature of my work, I am personally familiar with various fetal and maternal conditions in which abortion may be entertained as a therapeutic intervention. Some of these might include medical conditions that would threaten the mother's life or various fetal conditions that are incompatible with life or that would cause severe deformity. The ultimate decision whether to offer a termination in such cases is generally determined by an ethics committee, and the termination is performed in an acute care hospital with adequate surgical personnel and anesthesia. The vast majority of abortions do not fall into this category. Abortions are typically elective procedures, not medically necessary procedures.

4. Any physician performing an in-office abortion procedure (i.e., a procedure involving the use of suction and/or instruments) should use personal protective equipment ("PPE") while performing such a procedure. Staff assisting with those procedures should likewise use appropriate PPE. PPE includes masks, gloves, gowns, and face shields. The facial mask is critical. Due to the current COVID-19 outbreak, the specific type of mask that is currently required is a N95 mask. All surgeons performing non-elective surgery at the present time are required to wear N95 masks. Those masks are in short supply. During the current COVID-19 crisis, it would be especially important for PPE to be used during any in-office abortion procedure and for items such as masks and gloves to be changed between each patient and not reused or used with multiple patients. This is critical to minimize the possible spreading of COVID-19.

5. Due to the current COVID-19 outbreak, many different types of procedures that are not immediately medically necessary are being suspended. Some examples

App.230

include cosmetic surgery, bariatric surgery, elective orthopedic procedures (joint replacement), or some gynecologic surgeries such as tubal ligations. The vast majority of abortion procedures are generally similar to those procedures in that they are not immediately medically necessary. As with other procedures that are not immediately medically necessary, suspending elective abortion procedures would help preserve valuable PPE and hospital capacity in the event of abortion complications, which do occur and are typically handled by a local acute care hospital.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

App.231

## DECLARATION UNDER PENALTY OF PERJURY

I, Timothy Harstad, M.D., a citizen of the United States and a resident of Texas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this _28_ day of March, 2020.

**Timothy Harstad, M.D.**

App.232

**DX-8**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD | § | |
| CENTER FOR CHOICE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CAUSE NO. 1:20-CV-00323-LY |
| | § | |
| GREG ABBOTT, et al., | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF MAYRA B. JIMENEZ THOMPSON, M.D.

I, Mayra B. Jimenez Thompson, M.D., declare the following:

1. I am a member of UT Southwestern Medical Center's Division of Gynecology in the Department of Obstetrics and Gynecology, located in Dallas, Texas. I make this Declaration based upon my personal knowledge and am competent to testify thereto.

2. I am a medical doctor licensed in the State of Texas and in good standing with the Texas Medical Board. I received my undergraduate degree from Northwestern University and earned my medical degree at the University of Illinois Abraham Lincoln School of Medicine. I completed my residency in obstetrics and gynecology at the University of Illinois Research Hospital. I am board certified in obstetrics and gynecology and a Fellow of the American Congress of Obstetricians and Gynecologists. I have lectured and proctored courses in the use of minimally invasive surgical techniques at UT Southwestern and elsewhere. I am a member of

numerous professional organizations, including the Association of Advanced Laparoscopic Surgeons, the American Association of Gynecologic Laparoscopists, the Texas Medical Association, and the Dallas County Medical Society.

3. The spread of COVID-19, the disease caused by the novel coronavirus known as SARS-CoV-2, has become a global pandemic. Medical providers in Texas are enacting strong measures to slow the spread of COVID-19, to preserve limited supplies of personal protective equipment (PPE) and hospital beds for treatment of COVID-19 patients. PPE includes things like masks, gloves, gowns, and face shields.

4. All physicians at UT Southwestern Medical Center are restricted to performing surgery only in life-threatening cases in order to preserve PPE and hospital capacity to treat COVID-19 patients. All of my surgical cases at UT Southwestern Medical Center have been postponed or canceled for at least several weeks, including patients with possible uterine cancer and cervical cancer diagnoses who are in need of surgeries, as well as patients with heavy bleeding who need surgery but where we can temporarily control the bleeding with medication. At UT Southwestern Medical Center physicians are currently only permitted to perform procedures in life-threatening cases, such as appendectomies, advanced cancer tumors, and medically urgent procedures such as dialysis treatments and liver and kidney transplants.

5. I am aware of Governor Abbott's executive order that requires all physicians and medical providers in the State of Texas to postpone all procedures that are not

"immediately medically necessary." I am also aware that numerous abortion providers in Texas have filed a lawsuit asking the federal court to allow them to continue to perform elective abortion procedures in Texas during this global health crisis. Elective abortions are never "immediately medically necessary," and abortion providers should not be exempted from Governor Abbott's executive order.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## DECLARATION UNDER PENALTY OF PERJURY

I, Mayra Thompson, M.D., a citizen of the United States and a resident of Texas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 28th day of March, 2020.,

**Mayra B. Jimenez Thompson, M.D.**

**DX-9**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § § § | |
| Plaintiffs, | § | |
| v. | § | CAUSE NO. 1:20-CV-00323-LY |
| | § | |
| GREG ABBOTT, et al., | § | |
| | § | |
| Defendants. | § | |

---

**DECLARATION OF ROBERT L. MARIER, M.D., M.H.A., F.A.C.P.**

---

I, Robert L. Marier, M.D., M.H.A., declare the following:

1. I am the System Vice Chairman of Hospital Medicine for the Ochsner Health System located in Louisiana. I served as a member of the Hospital's Medical Staff Credentialing Committee until recently. I make this Declaration based upon my personal knowledge and am competent to testify thereto.

2. I received my M.D. degree from Yale University School of Medicine, New Haven, Connecticut in 1969. My post-graduate training in internal medicine took place at Massachusetts General Hospital in Boston, Massachusetts. I served as an Epidemic Intelligence Service Officer, National Center for Disease Control, USPHS, Atlanta, Georgia from 1971-1973, followed by a fellowship in infectious disease at Yale University.

3. In 1978, I joined the faculty of LSU School of Medicine, where over the years I served as Professor of Medicine and Public Health, Medical Director of Charity Hospital, Director of the Public Hospital System in the State of Louisiana, and

Dean of the Schools of Medicine and Public Health. In 2006, I was appointed to be Executive Director of the Louisiana State Board of Medical Examiners—a position I held until 2012, when I joined the staff at Ochsner Medical Center.

4. I am Board Certified in Internal Medicine and Infectious Diseases and am a Diplomat of the American Board of Medical Management (now known as the Certifying Commission in Medical Management). I hold a Master's degree in health system administration from Tulane University School of Public Health.

5. I am aware of Governor Abbott's Executive Order that postpones all "surgeries and procedures" in Texas that are "not immediately medically necessary" during the coronavirus disease 2019 (COVID-19) outbreak.

6. Patients with COVID-19 infection may infect others prior to the onset of symptoms, especially in the health care setting due to the proximity of contact. We have had two such cases over the past few days at Ochsner Medical Center.

7. The onset and duration of viral shedding and period of infectiousness for COVID-19 are not yet known.

8. According to the United States Centers for Disease Control (CDC) [1]

   a. It is possible that SARS-CoV-2 RNA may be detectable in the upper or lower respiratory tract for weeks after illness onset, similar to infection with MERS-CoV and SARS-CoV. However, detection of viral RNA does not necessarily mean that infectious virus is present. Asymptomatic infection with SARS-CoV-2 has been reported, but it is not yet known

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

what role asymptomatic infection plays in transmission. Similarly, the role of pre-symptomatic transmission (infection detection during the incubation period prior to illness onset) is unknown. Existing literature regarding SARS-CoV-2 and other coronaviruses (e.g. MERS-CoV, SARS-CoV) suggest that the incubation period may range from 2–14 days.

b. Very limited data are available about detection of SARS-CoV-2 and infectious virus in clinical specimens, so it is unknown exactly which bodily fluids may transmit the virus, so that we have a full picture of how to prevent transmission between people. SARS-CoV-2 RNA has been detected from upper and lower respiratory tract specimens, and SARS-CoV-2 has been isolated from upper respiratory tract specimens and bronchoalveolar lavage fluid. SARS-CoV-2 RNA has been detected in blood and stool specimens, but whether infectious virus is present in extrapulmonary specimens is currently unknown. The duration of SARS-CoV-2 RNA detection in upper and lower respiratory tract specimens and in extrapulmonary specimens is not yet known but may be several weeks or longer, which has been observed in cases of MERS-CoV or SARS-CoV infection. While viable, infectious SARS-CoV has been isolated from respiratory, blood, urine, and stool specimens, in contrast, viable, infectious MERS-CoV has only been isolated from respiratory tract specimens. It is not yet known whether other non-respiratory body fluids from an infected person, including vomit, urine, breast milk, or semen, can contain viable, infectious SARS-CoV-2.

9. Health Care workers caring for patients under investigation for COVID 19 or for patients with confirmed COVID 19 infection routinely wear face masks and other personal protective equipment (PPE).

10. Health care workers do not routinely wear face masks and other PPE when caring for patients who are not under investigation for COVID 19 or for patients with confirmed infection.

11. Wearing face masks and other PPE when caring for patients under investigation for COVID 19 or for patients with confirmed COVID 19 infections reduces the risk of transmission but does not eliminate it.

12. Not wearing face masks and other PPE when caring for patients who are not under investigation for COVID 19 or for patients with confirmed COVID 19 infections exposes health care workers to transmission of infection from patients who are incubating infection and asymptomatic.

13. The President and CEO of Ochsner Health reported on March 25, 2020, that 60 employees have tested positive for COVID-19, and approximately 300 employees have been quarantined attesting to the importance paragraphs 11 and 12 above.

14. Given the risk of transmission in health care settings, Governor Abbott has a sound basis for limiting all surgeries except those that are immediately medically necessary so as to prevent the spread of COVID 19.

//

//

//

App.242

//

//

//

//

//

//

//

//

//

//

//

//

## DECLARATION UNDER PENALTY OF PERJURY

I, Robert L. Marier, M.D., M.H.A., F.A.C.P., a citizen of the United States and a resident of Louisiana, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this ___29__ day of March 2020.

*Robert Marier*

_____

**Robert L. Marier, M.D., M.H.A**

**DX-10**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD | § | |
| CENTER FOR CHOICE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CAUSE NO. 1:20-CV-00323-LY |
| | § | |
| GREG ABBOTT, et al., | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JEFFREY HOOGHEEM

I, Jeffrey Hoogheem, declare the following:

1. I am the Director, Center for Health Emergency Preparedness and Response at the Texas Department of State Health Services (DSHS). I have served in this role more than two years. I make this Declaration based upon my personal knowledge and am competent to testify thereto.

2. Resource requests, during a disaster, are submitted via a State of Texas Assistance Request (STAR) to the Texas State Operations Center (SOC). The State Medical Operations Center (SMOC), run by DSHS, handles all STARs for health and medical assistance.

3. Personal protective equipment (PPE) is essential to protect Texas health care providers and their patients, including COVID-19 patients. Without proper PPE, the ability of health care facilities to care for and treat COVID-19 patients will be diminished.

4. The following PPE is used to protect medical providers and patients from COVID-19 and to treat COVID-19 patients:

    a. Gowns: isolation gowns, surgical gowns, coveralls;

    b. Face masks: facemasks with ties, facemasks with elastic ear hooks;

    c. N95 respirators;

    d. Ventilators; and

    e. Eye protection: goggles, face shields.[1]

5. DSHS has received 2,178 STARs for PPE as of 6:00 p.m. on March 27, 2020.

6. Facilities/entities requesting PPE during the COVID-19 health disaster include the following:

    a. Long term care facilities: nursing homes, assisted living centers, home health providers, hospices;

    b. First responders: emergency medical services, fire departments, law enforcement;

    c. Hospitals; and

    d. County/city/public health officials.

7. At the time of the signing of this declaration DSHS and the Texas Department of Emergency Management (TDEM) have issued approximately 90 purchase orders for PPE.

*//*

*//*

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html.

//

//

//

//

## DECLARATION UNDER PENALTY OF PERJURY

I, Jeffrey Hoogheem, a citizen of the United States and a resident of Texas,
hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the
foregoing Declaration is true and correct.

Executed this 29 day of March, 2020.

Jeffrey Hoogheem

**Exhibit 4:** Plaintiffs' Supplemental Statement in Support of Motion for Temporary Restraining Order (with attached exhibit)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, *et al*., | |
| Plaintiffs, | |
| v. | No. 1:20-cv-00323-LY |
| GREG ABBOTT, in his official capacity as Governor of Texas, *et al*., | |
| Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL STATEMENT IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiffs file this supplemental statement in support of their motion for a temporary restraining order to correct a factual misstatement by the Texas Attorney General's Office during the March 27, 2019, conference and to bring to the Court's attention additional evidence in support of Plaintiffs' motion.

During the March 27 conference, counsel with the Attorney General's Office stated that Plaintiffs were asking for an exemption from the Executive Order and Emergency Rule to use "thousands of N95 masks for their procedures that then are not able to be used by hospitals and health care providers to treat the crisis." Telephone Conf. Tr. at 11:4–6 (Stephens), Mar. 26, 2020. That statement is contrary to all evidence in the case. Four of the six institutional Plaintiffs reported that they neither have nor use N95 respirators. Barraza Decl. ¶ 8; Ferrigno Decl. ¶ 13; Hagstrom-Miller Decl. ¶ 16; Lambrecht Decl. ¶ 12; Schutt-Aine Decl. ¶ 27. The fifth institutional Plaintiff reported that it had a "small number" of N95 masks that it "generally does not use" and explained that a single provider there "has been wearing and reusing a single N95 mask during all face-to-

face interactions with patients" during the COVID outbreak. Klier ¶¶ 6, 13. The sixth institutional Plaintiff reported that although it had "a limited number of N95 masks at the clinic," which is consistent with a recommendation it received from the Dallas County Health and Human Services, it "would only use them if [it] were treating a patient with a suspected or confirmed COVID-19 infection" and that it had not used any to date. *Id.* ¶¶ 16, 21. In sum, the facts show that a single clinician is reusing a single N95 mask for patient interactions, that only two of the six institutional Plaintiffs even have N95 masks in stock, and that, apart from the single mask that is being reused, that small supply of masks is not currently being used.

Plaintiffs also submit as Exhibit 10 in support of their Motion for a Temporary Injunction and a Preliminary Injunction the Declaration of Jane Doe. Ms. Doe is a Texas resident and was among those patients whose abortion appointments were cancelled last week because of the Executive Order in this case. Ms. Doe's declaration supports Plaintiffs' assertion that the Executive Order and Emergency Rule will only exacerbate the ongoing public health crisis and that any benefit from those challenged actions cannot possibly outweigh the burdens those actions are imposing and will continue to impose on patients. *See* Mot. for TRO and/or Prelim. Inj. & Mem. of Law in Supp. at 21–25.

## CONCLUSION

For these reasons and those set forth in Plaintiffs' previous submissions, this Court should grant Plaintiffs' motion for a temporary restraining order and/or preliminary injunction to enjoin enforcement of the Executive Order and Emergency Rule, as interpreted by Defendants, to prohibit abortions.

Dated: March 30, 2020

Respectfully submitted,

2

/s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com

*Attorney for All Plaintiffs*

Julie Murray (*pro hac vice* pending)
Alice Clapman (*pro hac vice* pending)
Richard Muniz (admitted *pro hac vice*)
Hannah Swanson (admitted *pro hac vice*)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
alice.clapman@ppfa.org
richard.muniz@ppfa.org
hannah.swanson@ppfa.org

Jennifer Sandman (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood Center for Choice,
Planned Parenthood of Greater Texas Surgical Health Services,
and Planned Parenthood South Texas Surgical Center*

Molly Duane (*pro hac vice* pending)
Rabia Muqaddam (*pro hac vice* pending)
Francesca Cocuzza (*pro hac vice* pending)
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Plaintiffs Southwestern Women's Surgery Center and Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center*

Stephanie Toti
Rupali Sharma (admitted *pro hac vice*)
Sneha Shah (*pro hac vice* pending)
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

*Attorneys for Plaintiffs Whole Woman's Health and Whole Woman's Health Alliance*

## CERTIFICATE OF SERVICE AND NOTICE

I certify that on this 30th day of March, 2020, I filed a copy of the above document on CM/ECF, which will provide notice to Mr. Andrew Stephens, counsel for Governor of Texas; Ken Paxton, in his official capacity as Attorney General of Texas; Phil Wilson, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission; Stephen Brint Carlton, in his official capacity as Executive Director of the Texas Medical Board; and Katherine A. Thomas, in her official capacity as Executive Director of the Texas Board of Nursing.

*/s/ Patrick J. O'Connell*
Patrick J. O'Connell

I certify that on this 30th day of March, 2020, I emailed a copy of the above document to:

leslie.dippel@traviscountytx.gov

sherine.thomas@traviscountytx.gov

joe.gonzales@bexar.org

John.Creuzot@dallascounty.org

Russell.Roden@dallascounty.org

daesparza@epcounty.com

Melissa.Spinks@cao.hctx.net

josephine.ramirez@da.co.hidalgo.tx.us

Barry.Johnson@co.mclennan.tx.us

swilson@tarrantcountytx.gov

*/s/ Julie Murray*
Julie Murray

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, *et al*., | |
| Plaintiffs, | |
| v. | No. 1:20-cv-00323-LY |
| GREG ABBOTT, in his official capacity as Governor of Texas, *et al*., | |
| Defendants. | |

## DECLARATION OF JANE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Jane Doe declares the following:

1.       I am a 24-year-old college student and reside in Arlington, Texas. My appointment for an abortion in Texas on March 23, 2020, was cancelled because of Governor Abbott's Executive Order No. GA-09.

2.       I submit this declaration in support of Plaintiffs' motion for a temporary restraining order followed by a preliminary injunction, which seeks to enjoin the Executive Order, as interpreted by the Texas Attorney General to ban most abortions in Texas as well as the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order.

3.       The facts I state here are based on my personal experience.

4.       I am studying to become a secondary school teacher. I am planning to graduate this spring, but I have not gotten a teaching position yet.

5. Throughout college, I have been waiting tables part-time to support myself. About three weeks ago, I lost my job. Because of the COVID-19 outbreak, my restaurant announced that it would close down for eight weeks. It gave my coworkers and me information about applying for unemployment.

6. The same week I lost my job waiting tables, I became worried that I might be pregnant, even though my partner and I had been using birth control. Even before I took the at-home pregnancy test, I knew what I was going to do if it was positive. My partner and I were on the same page: This wasn't the right time. I had just lost my job. I was still in school. And I would need to start applying and interviewing for new jobs, which I expected would be harder to get if schools knew I was pregnant. And the biggest factor for me was simply that I didn't want to become a parent right now.

7. Coronavirus was all over the news, but I wasn't panicked about getting an appointment until I started calling abortion clinics. That's when I realized it was going to be tough to be seen in a timely fashion. Clinics kept telling me they couldn't see me for three or four weeks. Eventually, I secured an appointment in Fort Worth for the following week.

8. On Friday, March 20, I went to the clinic alone. I wasn't allowed to bring my partner because of the social distancing rules in place. In order to limit the number of patients inside the clinic, they actually had us sign in and wait in our cars. I sat in my car in the clinic parking lot for two hours before I was able to enter the building. Lots of other patients were waiting in their cars, too. Meanwhile, anti-abortion protesters stood about 10 feet away with signs and screamed at me and other patients. Later, I heard some nurses talking about how one woman got intimidated and drove off.

9.      The appointment took five hours. The clinic gave me a sonogram over my belly and took blood. I was under 10 weeks pregnant so I qualified for a medication abortion. But Texas has a 24-hour waiting period, so the clinic couldn't let me go forward with the medication abortion that day even though I was certain of my decision and did not want to expose myself or anyone else to further risk of infection by having to come in for a second appointment. I had to come back for a second appointment. The soonest they could see me was in four days, which was Tuesday, March 24.

10.     I was experiencing severe pregnancy symptoms. I was throwing up every day throughout the day. I wasn't able to study or eat. I felt so tired I could barely get out of bed. But I had no choice except to wait.

11.     The night of Monday, March 23, I got a phone call from the clinic. My second appointment the next day was cancelled. The staffer told me that Gov. Greg Abbott halted all abortions in the state, claiming that medical supplies needed to be saved for other patients. I started to cry, and she cried too. She told me my only option at that point was to go out of state or delay my abortion and possibly be forced to have a baby. I was dumbfounded. I had a plan and everything came crashing down.

12.     My partner was with me during the call, and we cried together afterward. Waiting to see if I could get an abortion later in Texas was not an option. I felt so sick. I didn't want to be pregnant one day longer, and I couldn't risk the possibility that I would run out of time to have an abortion while the outbreak continued. It seemed to be getting more and more difficult to travel. I also wanted to have a medication abortion so that I could do it in the privacy of my own home with my partner. Because of the clinic's rules during the COVID-19 outbreak, support companions weren't allowed in the clinic at all during procedural abortions. The clinic told me that medication

abortion wasn't available after ten weeks of pregnancy in Texas, so I knew that if I wanted to obtain a medication abortion, I needed to act quickly.

13.     After the call, my partner and I began researching abortion restrictions in the states nearest Texas. Oklahoma has a 72-hour waiting period so I didn't want go there. I would have had to make more than one trip during the pandemic to meet that requirement and spend even more than I already had to.

14.     We also looked at clinics in New Mexico, which would have been about a nine-hour drive each way for me. One was closed, and the others told me they couldn't see me for three or four weeks.

15.     So then we looked at Colorado. I made a bunch of calls. On Monday night at about 11 p.m., I finally was able to make an online appointment with a clinic in Denver that could see me for a medication abortion on Thursday.

16.     It's a 12-hour drive from my house and roughly 780 miles on the road one-way to Denver. My partner couldn't afford to miss work to accompany me. We were worried that he would have to explain to his boss why he was taking three days away from work. We didn't want to reveal to his employer that I was having an abortion. Luckily, my partner still has a job.

17.     I couldn't have done the drive alone, and I was scared. My best friend came up on Tuesday from Austin to go with me. She also lost her job at a restaurant a couple weeks ago, so she was free.

18.     My partner packed a box of sanitizing supplies for us to take on our trip, and we brought food to help avoid the need to make stops and risk exposure to the virus. My friend and I started out early on Wednesday and drove throughout the day. I rented the cheapest AirBnB I could find in Denver, and we wiped it down with disinfectant when we got there before sleeping.

19.     My appointment was in the afternoon on Thursday, March 26. I noticed when we arrived at the clinic that two other cars with Texas license plates were in the parking lot. I had to go through the sonogram, bloodwork, and counseling all over again. But since Colorado does not have a 24-hour waiting period, the clinic I went to was able to give me the medication for my abortion without further delay. I took the first pill there and they sent me home with the second pill.

20.     My friend and I started the twelve-hour drive home at 3:30 p.m. It felt like we were in a race against time because the clinic recommended that I take the second pill 24 to 30 hours after the time I took the first pill. We didn't want to take breaks or rest because I was worried about having my abortion in the car.

21.     We drove about six hours but had to stop. It was pitch black, and we were exhausted. It was too dangerous for us to keep going. We had to rent a hotel room and stay there until the morning.

22.     I got home in the afternoon on Friday, March 27. The provider in Colorado had recommended that I try to get as comfortable as possible before taking the second pill. I wanted to make sure I could eat a meal before taking the medication because I worried I would feel too nauseous afterwards to eat anything. By the time I took the second pill, nearly thirty hours had passed since the first one.

23.     I was exhausted, and only then was I able to have my abortion. I passed the pregnancy Friday night at home with my partner.

24.     With the cost of the AirBnB, gas, food, and parking, I've had to pay a lot more money out of pocket to get this abortion than I should have had to. I've spent nearly $1,000,

including the cost of the abortion itself, which is not covered by my health insurance. I've had to drain my savings to pay these costs.

25.     Then there's the additional stress. Obviously, had this pregnancy not been a factor, I wouldn't be traveling during a pandemic. I already felt like it was risky for me to travel to a nearby clinic in Fort Worth to have my appointment. Instead, I was forced to drive across the country, to stop at dirty gas stations, to stay in an unfamiliar home, just to get health care. I feel like Texas put me, and my best friend, in danger.

26.     With all of this stress and unexpected travel, I haven't been able to finish my application for unemployment benefits yet, so I probably won't get a check for at least another week. Even then the benefits will be a fraction of what I made working at a restaurant, and I now have fewer savings to cover the difference.

27.     Despite everything I've been through this week, I feel incredibly grateful. I had savings. I have a partner with income. I don't already have kids. I had a best friend with a car who could go with me on a long, unexpected trip. So far I'm not sick.  So many Texans don't have those things right now. And unlike me, many of them are much further along in pregnancy than I was. I have no idea how they're going to get the abortion care they need. Based on my own experience, I expect many will not. I know I was desperate, and desperate people take desperate steps to protect themselves.

28.     I was born and raised in Texas. Right now, I feel let down by my government. I feel like Governor Abbott doesn't care about me or other patients who need essential abortion care. Why is my life not important enough to him and the other men making these decisions? Frankly, I feel like my constitutional rights were violated when I needed them the most.

29.     I want to submit this declaration under a pseudonym because the information I am sharing in this action about my reproductive health care history is private and personal. I would not feel comfortable if this information and my name became public, especially because I will be looking for a job in the coming weeks. I also fear that if this information and my name became public, I would become a target for harassment by anti-abortion protestors.

30.     I swear under penalty of perjury that the foregoing is true and correct.

Executed March 29, 2020

/s/ Jane Doe*  
Jane Doe

*I have signed a copy of this declaration with my actual name and given it to Plaintiffs' attorneys for their records.

**Exhibit 5:** Order Granting Plaintiffs' Request
for Temporary Restraining Order

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION




FILED

2020 MAR 30 PM 3: 05

WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

| | |
|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES, PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER, WHOLE WOMAN'S HEALTH, WHOLE WOMAN'S HEALTH ALLIANCE, SOUTHWESTERN WOMEN'S SURGERY CENTER, BROOKSIDE WOMEN'S MEDICAL CENTER PA D/BA BROOKSIDE WOMEN'S HEALTH CENTER AND AUSTIN'S WOMEN'S HEALTH CENTER, AND ROBIN WALLACE, M.D., M.A.S., <br> PLAINTIFFS, <br><br> V. <br><br> GREG ABBOTT, GOVERNOR OF TEXAS, KEN PAXTON, ATTORNEY GENERAL OF TEXAS, PHIL WILSON ACTING EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, STEPHEN BRINT CARLTON, EXECUTIVE DIRECTOR OF THE TEXAS MEDICAL BOARD, KATHERINE A. THOMAS, EXECUTIVE DIRECTOR OF THE TEXAS BOARD OF NURSING, EACH IN THEIR OFFICIAL CAPACITY, AND MARGARET MOORE, DISTRICT ATTORNEY FOR TRAVIS COUNTY, JOE GONZALES, CRIMINAL DISTRICT ATTORNEY FOR BEXAR COUNTY, JAIME ESPARZA, DISTRICT ATTORNEY FOR EL PASO COUNTY, JOHN CREUZOT, DISTRICT ATTORNEY FOR DALLAS COUNTY, SHAREN WILSON, CRIMINAL | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § CAUSE NO. A-20-CV-323-LY |

DISTRICT ATTORNEY TARRANT §
COUNTY, RICARDO RODRIGUEZ, JR., §
CRIMINAL DISTRICT ATTORNEY §
FOR HIDALGO COUNTY, BARRY §
JOHNSON, CRIMINAL DISTRICT §
ATTORNEY FOR MCLENNAN §
COUNTY, KIM OGG, CRIMINAL §
DISTRICT ATTORNEY FOR HARRIS §
COUNTY, AND BRIAN MIDDLETON §
CRIMINAL DISTRICT ATTORNEY §
FOR FORT BEND COUNTY, EACH IN §
THEIR OFFICIAL CAPACITY, §
           DEFENDANTS. §

## ORDER GRANTING PLAINTIFFS' REQUEST
## FOR TEMPORARY RESTRAINING ORDER

Before the court is the above styled and numbered cause.  Plaintiffs include several licensed

abortion facilities, Robin Wallace, a board-certified family medicine physician who provides

abortion care and is co-medical director at Southwestern Women's Surgery Center, who bring this

action on behalf of herself and her patients, and other organizations that provide abortion services

in the State of Texas.  Plaintiffs bring this constitutional challenge, pursuant to Title 42 United States

Code section 1983, following the publication of a March 23, 2020 press release by the Texas

attorney general titled, "Health Care Professionals and Facilities, Including Abortion Providers, Must

Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to

Fight COVID-19 Pandemic."[1]  The press release interprets the governor of Texas's "Executive Order

GA-09 relating to hospital capacity during the COVID-19 disaster" ("Executive Order") signed

---

[1] *Available at* https://www.texasattorneygeneral.gov/news/releases/health-care-professions-and-facilities-including-abortion-providers-must-immediately-stop-all.

2

March 22, 2020.[2] To the extent the attorney general's interpretation is consistent with the Executive

Order, Plaintiffs challenge the Executive Order itself. Plaintiffs also challenge the Texas Medical

Board's emergency amendment to Title 22 Texas Administrative Code section 187.57 ("Emergency

Rule"), which imposes the same requirements as the Executive Order.[3] The Executive Order

remains in effect until 11:59 PM on April 21, 2020, at the earliest, or until the governor rescinds or

modifies it.

Pending now before the court is Plaintiffs' Motion for Temporary Restraining Order and/or

Preliminary Injunction filed March 25, 2020 (Clerk's Document No. 7). The court held a telephone

conference on March 26, 2020, at which Plaintiffs and several Defendants participated by counsel.

The court granted the State Defendants'[4] request to file a written response to the motion. The State

---

[2] *Available at* https://gov.texas.gov/news/post/govorner-abbott-issues-executive-order-increasing-hospital-capacity-announces-supply-chain-strike-force-for-COVID-19-response. Under the Emergency Management Chapter of the Texas Government Code, "the governor may issue executive orders, proclamations, and regulations and amend or rescind them. Executive orders, proclamations, and regulations have the force and effect of law." Tex. Gov't Code Ann. § 418.012 (West 2019).

[3] *Available at* https://tinyurl.com/v4pz99u. On March 24, 2020, the Texas Medical Board adopted an emergency rule to enforce the Executive Order. Under preexisting law, the Texas Medical Board could temporarily suspend or restrict a physician's license if the physician's "continuation in practice would constitute a continuing threat to the public welfare." 22 Tex. Admin. Code § 187.57(b). The Emergency Rule expands this basis for discipline to include "performance of a non-urgent elective surgery or procedure."

Because the Emergency Rule contains the same requirements to postpone surgeries and procedures that are not immediately necessary, Plaintiffs discuss the Emergency Rule together with the Executive Order.

[4] Defendants Greg Abbott, Governor of Texas, Ken Paxton, Attorney General of Texas, Phil Wilson, Acting Executive Commissioner of the Texas Health and Human Services Commission, Stephen Brint Carlton, Executive Director of the Texas Medical Board, Katherine A. Thomas, Executive Director of the Texas Board of Nursing, each in their official capacity, are referred to as "State Defendants."

3

Defendants responded March 30, 2020 (Clerk's Document No. 30), and Plaintiffs filed a Supplemental Statement In Support of Motion For Temporary Restraining Order the same day (Clerk's Document No. 29).

Plaintiffs argue that they have shown they are entitled to a temporary restraining order following the attorney general's press release. Plaintiffs interpret the press release as "suggesting that [the attorney general] believes continuing to provide *any* abortion care (other than for an immediate medical emergency) would violate the Executive Order, and as a warning to abortion providers that '[t]hose who violate the [Executive O]rder will be met with the full force of the law.'" The Executive Order provides that failure to comply is a criminal offense punishable by a fine of up to $1,000, confinement in jail for up to 180 days, or both fine and confinement. *See* Tex. Gov't Code Ann. § 418.173 (West 2019) ("Penalty for Violation of Emergency Management Plan"). These criminal penalties also trigger administrative enforcement provisions for the Texas Health and Human Services Commission, the Texas Medical Board, and the Texas Board of Nursing, each of which is authorized to pursue disciplinary action against licensees who violate criminal laws. *See* 25 Tex. Admin. Code §§ 139.32(b)(6), 135.24(a)(1)(F); 22 Tex. Admin. Code § 185.17(11); Tex. Occ. Code Ann. §§ 164.051(a)(2)(B), (a)(6); 301.452(b)(3), (b)(10).

Plaintiffs move for a temporary restraining order that restrains Defendants and their employees, agents, successors, and all others acting in concert or participating with them from enforcing the Executive Order and the Texas Medical Board's Emergency Rule as banning all medication abortions and procedural abortions.

The court, having considered the pleadings, the motion and supporting exhibits, the response, the applicable law, and arguments of counsel, finds and concludes for the specific reasons required

4

under Federal Rule of Civil Procedure 65(d) and Local Rule 65.01, that Plaintiffs have shown (1) a likelihood of success on the merits, (2) that they will suffer irreparable harm if temporary relief is not granted, (3) that the injury to Plaintiffs outweighs any harm the temporary relief might cause Defendants; and (4) that a temporary restraining order will not disserve the public interest. *See, e.g., Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) ("*Jackson I*"); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

**Substantial likelihood of success on the merits**

Specifically, the court finds that Plaintiffs have established a substantial likelihood of success on the merits of their claim that the Executive Order, as interpreted by the attorney general, violates Plaintiffs' patients' Fourteenth Amendment rights, which derive from the Bill of Rights, by effectively banning all abortions before viability. *See Planned Parenthood v. Casey*, 505 U.S. 833, 848-49 (1992) (citing *Griswold v. Conn.*, 381 U.S. 479, 481-82(1965); *Roe v. Wade*, 410 U.S. 113, 153–54 (1973)). The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a woman's right to choose abortion, *Roe v. Wade*, 410 U.S. 113, 153–54 (1973), and before fetal viability outside the womb, a state has *no interest* sufficient to justify an outright ban on abortions. *Roe*, 410 U.S. at 163–65; *see also Casey*, 505 U.S. at 846, 871 (1992) (reaffirming *Roe*'s "central principle" that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion"); *Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) (per curiam) ("*Jackson III*"); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268–69 (5th Cir. 2019) ("*Jackson II*").

Under the attorney general's interpretation, the Executive Order either bans all non-emergency abortions in Texas or bans all non-emergency abortions in Texas starting at 10 weeks of

5

pregnancy, and even earlier among patients for whom medication abortion is not appropriate. Either interpretation amounts to a previability ban which contravenes Supreme Court precedent, including *Roe. See, e.g., Jackson III*, 951 F.3d at 248 (*ban* on abortions starting at six weeks). Previability abortion bans are "unconstitutional under Supreme Court precedent without resort to the undue burden balancing test." *Id.* States "may regulate abortion procedures prior to viability so long as they do not impose an undue burden on the woman's right, but they may not ban abortions." *Jackson II*, 945 F.3d at 269.

The State Defendants well describe the emergency facing this country at the present time. They do not overstate when they say, "Texas faces it worst public health emergency in over a century." The Executive Order, as written, does not exceed the governor's power to deal with the emergency. But the attorney general's interpretation of that order constitutes the threat of criminal penalties against those whose interpretation differs. Yes, the attorney general is not the enforcer of those penalties, but many of those who are charged with enforcement are named as defendants in this action. The court takes notice that the opinion or notion of the attorney general as to the breadth of a law, even if expressed informally, carries great weight with those who must enforce it.

Regarding a woman's right to a pre-fetal-viability abortion, the Supreme Court has spoken clearly. There can be no outright ban on such a procedure. This court will not speculate on whether the Supreme Court included a silent "except-in-a-national-emergency clause" in its previous writings on the issue. Only the Supreme Court may restrict the breadth of its rulings. The court will not predict what the Supreme Court will do if this case reaches that Court. For now, the State Defendants, and perhaps the others, agree that the Executive Order bans all pre-fetal-viability abortions. This is inconsistent with Supreme Court precedent. Plaintiffs have demonstrated a strong likelihood of success on the merits of their action.

6

**Plaintiffs will suffer irreparable harm**

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order. The attorney general's interpretation of the Executive Order prevents Texas women from exercising what the Supreme Court has declared is their fundamental constitutional right to terminate a pregnancy before a fetus is viable. It is well established that, upon a plaintiff's demonstrating a constitutional violation, no further irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981).

**The threatened injury to Plaintiffs outweigh any damage the temporary restraining order may cause Defendants**

A delay in obtaining abortion care causes irreparable harm by "result[ing] in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 796 (7th Cir. 2013). This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Planned Parenthood of Kan. v. & Mid Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018). For some patients, such a delay will deprive them of any access to abortion. *See* Tex. Health & Safety Code Ann. § 171.044 (West 2017) (prohibiting abortions after 20 or more weeks post-fertilization age). The court finds that the threatened injury to Plaintiffs outweighs any damage the temporary restraining order may cause Defendants.

7

App.269

**Temporary restraining order will not disserve the public interest**

"The grant of an injunction will not disserve the public interest . . . when an injunction is designed to avoid constitutional deprivations." *Jackson's Woman's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd*, 760 F.3d 448 (5th Cir. 2014). Plaintiffs' requested relief will essentially continue the *status quo*, tipping the balance of equities toward Plaintiffs and serving the public interest. *Id.*; *United States v. Tex.*, 508 F.2d 98, 101 (5th Cir. 1975). The benefits of a limited potential reduction in the use of some personal protective equipment by abortion providers is outweighed by the harm of eliminating abortion access in the midst of a pandemic that increases the risks of continuing an unwanted pregnancy, as well as the risks of travelling to other states in search of time-sensitive medical care. The court finds that a temporary restraining order will not disserve the public interest.

The court concludes that Plaintiffs have shown that they are entitled to a temporary restraining order. Therefore,

**IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order filed March 25, 2020 (Clerk's Document No. 7) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants and their employees, agents, successors, and all others acting in concert or participating with them, are **TEMPORARILY RESTRAINED** from enforcing Executive Order GA-09, "Relating to hospital capacity during the COVID-19 disaster," and the Texas Medical Board's emergency amendment to Title 22 Texas Administrative Code section 187.57, as applied to medication abortions and procedural abortions.[5]

---

[5] Pursuant to an Agreed Stipulation for Non-Enforcement Pending Final Resolution, Attorneys Fees and Costs filed March 28, 2020 (Clerk's Document No. 25) this order does not apply to Defendant Brian Middleton, Criminal District Attorney for Fort Bend County.

8

**IT IS FURTHER ORDERED** that this Temporary Restraining Order shall expire on April 13, 2020 at *3:00* p.m.  This order may be extended for good cause, pursuant to Federal Rule of Civil Procedure 65.

Plaintiffs have also moved for a preliminary injunction.  Therefore,

**IT IS ORDERED** that the hearing on Plaintiffs' motion for a preliminary injunction is set for a telephonic hearing on April 13, 2020 at 9:30 a.m.  Counsel and parties may call in to the court's conference line at (877) 873-8017, with Access Code 7996289.

Plaintiffs shall not be required to post a bond.  *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

SIGNED at *3:00 p.* .m., this *30th* day of March, 2020.

_____

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

9