# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

*In re* GREG ABBOTT, in his official capacity as Governor of Texas;
KEN PAXTON, in his official capacity as Attorney General of Texas;
PHIL WILSON, in his official capacity as Acting Executive Commissioner of
the Texas Health and Human Services Commission; STEPHEN BRINT
CARLTON, in his official capacity as Executive Director of the Texas Medical
Board; and KATHERINE A. THOMAS, in her official capacity as Executive
Director of the Texas Board of Nursing.

On Petition for a Writ of Mandamus from the United States District Court,
Western District of Texas, Austin Division
No. 1:20-cv-00323-LY

## OPPOSITION TO PETITIONERS' EMERGENCY MOTION
## TO STAY TEMPORARY RESTRAINING ORDER PENDING
## MANDAMUS

PATRICK J. O'CONNELL
Law Offices of Patrick J.
O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com
*Counsel for Plaintiffs-Respondents*

[Additional counsel on inside
cover]

JULIE A. MURRAY
RICHARD MUNIZ
HANNAH SWANSON
Planned Parenthood Federation of America
1110 Vermont Ave., NW, Ste. 300
Washington, DC 20005
(202) 973-4800

JENNIFER SANDMAN
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
(212) 541-7800
*Counsel for Plaintiffs-Respondents Planned
Parenthood Center for Choice, Planned
Parenthood of Greater Texas Surgical
Health Services, and Planned Parenthood
South Texas Surgical Center*

Additional counsel:

STEPHANIE TOTI
RUPALI SHARMA
Lawyering Project
25 Broadway, 9th Floor
New York, NY 10004
(646) 490-1083
*Counsel for Plaintiffs-Respondents Whole Woman's Health and Whole Woman's Health Alliance*

MOLLY DUANE
Center for Reproductive Rights
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631
*Counsel for Plaintiffs-Respondents Southwestern Women's Surgery Center, Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center, and Robin Wallace, M.D.*

# CERTIFICATE OF INTERESTED PERSONS

No. 20-50264, *In re Greg Abbott, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiffs-Respondents | Counsel |
|---|---|
| 1. Planned Parenthood Center for Choice<br>2. Planned Parenthood of Greater Texas Surgical Health Services<br>3. Planned Parenthood South Texas Surgical Center<br>4. Whole Woman's Health<br>5. Whole Woman's Health Alliance<br>6. Southwestern Women's Surgery Center<br>7. Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center<br>8. Robin Wallace, M.D. | 1. Law Offices of Patrick J. O'Connell PLLC (Patrick J. O'Connell)<br>2. Planned Parenthood Federation of America (Jennifer Sandman, Julie Murray, Richard Muniz, Hannah Swanson)<br>3. Center for Reproductive Rights (Molly Duane, Rabia Muqaddam, Francesca Cocuzza)<br>4. Lawyering Project (Stephanie Toti, Rupali Sharma, Sneha Shah) |
| **Defendants-Petitioners** | **Counsel** |
| 1. Greg Abbott, Governor of the State of Texas<br>2. Ken Paxton, Attorney General of Texas<br>3. Phil Wilson, Acting Executive Commissioner of the Texas Health and Human Services Commission<br>4. Stephen Brint Carlton, Executive | 1. Office of the Attorney General of Texas (Kyle D. Hawkins, Jeffrey C. Mateer, Andrew B. Stephens, Heather G. Hacker, Benjamin S. Walton) |

| | |
|---|---|
| Director of the Texas Medical Board<br>5. Katherine A. Thomas, Executive Director of the Texas Board of Nursing | |
| **Defendants** | **Counsel** |
| 1. Margaret Moore, District Attorney for Travis County<br>2. Joe Gonzales, Criminal District Attorney for Bexar County<br>3. John Creuzot, District Attorney for Dallas County<br>4. Jaime Esparza, District Attorney for El Paso County<br>5. Kim Ogg, Criminal District Attorney for Harris County<br>6. Ricardo Rodriguez, Jr., Criminal District Attorney for Hidalgo County<br>7. Barry Johnson, Criminal District Attorney for McLennan County<br>8. Sharen Wilson, Criminal District Attorney for Tarrant County<br>9. Brian Middleton, Criminal District Attorney for Fort Bend County | 1. Office of the Dallas County District Attorney (John J. Butrus, Jr.)<br>2. Office of the Fort Bend County District Attorney (Justin C. Pfeiffer) |
| **Amicus Curiae** | **Counsel** |
| 1. Attorneys General of the States of Alabama, Arkansas, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and West Virginia | 1. Louisiana Department of Justice (Elizabeth Murrill, J. Scott St. John)<br>2. Lill Firm, P.C. (David S. Lill) |

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................... v

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A.   The Governor's Executive Order ............................................................ 2

    B.   Abortion in Texas .................................................................................. 4

    C.   The Enforcement Threat and This Litigation ......................................... 8

ARGUMENT........................................................................................................... 9

  I.   State Defendants Will Not Prevail in Their Petition for a Writ of
Mandamus ............................................................................................................. 9

    A.   The District Court correctly concluded that Providers are likely to prevail
on their substantive due process claim. .............................................................. 9

       1.   The previability abortion ban violates *Roe v. Wade* and its progeny . 10

       2.   The previability abortion ban could not survive application of *Casey*'s
undue-burden balancing test ...................................................................... 11

       3.   The previability abortion ban is inconsistent with *Jacobson v.
Commonwealth of Massachusetts* ............................................................. 15

    B.   The District Court did not err by exercising its authority to enter a TRO.
16

  II.   State Defendants Have Not Shown That They Would Suffer Irreparable
Injury in the Absence of a Stay ......................................................................... 19

  III.  The Remaining Factors Favor Denial of the Stay ..................................... 20

CONCLUSION ..................................................................................................... 20

CERTIFICATE OF SERVICE .............................................................................. 22

CERTIFICATE OF COMPLIANCE...................................................................... 23

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Belcher v. Birmingham Tr. Nat'l Bank*,
  395 F.2d 685, 686 (5th Cir. 1968) ........................................................ 9

*Cheney v. U.S. Dist. Court*,
  542 U.S. 367, at 381 ........................................................................ 10

*Doe v. Bolton*,
  410 U.S. 179, 188 (1973) .................................................................. 18

*Greene v. Fair,*
  314 F.2d 200, 202 (5th Cir. 1963) ...................................................... 9

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
  88 F.3d 274, 280 (5th Cir. 1996), *cert. denied sub nom. Moore v.
  Ingebretsen*, 519 U.S. 965 (1996) .................................................... 21

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ............................................................ 10

*Jackson Women's Health Org. v. Dobbs*,
  945 F.3d 265, 268, 271 (5th Cir. 2019) ............................................. 10

*Jackson Women's Health Org. v. Dobbs*,
  951 F.3d 246, 248 (5th Cir. 2020) .................................................... 10

*Jacobson v. Commonwealth of Massachusetts*,
  197 U.S. 11 (1905) ...................................................................... 15, 16

*Kowalski v. Tesmer*,
  543 U.S. 125, 130 (2004) .................................................................. 18

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
  528 U.S. 32, 39–40 (1999) ................................................................ 19

*Lujan v. Def. of Wildlife*,
    504 U.S. 555, 560 .......................................................................... 17

*Nken v. Holder*,
    556 U.S. 418, 425–26, 434 (2009) ..................................................... 9

*Planned Parenthood of Cent. Mo. v. Danforth*,
    428 U.S. 52, 62 (1976) ................................................................... 18

*Planned Parenthood of Se. Penn. v. Casey*,
    505 U.S. 833, 846, 871 (plurality opinion) ...................................... 10

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
    738 F.3d 786, 794 (7th Cir. 2013) ................................................... 19

*Roe v. Wade*,
    410 U.S. 113, 163–65 (1973) .......................................................... 10

*Singleton v. Wulff*,
    428 U.S. 106, 117 (1976) (plurality opinion) ................................... 18

*Van Hollen*, 738 F.3d at 796 ................................................................ 21

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292, 2309–10 (2016) .................................................... 14

**Statutes**

25 Tex. Admin Code § 139.53(b)(4) ...................................................... 20

25 Tex. Admin. Code §§ 139.32(b)(6), 135.24(a)(1)(F) ........................... 4

22 Tex. Admin. Code § 185.17(11) ......................................................... 4

Tex. Occ. Code Ann. §§ 164.051(a)(2), (a)(6); 301.452(b)(3), (b)(10). ........ 4

28 Tex. Admin. Code § 35.1 .................................................................. 20

42 U.S.C. § 1983 ................................................................................ 18

Tex. Gov't Code § 402.028(a) .............................................................. 17

Tex. Gov't Code § 418.012 ....................................................... 3, 17

Tex. Health & Safety Code § 171.012 .......................................... 6

Tex. Health & Safety Code § 171.044 .......................................... 5

Tex. Health & Safety Code § 171.063(a)(2) .................................. 5

Tex. Health & Safety Code § 171.063(e) ...................................... 20

Tex. Occ. Code § 111.005(c) ...................................................... 20

**Regulations**

Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020). ................................................................................ 3

**Other Authorities**

ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak ................................................. 7

ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019 6

Am. Coll. of Surgeons, *COVID-19 Guidelines for Triage of Gynecology Patients* (Mar. 24, 2020), https://www.facs.org/covid-19/cli .............. 7

Am. Med. Ass'n, *AMA Statement on Government Interference in Reproductive Health Care* (Mar. 30, 2020), https://www.ama-assn.org/press-center/ama-statements/ama-statement-government-interference-reproductive-health-care .................................... 7

Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar.

19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html. .......................................................................... 3

Brief for Texas as Amicus Curiae at 4, *June Med. Servs., L.L.C. v. Gee*, 140 S. Ct. 35 (2019) (Nos. 18-1323, 18-1460), 2019 WL 7397758, at \*4 18

CDC, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html ............................................................................... 6

Ctrs. for Disease Control & Prevention ("CDC"), *Healthcare Supply of Personal Protective Equipment* (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html.............................................................................. 4

Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (last updated Mar. 11, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html 4

Gabriela Vidal, *New Models Predict Texas COVID-19 Deaths Could Reach Over 4,000*, CBS Austin (Mar. 30, 2020), https://cbsaustin.com/news/local/new-models-predict-texas-covid-19-deaths-could-reach-over-4000 ......................................................... 20

Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 77–78 (2018)..................................................... 12

Press Release, Governor Abbott Announced Increased PPE Supply, Issues Executive Order to Strengthen Reporting Capabilities (Mar. 24, 2020), https://gov.texas.gov/news/post/governor-abbott-announces-increased-ppe-supply-issues-executive-order-to-strengthen-reporting-capabilities. ......................................... 20

Press Release, Office of the Tex. Gov., Governor Abbott Announces Expanded Health Care Capacities in Texas, Issues Executive Orders to Expand Quarantines and Protect Public Safety (Mar. 29, 2020), https://gov.texas.gov/news/post/governor-abbott-announces-

expanded-health-care-capacities-in-texas-issues-executive-orders-to-expand-quarantines-and-protect-public-safety ................................. 20

Shayna D. Cunningham et al., *Association Between Maternal Comorbidities and Emergency Department Use Among a National Sample of Commercially Insured Pregnant Women*, 24 Acad. Emergency Med. 940 (2017) ......................................................................... 14

**STATUTES**

**OTHER AUTHORITIES**

ix

# INTRODUCTION

No one doubts that the COVID-19 pandemic has created a public health crisis. But Defendants-Petitioners ("State Defendants") are using Texas Governor Greg Abbott's March 22, 2020, Executive Order to exploit that real crisis and achieve their longtime goal of banning abortion, though doing so does not advance the Executive Order's stated goals. The district court reasonably issued a temporary restraining order ("TRO") to prevent State Defendants from applying the Executive Order to abortion while the parties prepare for a preliminary-injunction hearing just days away. State Defendants' request for the extraordinary remedy of a stay of the TRO should be denied.

First, State Defendants cannot show they are likely to prevail on their pending petition for a writ of mandamus because the district court did not commit a clear and indisputable error that is irremediable later in litigation. The district court correctly held that Plaintiffs-Respondents, abortion providers in Texas ("Providers"), have "demonstrated a strong likelihood of success" on their Fourteenth Amendment challenge to the State Defendants' ban on most previability abortion. The district court's exercise of jurisdiction was consistent with decades of precedent and State Defendants' own concessions.

Second, State Defendants have not shown that they will suffer irreparable injury absent a stay. Although Providers share State Defendants' stated goal of

1

conserving hospital capacity and personal protective equipment ("PPE") to fight COVID-19, the Executive Order does not serve these interests when applied to abortion. Instead, as the record demonstrates, the ban will delay or prevent patients' access to in-state abortion care, prompting many Texas residents to travel long distances across state lines and increasing opportunities for disease transmission. Moreover, the ban will actually *increase* the amount of PPE needed to care for pregnant patients, who will require other care and who may also be at heightened risk of severe symptoms from COVID-19 due to their pregnancy.

Finally, the balance of equities and public interest favor preserving Texans' constitutional rights while litigation over State Defendants' farfetched mandamus petition runs its course. Providers have already been forced to turn away hundreds of Texans seeking abortion care, including people seeking only medication abortion, which involves ingestion of pills, and people at risk of reaching a gestational point in pregnancy after which abortion is banned in Texas. The public interest would be disserved by a stay, particularly as it applies to these patients.

## BACKGROUND

### A. The Governor's Executive Order

In March 2020, the United States declared a state of emergency and Texas declared a state of disaster related to the COVID-19 pandemic. *See* App. 34, 218–220; Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13,

2020). Government officials and medical professionals expect a surge of infections that will test the limits of a health care system already facing a shortage of PPE at the national level, particularly N95 masks.[1]

Ostensibly to conserve PPE and hospital beds to combat COVID-19, Texas Governor Greg Abbott issued an executive order on March 22, 2020, barring "all surgeries and procedures that are not immediately medically necessary," effective immediately. App. 33–35. The Executive Order contains a broad exemption for procedures that "would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." App. 35. Although the Executive Order does not define PPE, that term is generally understood to refer to N95 respirators, surgical masks, non-sterile and sterile gloves, and disposable protective eyewear, gowns, and hair and shoe covers.

The Executive Order has the "force and effect of law." Tex. Gov't Code. § 418.012. It remains in effect until 11:59 PM on April 21, 2020, or until Governor

---

[1] Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

Abbott rescinds or modifies it. App. 35. Experts expect the pandemic to last up to eighteen months[2] and the PPE shortage to last three or four months.[3]

The Executive Order carries criminal penalties: a fine of up to $1,000, confinement in jail for up to 180 days, or both. App. 35 (citing Tex. Gov't Code § 418.173). These criminal penalties may in turn trigger administrative enforcement by the Texas Health and Human Services Commission, the Texas Medical Board, and the Texas Board of Nursing, which can pursue disciplinary action against licensees who violate criminal laws.[4]

After the Governor issued the Executive Order, the Texas Medical Board adopted an emergency amendment to 22 Tex. Admin. Code § 187.57, which made violation of the Executive Order subject to discipline by the board. App. 37–38. As one indication that the Executive Order is likely to be extended, the Emergency Rule does not expire until July 20, 2020. App. 38.

### B. Abortion in Texas

There are two main methods of abortion: medication and procedural abortion. App. 129. For medication abortion, the patient ingests two pills: mifepristone and

---

[2] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (last updated Mar. 11, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[3] Ctrs. for Disease Control & Prevention ("CDC"), *Healthcare Supply of Personal Protective Equipment* (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html.

[4] 25 Tex. Admin. Code §§ 139.32(b)(6), 135.24(a)(1)(F); 22 Tex. Admin. Code § 185.17(11); Tex. Occ. Code Ann. §§ 164.051(a)(2), (a)(6); 301.452(b)(3), (b)(10).

misoprostol. App. 129–30. The patient takes the mifepristone in a health center and then, twenty-four to forty-eight hours later, takes the misoprostol at a location of their choosing, most often at home, after which they expel the pregnancy as in a miscarriage. App. 129–30. Although medication abortion is safe and effective through eleven weeks as measured from the first day of the pregnant person's last menstrual period ("LMP"), Texas law restricts this method to the first ten weeks LMP. Tex. Health & Safety Code § 171.063(a)(2).

Though sometimes referred to as "surgical abortion," procedural abortion is not what is commonly understood as "surgery"; it requires no incision, general anesthesia, or sterile field. App. 130–31. For some patients, medication abortion is contraindicated and procedural abortion is safer, such as when the patient has an allergy to the medications. App. 131. Providers provide procedural abortion in both the first and second trimester. At or after twenty-two weeks LMP, Texas law prohibits abortion except in narrow circumstances. *See* Tex. Health & Safety Code § 171.044.

Neither method of abortion requires extensive PPE. In fact, providing the pills for medication abortion does not require any PPE. App. 73, 86, 91, 100, 110, 117, 119, 130, 134, 137, 157. For procedural abortion, Providers use PPE such as gloves, a surgical mask, disposable eyewear, disposable or washable gowns, and hair and shoe covers. App. 73–74, 86, 91–92, 100, 110, 117, 134, 157. Gloves are typically

5

needed for any transvaginal ultrasound or laboratory exam, but are not required for transabdominal ultrasounds. Of all Providers' facilities and physicians, only one physician has used an N95 respirator since the COVID-19 pandemic began. App. 74, 85, 92, 100, 109–110, 117, 135.

Texas abortion restrictions, which are some of the harshest in the country, impose burdens that weigh even more heavily on patients during the current pandemic. For example, Texas law requires most patients to make at least two in-person appointments for an abortion, even though most patients could obtain care just as safely in one visit, and it mandates medically unnecessary ultrasounds. *See* Tex. Health & Safety Code § 171.012. Resulting delays in access to abortion care impose higher financial and emotional costs to the patient. App. 86–87, 96, 104, 133, 158, 161–163. In addition, the American College of Obstetricians & Gynecologists ("ACOG") has warned that "pregnant women should be considered an at-risk population for COVID-19," so delays in abortion care may leave these patients at greater risk during the public health crisis.[5]

During the COVID-19 pandemic, Providers are committed to doing their part to "flatten the curve," protect patients and staff, and minimize the use of PPE. Even

---

[5] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* CDC, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

before the Executive Order, Providers had taken numerous steps to this end, for example, by limiting the number of individuals present for any procedure that would require PPE. App. 74, 84, 95, 110, 117–118, 135–136, 157. Providers also took extensive precautions to reduce the possibility of COVID-19 infection among patients and staff. App. 74–75, 84–85, 92–93, 101, 110–111, 117–118, 135–136, 157.

However, consistent with guidance from expert medical entities, Providers intend to continue offering abortion care during the pandemic if legally permitted to do so. As ACOG and others have acknowledged, "[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[6]

---

[6] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion -access-during-the-covid-19-outbreak. *See also, e.g.*, Am. Coll. of Surgeons, *COVID-19 Guidelines for Triage of Gynecology Patients* (Mar. 24, 2020), https://www.facs.org/covid-19/cli nical-guidance/elective-case/gynecology (listing "[p]regnancy termination (for medical indication or patient request)" as a "surger[y] that if significantly delayed could cause significant harm"); Am. Med. Ass'n, *AMA Statement on Government Interference in Reproductive Health Care* (Mar. 30, 2020), https://www.ama-assn.org/press-center/ama-statements/ama-statement-government-interference-reproductive-health-care (emphasizing that "physicians—not politicians—should be the ones deciding which procedures are urgent-emergent and need to be performed").

### C.     The Enforcement Threat and This Litigation

On March 23, 2020, the Attorney General issued a press release stating that provision of "*any* type of abortion" other than for an immediate medical emergency would violate the Executive Order, and warning that "[t]hose who violate the governor's order will be met with the full force of the law." App. 30–31 (emphasis added). Providers sought clarification from the Attorney General's office as to whether the Executive Order applied to medication abortion as well as procedural abortion (despite the fact that the Executive Order on its face is limited to "procedures"). The office provided no such clarification.

Given the enforcement threat and the risk of serious criminal and administrative penalties, Providers, their physicians, and staff were forced to stop providing *all* abortion care that entails the use of PPE. App. 75, 84, 95, 103, 111, 119, 136, 158. They began cancelling hundreds of appointments the week of March 23, 2020. App. 84, 94, 103, 111, 119, 156.

To protect their patients' access to care, Providers brought this lawsuit and sought a TRO, which the district court granted on March 30, 2020. The court found that Providers had established a likelihood of success on the merits of their claim that the Executive Order violates Providers' patients' Fourteenth Amendment rights "by effectively banning all abortions before viability." App. 267. The district court

set an April 13, 2020, hearing on Providers' pending motion for a preliminary injunction.

## ARGUMENT

Stay pending resolution of a petition for writ of mandamus is an extraordinary remedy. *See Belcher v. Birmingham Tr. Nat'l Bank*, 395 F.2d 685, 686 (5th Cir. 1968). It should be granted only "in exceptional cases," where there "is great likelihood, approaching near certainty, that [the moving party] will prevail when [the] case finally comes to be heard" by the appellate court. *Greene v. Fair,* 314 F.2d 200, 202 (5th Cir. 1963) (per curiam).

This stringent standard is even more difficult to meet in the TRO context. State Defendants must demonstrate: (1) "a strong showing" that they are likely to succeed on their petition for writ of mandamus; (2) that they are likely to suffer irreparable injury absent a stay; (3) that Providers and their patients will not be substantially harmed by a stay; and (4) that granting the stay will serve the public interest. *Nken v. Holder*, 556 U.S. 418, 425–26, 434 (2009) (citations omitted). State Defendants do not come close to clearing that high bar.

## I. State Defendants Will Not Prevail in Their Petition for a Writ of Mandamus

### A. The District Court correctly concluded that Providers are likely to prevail on their substantive due process claim.

The district court concluded—at this most preliminary stage of litigation— that Providers are likely to prevail on their substantive due process claim. App. 267.

This was not "clear and indisputable" error necessitating mandamus. *Cheney v. U.S. Dist. Court*, 542 U.S. 367, at 381 (citation omitted).

**1. The previability abortion ban violates *Roe v. Wade* and its progeny**

The Supreme Court has been clear that no state interest can justify a ban on previability abortion. *See*, *e.g.*, *Roe v. Wade*, 410 U.S. 113, 163–65 (1973); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846, 871 (plurality opinion) (reaffirming *Roe*'s "central principle" that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion"). Likewise, the Fifth Circuit has consistently applied this rule to hold that states may not ban all or nearly all previability abortions. *See Jackson Women's Health Org. v. Dobbs*, 951 F.3d 246, 248 (5th Cir. 2020) ("*Jackson II*") (per curiam) (holding that previability abortion bans are "unconstitutional under Supreme Court precedent without resort to the undue burden balancing test," and striking down ban on abortions after six weeks LMP); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268, 271 (5th Cir. 2019) ("*Jackson I*") (striking down ban on abortions after fifteen weeks LMP because "no state interest can justify a pre-viability abortion ban"). The district court's decision to follow this well-settled precedent here was correct.[7]

---

[7] Nothing in *Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014), compels a different conclusion. *See* Stay Mot. at 9. While there this Court suggested that a hypothetical abortion *regulation* effectively banning abortion statewide would not be *per se* unconstitutional, it noted that *Casey*'s balancing test would apply to such a regulation. *Currier*, 760 F.3d at 458. By contrast, as to the

### 2. The previability abortion ban could not survive application of *Casey*'s undue-burden balancing test

Even if, as State Defendants urge, the undue-burden standard established in *Casey* applied here, the Executive Order's abortion ban remains unconstitutional because its putative benefits do not outweigh its absolute burden on patients' access to abortion. *See Casey*, 505 U.S. at 877; *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016).

The burdens here on abortion access are extreme. The Executive Order operates as an outright ban for those patients whose pregnancies reach the legal gestational limit for an abortion in Texas while the order remains in effect. These patients will be forced to try to cross state lines for abortion care, to carry their pregnancies to term, or—in some cases—to resort to unsafe methods of self-managed abortion. App. 95–96, 104, 111, 138, 162–63. Moreover, even if some patients affected by the order are able to obtain an abortion after the order is lifted (which may be well beyond the order's current expiration date), the "risk of a serious complication" to them from abortion "increases with weeks' gestation," as does "the invasiveness of the required procedure and the need for deeper levels of sedation."

---

previability abortion *ban* here, the district court correctly applied *Roe* and this Court's recent precedent, not *Casey*. *See Jackson I*, 945 F.3d at 271–74 (distinguishing between a regulation and a ban and stating that "if the Act is a ban, the State's interests cannot outweigh the woman's right to choose an abortion and the undue-burden balancing test has no place in this case").

Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 77–78 (2018); *see also* App. 96, 104–105, 111, 138–139.

State Defendants argue these harms are justified because the Executive Order will (1) prevent use of PPE needed by healthcare providers treating COVID-19 patients, (2) reduce hospitalizations, and (3) avoid the spread of the COVID-19 virus. However, these interests are not served by applying the Executive Order to the provision of abortion, so they necessarily cannot outweigh the burdens on patients' constitutional rights.

First, while Providers are mindful of the need for everyone in Texas and around the country to blunt the effects of COVID-19 on our health systems, very little PPE, if any, is actually used to provide abortion. *No* PPE is used to provide the medications involved in medication abortion. App. 73, 86, 91, 100, 110, 117, 119, 130, 134, 137, 157. And most procedural abortions in Texas are single-day procedures, where a patient encounters either one or two clinicians, who each wear, at most, a paper mask (not an N95 respirator), a face shield, protective eyewear, two to three pairs of gloves, shoe covers, and a gown, which may be washable. App. 85, 100, 110, 134.

State Defendants largely ignore these facts, arguing that Providers' use of some PPE in abortion care, however small, justifies the outright ban. But State Defendants assume that a patient unable to obtain an abortion will not otherwise

need medical care. While that may be true for patients with certain other medical conditions who are turned away from care during the pandemic, that is simply not true for pregnant patients.

To the contrary, the Executive Order has *already* led patients to travel to other states to obtain abortion care in a pandemic, which uses as much, if not more, PPE, and exposes patients and third parties to infection risks. App. 258–59 (describing a patient's three-day trip to Colorado last week for abortion care). Where the need to travel delays these patients' abortion access, more PPE will also be used. For an abortion in the middle of the second trimester or later, patients may be forced to undergo a two-day procedure, which would mean two consecutive trips to a health center; twice as much contact with health care providers; and at least twice the amount of PPE used—for a total of three visits. *See, e.g.*, App. 119. Similarly, patients forced by State Defendants to delay their abortion past ten weeks LMP will lose the option of a medication abortion, whose medications can be administered without PPE.

In addition, the record shows that pregnant patients require prenatal care for their own health and the health of their pregnancy. Such care will use equivalent if not more PPE than abortion, as will childbirth. App. 134–35, 137.

Finally, the evidence demonstrates that pregnant patients frequently require unplanned hospital visits, which will require hospital capacity that outpatient

abortion care does not, even if one assumes a major complication rate for abortion equivalent to State Defendants' assertions. App. 135; *see also* Shayna D. Cunningham et al., *Association Between Maternal Comorbidities and Emergency Department Use Among a National Sample of Commercially Insured Pregnant Women*, 24 Acad. Emergency Med. 940 (2017) (reporting that twenty percent of pregnant women in a large study visited the emergency department at least once during pregnancy, and of those, twenty-nine percent visited twice or more). Ultimately, then, pregnant patients will require care from health care providers using PPE, whether they terminate their pregnancies or maintain them. In sum, the Executive Order does not reduce the use of PPE as applied to abortion care.

As to the second interest asserted by State Defendants—preservation of hospital capacity—legal abortion is safe and almost never requires hospitalization. Nearly all abortions in Texas are provided in outpatient facilities, such as Providers' abortion facilities and ambulatory surgical centers, not hospitals.[8] Complications from both medication and procedural abortion are rare, *Whole Woman's Health*, 136 S. Ct. at 2311–12, 2315, and when they occur they can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a follow-up visit.

---

[8] Tex. Health & Human Servs., *Induced Terminations of Pregnancy, 2017 Selected Characteristics of Induced Terminations of Pregnancy (2018)*, https://hhs.texas.gov/about-hhs/records-statistics/data-statistics/itop-statistics.

Although State Defendants argue that abortions will cause *some* hospital admissions—by their estimates, between two and four admissions per week, Stay Mot. at 10, across 407 hospitals in the state, App. 176 n.24—their assertion ignores the obvious fact that patients turned away from abortion care do not stop needing medical care. They remain pregnant, and many will require hospital care on one or more occasions for evaluation prior to labor and childbirth. App. 135; *see supra* p. 13. Thus, on balance, banning abortion is likely to *increase* demand for hospital care, not reduce it.

The Executive Order also fails to serve State Defendants' third asserted interest: reducing the spread of COVID-19. As an initial matter, the plain language of the Executive Order demonstrates that it was not adopted to serve this interest. Nor is it reasonably calculated to do so given that it applies only to "surgeries and procedures," not all other forms of medical care, including non-emergent care, where providers and patients interact in person. Moreover, by broadly prohibiting abortion, the Executive Order could well exacerbate the spread of COVID-19 by forcing patients to attempt to travel to other states to access abortion care, contrary to current recommendations against travel. App. 104, 111, 138, 162–63.

### 3. The previability abortion ban is inconsistent with *Jacobson v. Commonwealth of Massachusetts*

Even if the standard from *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), applies here, as State Defendants argue it should, Providers would

be equally likely to prevail. In *Jacobson*, the Supreme Court upheld a mandatory smallpox vaccination law as a valid exercise of the state's police powers. *Jacobson* nevertheless emphasized that if a State's action "purporting to have been enacted to protect the public health . . . has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." 197 U.S. at 31. The cases cited by State Defendants, *see* Stay Mot. at 7, are in accord.

Under that standard, the ban on abortion imposed by the Executive Order remains unconstitutional. Like *Casey*, *Jacobson* directs courts to assess the fit between the state's asserted ends and its chosen means. For all the reasons discussed above, the abortion ban does not have a "real or substantial relation" to the stated goal of conserving PPE and hospital capacity and preventing the spread of COVID-19. *See Jacobson*, 197 U.S. at 31. Accordingly, application of *Jacobson* does not help State Defendants here, and the district court's refusal to apply it was not indisputable error.

## B. The District Court did not err by exercising its authority to enter a TRO.

State Defendants contend that a series of threshold issues—including Article III standing, third-party standing, and sovereign immunity—should have precluded the district court's entry of a TRO. But courts, including this Court, routinely

exercise their jurisdiction to consider abortion providers' challenges to abortion restrictions under precisely the circumstances of this case. The district court was correct to do so here.

**First,** State Defendants contend that the Governor and Attorney General lack authority to enforce the Executive Order, so the district court did not have jurisdiction to enter a TRO as to them. Stay Mot. at 16–17. That is incorrect. The Executive Order, by its own terms, may be "modified, amended, rescinded, or superseded" by the Governor, App. 35, consistent with the Governor's statutory authority, Tex. Gov't Code § 418.012. Similarly, the Attorney General has the authority to prosecute Providers, at the request of local prosecutors, for alleged violations of the Executive Order. Tex. Gov't Code § 402.028(a); App. 8. State Defendants' argument that such enforcement is unlikely is belied by the Attorney General's press release, which repeatedly targets abortion providers with the threat of criminal penalties.  App. 29–31. Because Providers' injuries are fairly traceable to these Defendants and would be redressed by an injunction against them, Providers have standing to bring their claims against the Governor and Attorney General. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560. Mandamus on this ground would be unwarranted for the separate reason that any asserted error with the district court's opinion can be remedied at the scheduled hearing on a preliminary injunction, which is just days away. And in the meantime, the Governor and Attorney General should

suffer no harm from a TRO barring enforcement of an Executive Order that they assert they cannot enforce anyway.

**Second,** State Defendants seek mandamus on the ground that Providers do not have third-party, or prudential, standing to bring claims on behalf of their patients. More than four decades of controlling precedent say the opposite. *See, e.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 (1976); *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (plurality opinion); *Doe v. Bolton*, 410 U.S. 179, 188 (1973). And, in fact, so does Texas. *See* Brief for Texas as Amicus Curiae at 4, *June Med. Servs., L.L.C. v. Gee*, 140 S. Ct. 35 (2019) (Nos. 18-1323, 18-1460), 2019 WL 7397758, at *4 (acknowledging that this Court "routinely" holds "that abortion providers have third party standing" and "presume[s] that abortion providers are proper parties to raise women's constitutional rights in court"). Where, as here, enforcement of the Executive Order against Providers "would result indirectly in the violation of third parties' rights," Providers clearly have prudential standing. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted).

**Third,** State Defendants contend that Providers cannot bring their claims because 42 U.S.C. § 1983 "does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights." Stay Mot. at 18. They are wrong. While Section 1983 provides that a state actor "shall be liable to the party injured," it says nothing about who may bring the action and, specifically, whether

a plaintiff with third-party standing to represent that injured party may bring a Section 1983 action on her behalf. The Supreme Court has recognized that litigants with third-party standing, including abortion providers, may vindicate others' rights through Section 1983. *See, e.g.*, *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39–40 (1999); *Whole Woman's Health*, 136 S. Ct. at 2301; *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 794 (7th Cir. 2013) (noting "the cases are legion that allow an abortion provider, such as [Plaintiffs], to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state laws that restrict abortion").

## II. State Defendants Have Not Shown That They Would Suffer Irreparable Injury in the Absence of a Stay

State Defendants have not shown that they would suffer irreparable injury absent a stay. As discussed in Part I.A.2., permitting Providers to continue to offer essential abortion care to patients while this Court considers State Defendants' petition for a writ of mandamus would not meaningfully deplete the availability of PPE or hospital capacity. In fact, it would, on balance, help preserve PPE. *See supra*, p. 13.

Moreover, State Defendants could easily avoid many of the asserted harms of which they complain. For instance, they could waive medically unnecessary abortion restrictions, such as mandated in-person visits prior to the abortion, the ten-week gestational age limit for medication abortion, and ultrasound requirements. To

respond to the pandemic, the state has suspended general restrictions on telemedicine, 28 Tex. Admin. Code § 35.1 (emergency regulation adopted Mar. 17, 2020), and could suspend more specific restrictions on using telemedicine to provide medication abortion. *See, e.g.*, Tex. Occ. Code § 111.005(c); Tex. Health & Safety Code § 171.063(e); 25 Tex. Admin Code § 139.53(b)(4). Instead, State Defendants have banned abortion altogether and sought emergency relief from this Court at the expense of Providers' patients.

## III. The Remaining Factors Favor Denial of the Stay

The balance of equities and public interest also weigh heavily toward denying the stay, which would force Providers to continue to turn away patients, causing irreparable injury to women across Texas by infringing their constitutional rights and subjecting pregnant Texans to health risks from delayed abortion, self-abortion, out-of-state travel to access abortion, or inability to obtain an abortion. *See, e.g.*, *Van Hollen*, 738 F.3d at 796. Moreover, the public interest is not served by enforcing an order that is likely unconstitutional. *See, e.g., Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996), *cert. denied sub nom. Moore v. Ingebretsen*, 519 U.S. 965 (1996).

## CONCLUSION

For all the foregoing reasons, this Court should deny State Defendants' motion for a stay. In the alternative, Providers respectfully request that the Court at

least deny the stay as to (1) the provision of medication abortion, which involves the ingestion of pills, and (2) the provision of procedural abortion to patients whose pregnancies will, before the expiration of the stay, reach or exceed twenty-two weeks LMP, the gestational point at which abortion may no longer be provided in Texas.

Dated: April 1, 2020

Respectfully submitted,

/s/ Patrick J. O'Connell
PATRICK J. O'CONNELL
Law Offices of Patrick J.
O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com
*Counsel for Plaintiffs-Respondents*

STEPHANIE TOTI
RUPALI SHARMA
Lawyering Project
25 Broadway, 9th Floor
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
*Counsel for Plaintiffs-Respondents Whole Woman's Health and Whole Woman's Health Alliance*

MOLLY DUANE
Center for Reproductive Rights
199 Water St., 22nd Floor
New York, NY 10038

/s/ Julie A. Murray
JULIE A. MURRAY
RICHARD MUNIZ
HANNAH SWANSON
Planned Parenthood Federation of America, Inc.
1110 Vermont Ave., NW, Ste. 300
Washington, DC 20005
(202) 973-4800
julie.murray@ppfa.org
richard.muniz@ppfa.org
hannah.swanson@ppfa.org

JENNIFER SANDMAN
Planned Parenthood Federation of America, Inc.
123 William St., 9th Floor
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org
*Counsel for Plaintiffs-Respondents Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, and Planned Parenthood South Texas Surgical Center*

(917) 637-3631
mduane@reprorights.org
*Counsel for Plaintiffs-Respondents*
*Southwestern Women's Surgery Center,*
*Brookside Women's Medical Center PA*
*d/b/a Brookside Women's Health*
*Center and Austin Women's Health*
*Center, and Robin Wallace, M.D*

## CERTIFICATE OF SERVICE

     I hereby certify that on April 1, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for the Petitioners-Defendants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Julie Murray*
Julie Murray

# CERTIFICATE OF COMPLIANCE

Pursuant to <u>Fed. R. App. P. 32(g)</u>, I hereby certify that the foregoing complies with the type-volume limitation of <u>Fed. R. App. P. 27(d)(2)(A)</u> because it contains 4,864 words, excluding the items exempted by <u>Fed. R. App. P. 32(f)</u>. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 1, 2020

/s/ *Julie Murray*
Julie Murray
